# In the United States Court of Appeals for the District of Columbia Circuit

---

BRITTANY MONTROIS, Class of More Than 700,000 Similarly
Situated Individuals and Businesses; DAVID L. RUHM, as personal representative
for the Estate of Adam Steele; and JOSEPH HENCHMAN,
*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:14-cv-01523 (The Hon. Royce C. Lamberth)

---

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

---

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676

MEGHAN S.B. OLIVER
CHARLOTTE DOUGHERTY
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000

*\*application for admission forthcoming*

DEEPAK GUPTA
JONATHAN E. TAYLOR
ALISA C. PHILO
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

VARSHINI PARTHASARATHY\*
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

*(Additional counsel on inside cover)*

October 14, 2025                    *Counsel for Plaintiffs-Appellants*

ALLEN BUCKLEY
LAW OFFICE OF ALLEN BUCKLEY
2900 Paces Ferry Road, Suite C-2000
Atlanta, GA 30339
(678) 217-4083

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I. Parties appearing in the district court and this Court

1. Joseph Henchman, Brittany Montrois, Adam Steele, and David Ruhm as Personal Representative of the Estate of Adam Steele, *Plaintiffs-Appellants*.

2. United States of America, *Defendant-Appellee*.

## II. Rulings under review

The rulings under review are (1) U.S. District Court Judge Royce C. Lamberth January 24, 2023 opinion and order granting in part and denying in part motions for partial summary judgment, (2) the court's April 6, 2023 order granting joint motion to amend, (3) the court's September 25, 2023 opinion and order denying motion to clarify, (4) the court's August 9, 2024 opinion and order granting in part and denying in part motion to vacate, and (5) the court's March 24, 2025 entry of final judgment.

## III. Related cases

This case was previously before this Court as No. 17-5204, and the Court's opinion was published as *Montrois v. United States*, 916 F.3d 1056 (D.C. Cir. 2019).

October 14, 2025

Respectfully submitted,

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

# TABLE OF CONTENTS

Table of Authorities ..................................................................... iv

Glossary ................................................................................ viii

Introduction .............................................................................. 1

Statement of Jurisdiction .................................................................. 5

Statement of the Issues .................................................................... 5

Statutes and Regulations .................................................................. 5

Statement of the Case ...................................................................... 6

I.    Regulatory background ............................................................. 6

    A.    2009: After years of failed legislative efforts, the IRS decides to regulate tax-return preparers. ................................... 6

    B.    2010: As part of its new regulatory efforts, the IRS begins requiring return preparers to obtain, and pay for, a PTIN. ........................................................................ 7

    C.    2015: After this Court invalidates the IRS's new regulatory regime in *Loving*, the IRS continues to require and charge a user fee for PTINs—and in fact increases the vendor fee. ....................................................... 9

II.    Factual and procedural background ................................................. 11

    A.    2014: Tax-return preparers file this lawsuit to challenge the lawfulness and amount of the PTIN fee. .............................. 11

    B.    2019: This Court upholds the IRS's authority to charge a PTIN fee but leaves open the question of excessiveness. ........... 11

    C.    2020–23: On remand, the district court gives the IRS multiple chances to identify the lawful portion of the charged fees, but the IRS repeatedly fails to do so. ................... 12

    D.    2023: The district court remands to the IRS "to show its work and set a new fee within the bounds of … the law." ........ 13

E.    2023–24: On remand, the IRS calculates a total refund— but still does not justify the lawful portion of the PTIN fees.............................................................................15

F.    2024: The district court abandons the APA's standard of review, subjects the agency's work on remand to virtually no scrutiny, and holds that it largely passes muster despite its "arbitrary" and unexplained calculations. ........................... 18

G.    2025: After the IRS makes additional refund calculations following the second remand, the district court enters partial final judgment and the parties cross-appeal. ................20

Summary of Argument .............................................................................21

Argument ...................................................................................................24

I.    The APA's general standard of review applies to both the IRS's fee-setting regulations and its attempt to remedy the unlawfulness of those regulations on remand.....................................24

II.    The IRS's fee regulations are concededly unlawful, and its work on remand failed to produce a fee that may lawfully be charged. ......33

III.    This Court should vacate the IRS's unlawful fee regulations and order a full refund because vacatur is the ordinary APA remedy and because another remand to the IRS would serve no purpose. ...........................................................................................41

Conclusion .................................................................................................47

# TABLE OF AUTHORITIES*

**Cases**

*Air Transportation Association of Canada v. FAA*,
    254 F.3d 271 (D.C. Cir. 2001).........................................................38, 44

*Air Transportation Association of Canada v. FAA*,
    276 F.3d 599 (D.C. Cir. 2001) ................................................................39

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................. 42, 43, 44

*American Gas Association v. Federal Energy Regulatory Commission*,
    912 F.2d 1496 (D.C. Cir. 1990).............................................................46

*American Medical Association v. Reno*,
    57 F.3d 1129 (D.C. Cir. 1995) ..............................................................43

*Association of American Railroads v. United States Department of Transportation*,
    821 F.3d 19 (D.C. Cir. 2016)..................................................................35

*AT&T Corp. v. FCC*,
    967 F.3d 840 (D.C. Cir. 2020) ..............................................................35

*Bennett v. Donovan*,
    703 F.3d 582 (D.C. Cir. 2013)................................................................29

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................... 30

*Berge v. United States*,
    949 F. Supp. 2d 36 (D.D.C. 2013).........................................................45

*Bethlehem Steel Corp. v. United States*,
    26 Ct. Int'l Trade 1003 (2002)...............................................................29

*Biden v. Texas*,
    597 U.S. 785 (2022).........................................................................28, 32

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Bowen v. Georgetown University Hospital,*
488 U.S. 204 (1988) ................................................................38

*\*Central & Southern Motor Freight Tariff Association, Inc. v. United States,*
777 F.2d 722 (D.C. Cir. 1985) ..........................4, 23, 25, 36, 37

*Checkosky v. SEC,*
23 F.3d 452 (D.C. Cir. 1994) ...................................................42

*\*City of Port Isabel v. Federal Energy Regulatory Commission,*
111 F.4th 1198 (D.C. Cir. 2024) ...............................29, 41, 46

*Corner Post, Inc. v. Board of Governors of Federal Reserve System,*
603 U.S. 799 (2024) .................................................................42

*Department of Homeland Security v. Regents of the University of California,*
591 U.S. 1 (2020) ..............................................................29, 32

*\*Engine Manufacturers Association v. EPA,*
20 F.3d 1177 (D.C. Cir. 1994) ...................4, 23, 25, 36, 37, 43

*Fogg v. Ashcroft,*
254 F.3d 103 (D.C. Cir. 2001) .................................................44

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ..........................................................30, 31

*Fund for Animals, Inc. v. United States Bureau of Land Management,*
460 F.3d 13 (D.C. Cir. 2006) ...................................................30

*Ipsen Biopharmaceuticals, Inc. v. Azar,*
943 F.3d 953 (D.C. Cir. 2019) .................................................32

*\*Loving v. IRS,*
742 F.3d 1014 (D.C. Cir. 2014) ...........1, 9, 10, 11, 12, 13, 20, 37, 43

*Milk Train v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) .................................................42

*\*Montrois v. United States,*
916 F.3d 1056 (D.C. Cir. 2019) ...............................2, 11, 12, 25, 45

v

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ........................................ 25

*\*Nat'l Cable Television Ass'n v. FCC*,
554 F.2d 1094 (D.C. Cir. 1976) ..................... 3, 4, 5, 8, 21, 23, 26, 34, 36, 37, 39, 40

*\*National Association of Broadcasters v. FCC*,
554 F.2d 1118 (D.C. Cir. 1976) ........................... 26, 34, 44, 46

*\*National Association of Regulatory Utility Commissioners v. United States Department of Energy*,
736 F.3d 517 (D.C. Cir. 2013) ......................... 46

*National Cable Television Association v. United States*,
415 U.S. 336 (1974) ...................................... 3, 24

*New England Power Co. v. United States Nuclear Regulatory Commission*,
683 F.2d 12 (1st Cir. 1982) ......................... 34, 35

*Plunckett v. Castro*,
67 F. Supp. 3d 1 (D.D.C. 2014) ......................... 29

*Resolute Forest Products, Inc. v. U.S. Department of Agriculture*,
187 F. Supp. 3d 100 (D.D.C. 2016) ..................... 29

*Theodore Roosevelt Conservation Partnership v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ......................... 32

*Tozzi v. United States Department of Health & Human Services*,
271 F.3d 301 (D.C. Cir. 2001) ......................... 31

*United States Air Tour Association v. FAA*,
298 F.3d 997 (D.C. Cir. 2002) ......................... 31

*United States Army Corps of Engineers v. Hawkes Co.*,
578 U.S. 590 (2016) ...................................... 30

**Statutes**

5 U.S.C. § 551 ...................................... 30

*5 U.S.C. § 706 ..................................... 25, 27, 41

28 U.S.C. § 1291 ...............................................................5

28 U.S.C. § 1331 ...............................................................5

31 U.S.C. § 330 ................................................................ 9

*31 U.S.C. § 9701 ..............................2, 5, 8, 21, 24, 34, 40

**Rules & Regulations**

17 C.F.R. § 201.102 .........................................................42

75 Fed. Reg. 14,539 (proposed Mar. 26, 2010) ...................7

80 Fed. Reg. 66,792 (Oct. 30, 2015) ............................... 10

Furnishing Identifying Number of Tax Return Preparer,
  75 Fed. Reg. 60,309 (Sept. 30, 2010) .............................7

Preparer Tax Identification Number (PTIN) User Fee Update,
  81 Fed. Reg. 52,766 (Aug. 10, 2016) ........................... 10

Treas. Reg. § 1.6109-2 ......................................................7

Treas. Reg. § 300.13 .........................................................7

Treas. Reg. § 300.13T (2016) ..........................................34

Treas. Reg. § 300.9 (2010) ..............................................34

User Fees Relating to Enrollment and Preparer Tax Identification
  Numbers,
  75 Fed. Reg. 43,110 (proposed July 23, 2010) ...........6, 7, 8

User Fees Relating to Enrollment and Preparer Tax Identification
  Numbers,
  75 Fed. Reg. 60,316 (Sept. 30, 2010) ................... 7, 8, 9, 34

**Other Authorities**

IRS Pub. No. 4832 ......................................................... 6

Office of Management & Budget,
  OMB Circular A-25, User Charges (1993) .......................35

# GLOSSARY

**APA**　　　　　　　Administrative Procedure Act

**IOAA**　　　　　　Independent Offices Appropriations Act

**IRS**　　　　　　Internal Revenue Service

**PTIN**　　　　　　Preparer Tax Identification Number

**RPO**　　　　　　Return Preparer Office

**INTRODUCTION**

Fifteen years ago, the IRS tried to do something that it had long acknowledged that it lacked the authority to do: create and fund a program to regulate people who prepare tax returns for others. After repeatedly failing to secure specific regulatory authority from Congress, the IRS went ahead anyway. It promulgated regulations imposing new eligibility and testing requirements on paid tax-return preparers. As part of this unprecedented regulatory effort, the IRS also mandated that all preparers pay a fee to obtain and annually renew an agency-issued "preparer tax identification number" (or PTIN): an initial $64.25 to obtain the PTIN and $63 per year to keep it. The IRS's stated aim was to have the PTIN application process incorporate the new eligibility criteria, and to use the fees to cover the costs of its new licensing regime.

But this Court struck down the eligibility criteria as a "vast expansion" of the IRS's power, which "cannot be stretched so broadly as to encompass authority to regulate tax-return preparers." *Loving v. IRS*, 742 F.3d 1014, 1015, 1021 (D.C. Cir. 2014). Absent such authority, the IRS could not impose *any* eligibility criteria on preparers, thus reinstating the rule that anyone may prepare tax returns for compensation.

After *Loving*, one vestige of the IRS's regulations remained: the requirement that preparers pay annually for a PTIN. Although *Loving* did not invalidate this requirement, it removed the IRS's primary justification for adopting it. The agency at that point could have reconsidered the wisdom of retaining this requirement and

restored the status quo ante. But it chose differently. Undeterred by *Loving*, the IRS continued to charge the fees intended to fund its failed regulatory scheme.

This case challenges those fees. In a prior appeal, this Court held that the IRS could charge for the service of "providing tax-return preparers a PTIN" to protect the confidentiality of preparers' social security numbers—but *only* for that service. *Montrois v. United States*, 916 F.3d 1056, 1063 (D.C. Cir. 2019) . This Court noted that the fees must be "confined" to the costs of "generating and maintaining a database of PTINs" and could not include the IRS's "now-invalidated regime." *Id.* The Court remanded for "an assessment of whether the amount of the PTIN fee unreasonably exceeds the costs to the IRS to issue and maintain PTINs." *Id.* at 1058.

Back in the district court, the IRS conceded that its fees greatly surpassed the costs of issuing and maintaining PTINs in the relevant period (2010–17), and hence that its fee regulations are unlawful. The IRS was then given a chance to remedy its unlawful regulations following a remand from the district court (and another chance following a second remand). But even after a full year of trying, the IRS was unable to identity the lawful part of the fees in the way that this Court has long required. The sole statute on which the IRS relied, the Independent Offices Appropriations Act (or IOAA), authorizes agencies to charge for providing a "service or thing of value," but not for activities that benefit the public at large. 31 U.S.C. § 9701(b). To ensure that agencies stay within these bounds, the IOAA requires that they list the

"particular costs" making up the fee and "explain" their choices in their rulemaking. *Nat'l Cable Television Ass'n v. FCC (NCTA)*, 554 F.2d 1094, 1104–05 (D.C. Cir. 1976).

The IRS did not do that. It did not identify or explain *any* of the costs in its rulemaking, much less attempt to tease apart how much were attributable to the bare issuance and maintenance of PTINs and how much went beyond that. Further, for some of the fee—the fee that went to a third-party vendor tasked with issuing and maintaining PTINs—the IRS didn't even include the fee in a regulation *at all*, as the IOAA requires. Because the IRS failed to adhere to these requirements in real time, it could not possibly make up for these failures a decade later or unscramble the egg that it had broken. So, the IRS tried to identify a lawful fee by doing what this Court has repeatedly held that agencies may not do: The IRS began with entire categories of expenses—categories with concededly unrecoverable costs—and "reduced [them] by an unexplained percentage." *Id.* Specifically, it took dozens of categories and reduced them by a "neat and arguably arbitrary 33.3%," as the district court put it, "without explaining how [it] arrived at that particular percentage." A268 n.14.

That should have doomed the agency's efforts to produce a lawful fee. Yet the district court disagreed. It refused to apply the ordinary standard of review under the Administrative Procedure Act and instead held that a more deferential standard was appropriate. Under this standard, the court would defer to "the IRS's retrospective estimates," even if "arbitrary" or unexplained, unless the plaintiffs could identify a

"less arbitrary" alternative, or unless there was "a definite reason to doubt the agency's" post-hoc estimates. A263, A268 n.14, A270, A276. The court thought that this new standard was appropriate because the IRS's previous violations of the law made it difficult for the agency to engage in retrospective cost estimates.

This does not make sense. Instead of creating a new, atextual standard that rewards the agency for violating the law, the district court should have applied the APA. Then it should have held that the IRS's actions fail this standard. The agency's methodology for ascertaining the lawful portions of its fees plainly contravenes this Court's precedents. *See NCTA*, 554 F.2d at 1105; *see also Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994); *Cent. & S. Motor Freight Tariff Ass'n v. United States*, 777 F.2d 722, 739 (D.C. Cir. 1985). And the vendor fee is categorically unauthorized.

So the real question for this Court is what to do now—meaning, how should it remedy the IRS's unlawful actions? Faced with a fee that is both unjustified and unjustifiable, this Court should grant the usual remedy for unlawful agency action under the APA. It should vacate the IRS's unlawful fee regulations as well as its actions on remand, and order that the fees in question be refunded in full. The IRS should not be given yet another opportunity to do what it plainly cannot: excavate whatever fragments of its fees were untainted by its unlawful regulatory efforts, or go back in time to add the vendor fee to the regulation when it wasn't there from the start. More than a decade after this case was filed, it is time to move forward.

# STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. It entered partial final judgment under Rule 54(b) on March 24, 2025. A303–308. On March 26, the plaintiffs filed a timely notice of appeal; the government filed a timely notice of cross-appeal on May 22. A309; A312. This Court has jurisdiction under 28 U.S.C. § 1291.[1]

# STATEMENT OF THE ISSUES

**I. Standard of review:** Did the district court err in holding that the IRS, because it had previously violated the law, was entitled to more deference in trying to remedy its unlawful fee regulations than in promulgating them in the first place?

**II. Application:** May an agency calculate the amount of a proper user fee under 31 U.S.C. § 9701(b) by starting with dozens of categories of costs—categories that include costs that the agency concedes may not be recouped through the fee—and then "reduc[ing] [each] by an unexplained percentage"? *NCTA*, 554 F.2d at 1105.

**III. Remedy:** Should this Court grant the usual remedy for unlawful agency action under the APA—vacatur—and order the relevant fees refunded in full, or should the IRS be given yet another opportunity to do what has thus far been unable to do: justify the lawful portion in a way that is consistent with this Court's cases?

# STATUTES AND REGULATIONS

Relevant statutes and regulations are attached as an addendum to this brief.

---

[1] Unless otherwise specified, all internal quotation marks, alterations, and citations are omitted from quotations throughout this brief.

# STATEMENT OF THE CASE

## I. Regulatory background

### A. 2009: After years of failed legislative efforts, the IRS decides to regulate tax-return preparers.

Over the years, as taxes have become more complicated, individual taxpayers have increasingly sought out help in preparing their tax returns. IRS Pub. No. 4832, at 6–7 (2009). As of 2009, as many as 1.2 million tax-return preparers provided this service in exchange for compensation. *See* User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. 43,110, 43,111 (proposed July 23, 2010). These return preparers were not required "to have any minimum education, knowledge, training or skill" to do so. IRS Pub. No. 4832 at 8.

They were, however, required to identify themselves on the returns that they prepared for compensation. *Id.* at 33. They had two options. They could use their own social security numbers. *Id.* Or they could obtain a preparer tax identification number (or PTIN) from the IRS for free. *See* 75 Fed. Reg. at 43,111.

In 2009, the IRS recommended a comprehensive new regulatory system for return preparers that combined mandatory registration with new eligibility criteria. IRS Pub. No. 4832 at 33–36. The IRS had supported nearly a dozen attempts in Congress to give it the authority to impose such regulations. ECF No. 67-1 ¶ 14. All failed. *Id.* With its proposal, the IRS decided that it did not need legislation after all, for it had the power to regulate return preparers all along. IRS Pub. No. 4832 at 33.

**B.    2010: As part of its new regulatory efforts, the IRS begins requiring return preparers to obtain, and pay for, a PTIN.**

A year later, as part of its new regulatory regime, the IRS promulgated a regulation requiring each preparer to acquire and use a PTIN when filing a return. Treas. Reg. § 1.6109-2; *see* Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. 60,309 (Sept. 30, 2010) (final rule); *see also* 75 Fed. Reg. 14,539 (proposed Mar. 26, 2010) (notice of proposed rulemaking). To obtain a PTIN, any preparer who was not a licensed attorney, certified public accountant, or authorized tax practitioner known as an enrolled agent would now have to satisfy the newly instituted eligibility requirements, including competency testing and continuing education. 75 Fed. Reg. at 60,314–15. The IRS also mandated annual renewal of PTINs to "confirm [the] continuing competence and suitability" of each such preparer. *Id.* at 60,310. In this way, the IRS explained, the PTIN would act as a license—a "threshold requirement" that allowed the agency to "enforce the regulation of tax return preparers." User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. 60,316, 60,318–19 (Sept. 30, 2010).

The IRS recognized that "[t]he PTIN application, issuance, and renewal process"—and the new Return Preparer Office (or RPO) that would implement the new regulatory regime—would incur significant costs. 75 Fed. Reg. at 43,111. To pass along these costs, the IRS promulgated a separate regulation requiring each preparer to pay a fee to obtain and renew the now-mandatory PTINs. Treas. Reg. § 300.13;

*see* 75 Fed. Reg. at 60,316 (final rule); 75 Fed. Reg. at 43,110 (notice of proposed rulemaking). The IRS justified this fee under the IOAA, which authorizes agencies to impose fees for providing a "service or thing of value"—but *only* for providing such a service or thing of value. 31 U.S.C. § 9701(b). The IOAA does not allow such fees to exceed the costs incurred by the agency in providing the service. *Id.* And it requires agencies to "show the particular costs which they are assessing against the recipients" and to "explain" its choices. *NCTA*, 554 F.2d at 1104–05.

The IRS, however, provided little explanation for the fee (or its costs) in the rulemaking. It included part of the fee in the final rule—a $50 fee for each application or renewal, which the IRS "calculated to be" the "full cost to the government" to administer the new program. 75 Fed. Reg. at 60,318. But it did not list the specific expenses that made up this fee or otherwise describe how it arrived at this figure.

Nor did the IRS even include the remainder of the PTIN fee—a third-party vendor fee that preparers would also be required to pay each year—in the regulation. The IRS contracted with a company called Accenture to "establish and maintain a system" for PTIN registration and renewal, and to create and operate a call center for questions. A324. When each preparer paid the annual PTIN fee, a part of that fee would go to Accenture to "cover its costs" and profits. A325. But the IRS did not include this part in the regulation. 75 Fed. Reg. at 60,317. As a result, return preparers would have to pay $50 *plus* an undefined vendor fee.

Although the preamble stated that the vendor fee was "currently set at $14.25," it did not mention that there was another vendor fee for annual renewals set at $13. *Id.* at 60,319. Nor did it explain how, if Accenture was doing everything necessary to establish and maintain the PTIN database, the IRS could be performing these same activities for its own fee. The IRS in fact suggested the opposite: that its fee covered the licensing activities—not the bare issuance and maintenance of PTINs. *See id.* ("The respective fees pay for different aspects of administering the PTIN program, each of which is essential to providing PTINs to tax return preparers.").

C. **2015: After this Court invalidates the IRS's new regulatory regime in *Loving*, the IRS continues to require and charge a user fee for PTINs—and in fact increases the vendor fee.**

In early 2014, this Court struck down the IRS's new eligibility criteria as a "vast expansion" of its authority. *Loving*, 742 F.3d at 1021. The Court held that the IRS's asserted authority—a 125-year-old statute governing the "practice of representatives of persons before the … Treasury," 31 U.S.C. § 330(a)(1)—"cannot be stretched so broadly as to encompass authority to regulate tax-return preparers." *Loving*, 742 F.3d at 1015. This decision thus "invalidated many of the RPO activities that the PTIN fees funded," though it did not disturb "the regulations requiring all return preparers to obtain and renew PTINs and to pay a fee for doing so." A106.

After *Loving*, the IRS faced a choice: Should it unwind its failed regime and return to the pre-2010 status quo? Or should it press on, clinging to whatever vestige

of the licensing regime—and fees collected to fund it—that the agency could salvage? The IRS chose the latter. It recognized that "certain activities that would have been required to regulate registered tax return preparers will not be performed." Preparer Tax Identification Number (PTIN) User Fee Update, 80 Fed. Reg. 66,792, 66,793–94 (Oct. 30, 2015) (temporary regulation). But it kept the RPO intact, as it remains to this day. And it continued to require preparers to obtain and renew a PTIN, and to pay a fee to do so. *Id.* In 2015—after this case had been filed—the IRS "re-calculated its cost of providing services under the PTIN application and renewal process" and reduced the PTIN fee "from $50 to $33 per application or renewal" based on its assessment of "the full cost of administering the PTIN program going forward." *Id.*

As before, however, the IRS did not list any of the specific expenses that made up this fee or give any explanation for how it arrived at this number. And as before, the IRS noted the vendor fee in the preamble (which had somehow increased to $17 for both original applications and renewals) but did not include it in the rule. *Id.* at 66,794–95; *see* Preparer Tax Identification Number (PTIN) User Fee Update, 81 Fed. Reg. 52,766 (Aug. 10, 2016) (final regulation). The IRS did not explain why the vendor fee was increasing to maintain a system that was already up and running. Nor did it explain why its own portion of the fee was nearly double the vendor fee when Accenture was maintaining the PTIN system. Nor did the IRS refund the fees that it had already collected to reimburse the activities that *Loving* had invalidated.

## II.    Factual and procedural background

### A.    2014: Tax-return preparers file this lawsuit to challenge the lawfulness and amount of the PTIN fee.

After *Loving*, tax-return preparers sued to challenge the PTIN fees. ECF No. 1; *see* ECF No. 41; A33. They brought two fee-related claims. The first was that the IRS lacked authority to charge a fee at all because doing so "constitutes unlawful agency action under the [APA]," and "preparers receive no specific or special benefit or thing of value in registering for and obtaining a PTIN," as the IOAA requires. ECF No. 41 at 13. The second was that, even if the IRS had authority to charge *some* fees, the PTIN fees "exceed the amount that can be charged" under the IOAA because they include costs attributable to an unlawful licensing scheme. *Id.* at 14.

### B.    2019: This Court upholds the IRS's authority to charge a PTIN fee but leaves open the question of excessiveness.

In 2017, after the case was certified as a nationwide class action, the district court granted the plaintiffs' motion for summary judgment as to the first claim. ECF No. 78. The court found that the IRS lacked statutory authority under the IOAA to charge any PTIN fees. *Id.* It therefore enjoined collection of the fees. ECF No. 82.

Two years later, this Court reversed. In doing so, it reached only the question of the IRS's authority to charge a fee *at all*—not the fees' excessiveness. *Montrois*, 916 F.3d at 1058. The Court held that the IRS had authority under the IOAA to charge a fee for PTINs because it (1) provided a service (even if "slimmed-down" after *Loving*)

to (2) an identifiable group of people, and that service (3) afforded the specific benefit of helping "protect [their] identities by allowing them to list a number on returns other than their social security number." *Id.* at 1063, 1066. Further, reviewing the agency's action under the APA, the Court held that the decision to assess such a fee was not arbitrary and capricious. *Id.* at 1067.

The Court explicitly recognized, however, that the permissibility of the *amount* of the fee raised a different question. *Id.* at 1063, 1066. "To the extent the tax-return preparers believe that the amount of the PTIN fee is out of step with the narrowed scope of remaining PTIN-related functions" after *Loving*, the Court explained, "those concerns pertain to the reasonableness of the fee, not to whether a fee can be assessed in the first place." *Id.* at 1063. The Court left it to the district court on remand to determine "whether the amount of the fee is reasonable and consistent with the [IOAA]" and APA, *id.* at 1068, or "whether the amount of the PTIN fee unreasonably exceeds the costs to the IRS to issue and maintain PTINs." *Id.* at 1058.

**C.    2020–23: On remand, the district court gives the IRS multiple chances to identify the lawful portion of the charged fees, but the IRS repeatedly fails to do so.**

Back in the district court, the parties agreed to conduct discovery on the IRS's basis for the amounts in the 2010 and 2015 fee regulations. ECF Nos. 99, 100. What followed was a series of piecemeal concessions by the agency, with little to no explanation, as it sought to retain as much of the collected fees as possible.

As part of this process, the IRS used the internal cost models that it had developed to calculate the fees every two years. A66. The 2010 cost model underlay the original $50 user fee charged from 2011 to 2013. *Id.* The 2013 cost model calculated a slightly higher user fee of $54.47, but the IRS "kept the PTIN User Fee at $50 for the next two years." A74. The 2015 cost model then served as the basis for the IRS's decision to reduce the user fee to $33 for 2016 and 2017. A76.

Using these models and attempting to exclude cost categories declared unlawful in *Loving*, the IRS conceded that the fees charged from 2011 to 2017 were excessive because they sought to recover costs beyond the bare act of issuing and maintaining PTINs. Over the course of its briefing, the IRS calculated what it determined to be the total amount of the excessiveness, though it did not attempt to justify the amounts it thought to be lawful. *See* A68, A70–72; ECF No. 203 at 5 (2011–13 fees); A74–76 (2014–15 fees); A75–78 (2016–17 fees). By contrast, the IRS did not concede that any part of the vendor fee was unlawful.

### D.  2023: The district court remands to the IRS "to show its work and set a new fee within the bounds of … the law."

The district court determined that even the reduced amounts were excessive. A103–141. In its analysis, the court split its inquiry into two. It held that the "qualitative" question of whether a particular activity was reasonably related to providing the special benefit identified in *Montrois*—"providing return preparers with a means of identification that protects their identity"—was a legal question to which

it owed the IRS no deference. A121, A124. But the court believed that the IRS was entitled to "more than mere deference or weight" on the "quantitative" question of whether the amount charged for such services was "reasonable." A121.

Beginning with the IRS's own fee, the district court determined that the agency continued to charge for services that were impermissible under *Montrois*. As an initial matter, the court rejected the IRS's effort to retroactively rely on the 2013 cost model because it had declined to so at the time. A122–123. For the amounts charged from 2011 to 2015 (using the 2010 cost model) and 2016 to 2017 (using the 2015 cost model), the court held that the IRS's concessions did not go far enough. A122–130. The remaining fees continued to include costs for compliance, suitability, and support activities unrelated to the special benefit identified in *Montrois*. A124–125.

Turning to Accenture's vendor fee, the district court refused to consider the plaintiffs' argument that this fee was unlawful because it was not promulgated by regulation, as the IOAA requires. A130–131. The court believed that this argument had been waived. At the same time, the court rejected the IRS's attempt to shield the full fee from review simply because it was set by contract. A132. As with the user fee, the court held that the IRS could not require preparers to pay for activities unrelated to the issuance, renewal, and maintenance of PTINs. A131–133.

The district court did not vacate the unlawful fee regulations. It instead remanded the matter to the IRS to "show its work and set a new fee within the

bounds of what the law allows." A140. In its accompanying order, the court directed the agency "to determine an appropriate refund for the class" by "subtracting from the fees it actually charged a reasonable estimate of the cost of the activities identified … as being invalid bases for an IOAA fee." A101.[2]

### E.    2023–24: On remand, the IRS calculates a total refund—but still does not justify the lawful portion of the PTIN fees.

A year later, the IRS filed a notice with the court that contained its calculations for the "Court ordered incremental restitution." ECF No. 280 at 5 (citing A173–176). A declaration by the RPO director "provide[d] a breakdown of the costs to be refunded." A178. But it did little more than state that "additional refunds were calculated" and that a previous allocation was "reduced" or "adjusted." *See* A181–184, A186–187. A second declaration attached spreadsheets with additional figures but remained silent on reasoning. *See* A200–205 (for 2011–15), A206–207 (for 2016–17).

*2011–15 IRS fees.* For 2011 to 2013, the IRS identified the percentage of each activity that it had previously conceded could not be included in a lawful PTIN fee and estimated the percentage of an activity that fell beyond the court's order.

---

[2] The district court held that the IRS could lawfully charge for some limited compliance activities, including investigating "ghost preparers"—those who do not list any identification number on returns they prepare—even though the IRS would have incurred these same costs even if preparers could still use their social security numbers. A106, A125, A130, A138. The court also later clarified that the IRS could charge for the costs of providing PTINs to foreign preparers—even though most of them don't *have* social security numbers, and thus do not receive the special benefit identified in *Montrois* (protection from identity theft). A169–170.

A200–205 (columns F and G). The IRS did the same for the 2014–2015 fees, only now using the 2010 cost model. *Id.* (column H).

Some of the IRS's work makes sense without elaboration. The IRS previously determined that it could charge some fees for compliance activities, but it eliminated these fees after the court's order. *See* A200–201 (lines 21–28). The IRS also eliminated fees previously claimed for criminal "background check[s]." A201 (lines 29–36).

Other parts of the IRS's work are not so self-explanatory. For example, the IRS provided no additional refund for customer support and marketing activities. *See* A200 (lines 1–4). Nor did it refund other support activities that included testing, continuing education, and compliance. *See* A203–204 (lines 65–103). And for IT costs, where the IRS had conceded nothing, it now conceded just 0.5%. A204 (line 113).

Finally, and most confoundingly, the agency decided to apply an across-the-board reduction of 33.3% to dozens of cost categories. *See* A200, A203–204 (lines 6–8, 11, 17, 65–66, 78–82, 84–86, 88–92, 94–96). It provided no explanation of how it picked this number—which was central to its calculations—or why it was used at all.

***2016–17 IRS fees.*** For these fees, the IRS identified its original concession and implemented the additional court-ordered refund for entire RPO departments. *See* A206 (columns D and E). The IRS eliminated all fees attributable to the suitability department. *Id.* (lines 10–11). With no explanation, the agency also reduced the office of the director by an additional 42.5%, the strategy and finance department by an

additional 6.1%, the vendor department by an additional 27.7%, and the compliance department by an additional 27.1%. *Id.* (lines 6–7, 9, 12). It provided no additional refund for the remaining departments.

**Vendor fees.** Trying to justify the amount of the vendor fee for the first time, the IRS used the Accenture contracts for 2011–15 and 2016–17. A177–196.

For the 2011–15 contract, the IRS did three things. First, it said that the $1.25 difference between the amount charged for initial versus renewal registrations was "appropriate" even though Accenture charged the same fee for both in subsequent years. A189. Second, the IRS asserted that the call-center costs that made up part of the vendor fee were justified except for $0.09 per fee. A190–191. Third, because the IRS claimed that it lacked access to Accenture's cost data, it devised a novel approach to identify the remaining refund. A191–192. It counted all the sentences in the contract (subtracting duplicates and call-center costs), assigned each one equal weight, and reduced the vendor fee by the percentage of sentences deemed unlawful. *Id.* This sentence-counting approach yielded a refund of $0.88 per fee. *Id.*

For the 2016–17 contract, there was no fee differential between initial and renewal registrations, and the IRS determined that *no* call-center costs were related to non-chargeable activities. As with the earlier contract, the IRS again counted the number of sentences in the contract, deemed a percentage to be unlawful, and decided that $1.94 per fee represented non-chargeable amounts. A195.

**F.    2024: The district court abandons the APA's standard of review, subjects the agency's work on remand to virtually no scrutiny, and holds that it largely passes muster despite its "arbitrary" and unexplained calculations.**

The plaintiffs moved to vacate the unlawful regulations and the IRS's work on remand, arguing that they failed to comply with this Court's precedents, the APA, and the IOAA. A208–243. Despite recognizing "several questionable decisions and apparent mistakes by the agency, which the government neither justified in its declarations nor defended against plaintiffs' challenges," the district court found that, "[i]n the main, the IRS's work on remand passes muster." A245.

The court's conclusion was driven almost entirely by its determination that the APA's general standard of review was "inapplicable because the IRS's refund determination [was] not final agency action." A260. The court did not question that the culmination of the IRS's year-long process to calculate a refund was agency action. But it disagreed that the action was final. A261. Although "[e]stablishing the PTIN fees in the first place was final agency action," the court concluded that the IRS's work on remand was not final because it was a "response to a request issued by the Court so that it could craft an appropriate remedy" for the unlawful fees. *Id.*

Rather than apply the APA's standard of review, the court crafted its own standard—one that no court has ever applied. Under this standard, the court would defer to "the IRS's retrospective estimates," even if "arbitrary" or unexplained, unless the plaintiffs could identify a "less arbitrary" alternative, or unless there was

"a definite reason to doubt the agency's" post-hoc estimates. A263, A268 n.14, A270, A276. The court thought this standard appropriate because of the context in which the IRS found itself as a result of its own failure to include any of the specific expenses underlying the fees in its rulemaking, as the IOAA requires. Because of that violation, the district court reasoned, the IRS "must" be given "[s]ome allowance" to produce estimates "a decade or more after the fact" that are "rougher" and more "arbitrary" than would otherwise be "appropriate." A263, A276. But the court was unclear about what this meant. Although it "did not require the IRS to explain every aspect of its calculation," the court said that "more or less information" may be required "depending on the circumstances" to meet its "flexible" test. A263 & n.12.

Even under this shifting standard, the court still found certain decisions from the IRS beyond the pale. For example, the court found the IRS's refund for 2011 to 2015 support costs to be "too low to be reasonable, at least on its face." A266.

Yet the court blessed other equally opaque choices. Most significantly, the court acknowledged that, for dozens of categories of expenses, the IRS "repeatedly set[] the portion to be refunded at a neat and arguably arbitrary 33.3%," and did so "without explaining how [it] arrived at that particular percentage." A268 n.14. But because the court was not applying APA review, it reasoned that the IRS could "refund one-third of a particular cost category without explaining how [it] arrived at that particular percentage." *Id.* So the court permitted this unexplained percentage.

The court did the same for other categories. For example, of the over $10 million in fees that the IRS recouped in 2016 and 2017 for the compliance department, the agency determined (without explanation) that only 28% was impermissible. *See* A206 (line 12). The court allowed this too. A269–271. Rather than ask whether the agency could justify its post-hoc estimate, the court put the burden on the plaintiffs to "offer[] a compelling" reason to doubt it. A269.

The court took a similar approach to the vendor fee. On one hand, it refused to credit the IRS's claim that "97% of call center costs were for permissible activities" as "unsupported" and "undefended." A274–275. On the other, the court accepted the IRS's similarly unsupported and undefended way of calculating the remaining refund by counting the sentences in the contracts. The court identified several errors that the IRS made in applying this method, but it permitted the method itself because the plaintiffs could not "offer a better option" that was "less arbitrary." A276.

As a remedy, the court again remanded the case to the agency. A278–279.

## G. 2025: After the IRS makes additional refund calculations following the second remand, the district court enters partial final judgment and the parties cross-appeal.

On the second remand, the IRS calculated an additional refund for its fee by increasing the refund percentage to 33.3% for certain support costs. A292–293. It also refunded part of the vendor fee attributable to activities invalidated by *Loving*. A298, A300. But it provided no further refund for call-center costs. *Id.*

At the parties' joint request, the district court then entered final judgment under Rule 54(b) as to the plaintiffs' claim concerning excessive PTIN fees for 2010 to 2017. A303–308. (A separate claim for later fees remains pending.) The plaintiffs made clear that the IRS's work on the second remand remained flawed. A282. But to avoid another remand, the plaintiffs agreed with the IRS that partial final judgment was the most efficient course. *Id.* Both parties then timely appealed.

## SUMMARY OF ARGUMENT

**I.A.** The IOAA authorizes agencies to "prescribe regulations" charging a fee "for a service or thing of value." 31 U.S.C. § 9701(b). But it doesn't authorize them to charge more than the costs of the service, or to use the fees to fund other activities.

IOAA fee regulations are final agency action subject to review under the APA. To survive such review, this Court requires agencies to do three things relevant here: (1) limit any fee to the costs of providing the service for which the fee may be charged, (2) "make a public statement of the specific expenses" used to calculate the fee, along with "an explanation of the criteria used," and (3) set the fee from the ground up, based on what the service costs the agency, rather than by taking broad categories of expenses and deducting an "unexplained percentage." *NCTA*, 554 F.2d at 1104–05.

**B.** The district court correctly subjected the IRS's fee regulations to APA review. But after holding that they failed such review, the court then discarded the APA. Reasoning that the IRS's work on remand wasn't final agency action, the court

held that a more forgiving standard was appropriate, under which the agency would be permitted to do what it could not have done in setting the fees in the first place.

This reasoning is wrong for two reasons. *First*, it does not matter if the IRS's work on remand itself counts as final agency action. The district court was analyzing whether the IRS had remedied the defects in its previous final agency action, so no new final action was needed to maintain APA review. Were the district court right, absurd results would follow: An agency, by first *failing* APA review, would ensure that it could then *evade* APA review, doing something that it couldn't otherwise have done.

*Second*, even if new final agency action were required, it exists here. The IRS's work on remand is "agency action" under the APA's broad definition of that term. It is also "final." It purports to be final, binding the agency. And the district court then gave it additional legal effect by deferring to it. No more is needed. An agency cannot retroactively seek to change a regulation, relying on information outside the administrative record, and then claim that this wasn't taking final agency action.

**II.** The IRS's actions fail the proper standard of review.

**A.** The fee-setting regulations are concededly unlawful. They are substantively unlawful because they charged for illegal regulatory activities, and because they did not include the vendor fee, as the IOAA's text requires. They are also procedurally unlawful because they set fees without listing or explaining *any* specific expenses.

**B.** The IRS's work on remand did not remedy the unlawfulness of these regulations. Its determination of the lawful portion of the fees is based on its decision to assign arbitrary and unexplained percentages to various activities more than a decade after the fact, and to then deduct those percentages from entire categories of costs—including an across-the-board reduction 33.3% to over two dozen categories of expenses. This Court has repeatedly disallowed just such a maneuver. *See NCTA*, 554 F.2d at 1105; *Cent. & S. Motor*, 777 F.2d at 739; *Engine Mfrs.*, 20 F.3d at 1182. Further, the IRS's work on remand did not provide, nor could it possibly have provided, the authority for the vendor fee that did not exist at the time that the fee was charged.

**III.** Because the fee regulations are concededly unlawful (both substantively and procedurally), and because the agency's work on remand is also unlawful, this Court should grant the only remedy that is provided by the APA's text. It should vacate the unlawful agency action. And because that would mean that there would no longer be any authority for the IRS to retain any of the fees collected under those regulations, the Court should order that the fees be refunded in full.

There is no basis for deviating from this general rule here. The IRS has proven itself unable to do what the law requires before an agency may charge a fee under the IOAA. Nor will it be able to do so if only there were a third remand. And that is because of one thing, and one thing only: its own repeated failure to follow the law. It has had more than enough chances; the law does not condone giving it another.

## ARGUMENT

## I. The APA's general standard of review applies to both the IRS's fee-setting regulations and its attempt to remedy the unlawfulness of those regulations on remand.

On the standard of review, the district court started off on the right foot. It correctly subjected the IRS's fee regulations to arbitrary-and-capricious review. But then it stumbled. After declaring the regulations unlawful under this standard, the court inexplicably held that the IRS should receive *more* deference in trying to fix its errors on remand. Rather than apply the standard set forth in the APA, the court devised a new, more watered-down standard that appears in no statute or case.

This was error. The court should have applied the same APA standard that it applied to the agency's initial fee determination. An agency cannot somehow violate its way into a more relaxed standard of review. And regardless, the IRS's work on remand qualifies as final agency action that independently triggers the APA.

**A.** The IOAA authorizes agencies to "prescribe regulations" establishing a fee "for a service or thing of value" that the agency provides. 31 U.S.C. § 9701(b). The Supreme Court has read this statute "narrowly to avoid constitutional problems." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974). Because only Congress may impose taxes, any fee that an agency imposes under the IOAA must be "for a service that confers a specific benefit upon an identifiable beneficiary," not the public at large, and it must be limited to the costs of providing that service. *Engine*

*Mfrs. Ass'n*, 20 F.3d at 1180; *see Montrois*, 916 F.3d at 1062. Fees that exceed those costs are unauthorized. *See Cent. & S. Motor*, 777 F.2d at 729 ("[T]he fee may not exceed the agency's cost of providing the service."). Further, any fee "must be reasonably related to and may not exceed the value of the service to the recipient, whatever the agency's costs may be." *Id.* And "when the specific agency activity in question produces an *independent* public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to that public benefit." *Id.*

Courts police these rules, and thus the separation of powers, under the APA. When an agency promulgates a fee-setting regulation, that constitutes final agency action that triggers the APA's review scheme. *See, e.g., Cent. & S. Motor*, 777 F.2d at 729. The court asks if the agency's fee-setting was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A); *see, e.g., Montrois*, 916 F.3d at 1067; *Cent. & S. Motor*, 777 F.2d at 729; *Engine Mfrs.*, 20 F.3d at 1182. This familiar standard looks to whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" such that a reviewing court can "reasonably … discern[]" the agency's logic when it made its decision. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

To satisfy this standard, this Court has long required agencies to show their math and explain themselves. They must "justify" an IOAA fee "by a clear statement of the particular service or benefit which it is expected to reimburse." *Nat'l Ass'n of*

*Broads. v. FCC*, 554 F.2d 1118, 1133 (D.C. Cir. 1976). And they "must calculate the cost basis for each fee assessed," including "(a) an allocation of the specific expenses which form the cost basis for the fee to the smallest practical unit; (b) exclusion of any expenses incurred to serve an independent public interest; and (c) a public explanation of the specific expenses included in the cost basis for a particular fee, and an explanation of the criteria used to include or exclude particular items." *Id.*; *see NCTA*, 554 F.2d at 1104–05 ("[The agency] must make a public statement of the specific expenses which are included in the cost basis for that fee," including "an explanation of the criteria used."). These procedural requirements serve two purposes: They ensure that the people *paying* the fee "are paying only for the specific expenses … incurred in connection with the service," and they ensure that the courts *reviewing* the fee have a meaningful way of doing so. *NCTA*, 554 F.2d at 1105.

Under this Court's cases, an agency may use approximations in setting a fee if adequately explained, but it may not set a fee using "unexplained percentage[s]." *Id.* An agency goes about "its task backwards" if it takes an entire category of expenses— some of which may be charged under the IOAA, and some of which may not—and then "reduce[s] [it] by an unexplained percentage" to determine the fee amount. *Id.*

**B.** For a while, the district court seemed to understand this. In reviewing the lawfulness of the IRS's fee regulations, the court recognized that it was "reviewing an agency action—the setting of IOAA fees, with an eye to whether those fees were

excessive—under the APA." A139. And the court recognized, further, that it must therefore conduct its review "in accordance with the APA's judicial review provision." A114 (citing 5 U.S.C. § 706(2)(A), (C)). Applying that standard, the court held that the IRS's fee-setting regulations are unlawful because they authorize fees that include a slew of "unallowable [regulatory] activities." A139. Nor did the IRS in its rulemaking ever attempt to identify how much the bare service of "generating PTINs and maintaining a database of PTINs"—the only activity for which a PTIN fee may lawfully be charged under *Montrois*—actually costs. A111.

But then, the court took a wrong turn. After it "remand[ed] to the agency to show its work and set a new fee within the bounds of what the law allows"—a fee that would "determine an appropriate refund for the class"—the court relaxed its guard. A140. It refused to subject the IRS's action on remand to the same standard of review that governed the agency's action initially. Instead, the court reasoned that the IRS should be entitled to a more deferential standard of review than if it had never violated the law in the first place—one that allows for arbitrary decisionmaking and that eliminates the requirement of a reasoned explanation for specific expenses.

The court justified this counterintuitive approach by reasoning that "the IRS's refund determination is not final agency action." A260. And because it was not reviewing final agency action, the court thought itself free to devise its own test, untethered to any statute or caselaw. Under this test, the court would defer to "the

IRS's retrospective estimates," however "arbitrary" or unexplained they may be, unless the plaintiffs could offer a "less arbitrary" alternative, or unless there was "a definite reason to doubt the agency's" post-hoc estimates. A263, A268 n.14, A270, A276. The court believed that this new standard was appropriate because the agency had previously violated the law—not only by charging for its unlawful attempt to regulate return preparers, but also by failing to identity and justify the lawful portion of the fees in its rulemaking. Because of these dual violations, the court reasoned, the agency "must" be given "[s]ome allowance" to produce estimates "a decade or more after the fact" that are "rougher" and more "arbitrary" than would otherwise be "appropriate." A263, A276; *see* A263 ("[T]he IRS's retrospective estimates will not necessarily be treated as if they were contemporaneous agency action.").

This analysis is doubly wrong. *First*, it does not matter whether the agency's work on remand *itself* qualifies as "final agency action." The fee-setting regulations undeniably do, and the district court remanded the case to the IRS to remedy the defects in those regulations, rather than vacate them altogether. Because the court was analyzing whether the agency had cured the defects of the final action already taken, no *new* final action was required to trigger continued review under the APA. That would have been true even if the agency had sought to remedy only the rule's justifications, not the rule itself. *See Biden v. Texas*, 597 U.S. 785, 807 (2022) (explaining that an agency may "elaborate on its initial reasons for taking the action" under

review after remand for insufficient justification). So it is also necessarily true when the agency sought to remedy the rule itself, as the IRS did here. Consistent with this understanding, courts reviewing agency action on remand have regularly applied the same standard of review as the original action that the remand sought to remedy.[3]

And sensibly so: Were it otherwise, an agency that violates the law would be in a better position than one that complies with it. In violating the APA in an initial rulemaking, an agency would then be able to avoid the APA's standard of review on remand, allowing the agency to do then what it could not have done before: produce a rule that defies the ordinary standards. Neither the district court nor the IRS cited any case that endorses such a perverse result. If anything, the cases require a *more* searching inquiry when an agency forgoes new rulemaking on remand—not a *less* searching inquiry. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (explaining that when an agency forgoes new rulemaking, its actions "must be viewed critically" to protect against "impermissible post hoc rationalization"). By inverting this black-letter principle of administrative law, the district court erred.

---

[3] *See City of Port Isabel v. Fed. Energy Regul. Comm'n*, 111 F.4th 1198, 1206 (D.C. Cir. 2024); *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013); *see also*, e.g., *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 102 (D.D.C. 2016); *Plunckett v. Castro*, 67 F. Supp. 3d 1, 7 (D.D.C. 2014); *Bethlehem Steel Corp. v. United States*, 26 Ct. Int'l Trade 1003, 1006 (2002) ("The same standard of review applies to the review of a remand determination as to the review of the original determination.").

*Second*, even if the IRS's work on remand must independently qualify as "final agency action," it does. It plainly constitutes "agency action" under the APA. The statute's "expansive" definition of that term is "meant to cover comprehensively every manner in which an agency may exercise its power." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). The definition includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). Here, even if the agency's work on remand were best conceptualized as determining an appropriate refund rather than setting a new fee, that would still qualify as "agency action" because it would qualify as "relief" (or the "equivalent … thereof"). *See id.* § 551(11) (defining "relief").

So the only question is whether this action is "final." Courts assess finality by taking a "pragmatic approach." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). To be final, the action must (1) "mark the consummation of the agency's decisionmaking process" and (2) be "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (plurality opinion).

Both prongs of finality are easily met here. As to the first: The IRS's refund calculation marked the culmination of its year-long decisionmaking process on

remand. The calculation purported to be final from the agency's perspective, even if the court later ordered additional revisions. That is enough. "[I]f the possibility of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule would ever be final as a matter of law." *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1013 (D.C. Cir. 2002).

As to the second: Legal consequences necessarily flowed from the agency's refund calculation. Whether an agency action has "legal effect … is a function of the agency's intention to bind itself or regulated parties." *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001). The district court concluded (wrongly) that the "calculation d[id] not bind regulated parties," but it did not address whether the calculation bound the agency *itself*. A261. The IRS was bound by its calculation of the refund, which it would have to pay if approved by the court. That is sufficient to make the action final for purposes of APA review.

The IRS's calculation also "directly affect[ed] the parties" in a practical sense. *Franklin*, 505 U.S. at 797. The district court itself recognized as much. It took the view that "[i]t is up to the agency to determine the appropriate refund amount, subject to the Court's approval"—which is why the court gave the agency's action legal effect by deferring to it. A279. True, the court still had to approve the refund, but that doesn't make it non-final. The court isn't the terminus of final agency action—the agency is. The APA provides that final agency action will be subject to judicial

review, so finality isn't defeated by the mere existence of such review. What matters is that the IRS's calculations resulted in a "final determination of its [own] obligation to [pay a refund] once … judicial authorization had been obtained." *Texas*, 597 U.S. at 809 n.7; *see also Ipsen Biopharms., Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019) (noting that agency action may be final even if "not self-executing").

Or to come at the point from a different angle: The agency's work on remand, however it is conceptualized, is final for the same reason that its original rule was final—it determines the amount that may be charged for a PTIN. And that amount was then used to determine a refund, making the action final twice over. If the agency wants to calculate a new fee on remand—that is, if it wants to provide "new reasons" based on new information outside the original administrative record, and to thereby change the substance of its own regulation—there is only one way for the agency to do that: through "new administrative action." *Dep't of Homeland Sec.*, 591 U.S. at 21.[4]

_____

[4] We note that the IRS strayed beyond the original administrative record in formulating its calculations on remand. Thus, to the extent that the district court was correct that the IRS's work on remand is not final agency action, that would mean that the IRS was limited to the justifications asserted—and record produced—in the original rulemaking. It could not expand that record in the absence of "*new* agency action." *Texas*, 597 U.S. at 808; *see Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) ("The APA limits judicial review to the administrative record."). And that, in turn, would make it impossible for the IRS to justify the fees.

## II.  The IRS's fee regulations are concededly unlawful, and its work on remand failed to produce a fee that may lawfully be charged.

Under the proper standard, the IRS's actions do not comply with the law. Its fee regulations are concededly unlawful because they imposed a fee based on illegal regulatory activities and did not spell out the specific expenses that made up the fee in the rulemaking. They also failed to include the vendor fee, as the IOAA requires. And the IRS's work on remand did not remedy the unlawfulness of these regulations. Its determination of the lawful portion of the fees is based on its decision to assign arbitrary and unexplained percentages to various activities more than a decade after the fact. That would not fly for contemporaneous fee-setting, and it does not fly here.

In short, the IRS has never done the bare minimum that is required before any agency may charge any fee under the IOAA. Nor has it ever promulgated a regulation authorizing any vendor fee. That makes the fees unlawful in their entirety.

**A.** The unlawfulness of the IRS's fee regulations is not seriously in dispute. As the IRS conceded below, and the district court held, these regulations are unlawful because they set a fee that sought to reimburse the costs of the IRS's failed regulatory scheme, making the fee excessive under the IOAA. A122–133.[5]

---

[5] Although the district court correctly held that the regulations are unlawful because they imposed fees to reimburse activities that should not have been charged for, the court failed to recognize the full extent of the fees' excessiveness. It held, for instance, that the IRS could charge for certain limited compliance activities, including investigating "ghost preparers," and for the costs of providing PTINs to

But that isn't the only reason why the regulations are unlawful. They violate the law in two additional respects. *First*, they do not include what this Court has required of all IOAA rulemakings for the past 50 years. There is no "allocation of the specific expenses which form the cost basis for the fee to the smallest practical unit." *Nat'l Ass'n of Broads.*, 554 F.2d at 1133. Nor is there any "public explanation of the specific expenses included in the cost basis for [the] fee" or any "explanation of the criteria used to include or exclude particular items." *Id.* The regulations do not "list[] the specific expenses which form the cost basis" *at all*. *NCTA*, 554 F.2d at 1105.

*Second*, even though the IRS requires return preparers to pay a vendor fee as part of their PTIN fee, it did not include the vendor fee in the regulations. Both the 2010 and 2015 rules state this explicitly, as do their preambles. *See* Treas. Reg. § 300.9(b) (2010) (stating that the $50 fee "does not include any fees charged by the vendor"); *id.* § 300.13T(b) (2016) (same); 75 Fed. Reg. at 60,317 ("[T]hese regulations do not include any fees charged by the vendor."). That makes the vendor fee unauthorized by the IOAA, which "expressly requir[es] … that fees be prescribed by regulation." *New England Power Co. v. U.S. Nuclear Regul. Comm'n*, 683 F.2d 12, 16 (1st Cir. 1982); *see* 31 U.S.C. § 9701(b) (authoring agencies to "prescribe regulations

_____

foreign preparers. A106, A125, A130, A138; A169–170. But neither of these costs is attributable to providing the benefit identified in *Montrois* (protection from identity theft). The IRS would have incurred the same "compliance" costs even if preparers could still use their social security numbers, while most foreign preparers don't even have social security numbers to protect. These costs thus should have been excluded.

establishing a charge"); *see also* Off. of Mgmt. & Budget, OMB Circular A-25, User Charges § 7(a) (1993) (recognizing same). The vendor fee for obtaining a PTIN (but not the fee for renewal) was briefly mentioned in a preamble, but that is not "part of the binding regulation." *AT&T Corp. v. FCC*, 967 F.3d 840, 847 (D.C. Cir. 2020) (per curiam). "By expressly requiring in the IOAA that fees be prescribed by regulation, Congress evidenced its concern that such fees be communicated in advance to those who would have to bear them, thus permitting them to take intelligent action to avoid undesired consequences." *New England Power*, 683 F.2d at 16.

The IRS did not do that. Individual citizens cannot be expected to plumb the pages of the Federal Register to know what is required of them. Only the rule itself—not the preamble—has "legal force," so it is only the rule that they can be expected to know. *AT&T*, 967 F.3d at 847. Because the vendor fees were not included in any rule, the IRS lacked authority to require them, rendering them ultra vires.[6]

**B.** The IRS's work on remand did not remedy these violations or otherwise produce a fee that complies with the law. That is true for three separate reasons.

-------

[6] The district court believed that the plaintiffs did not make this argument until their summary-judgment reply, and thus refused to consider it. A371–372. But that is incorrect. The plaintiffs made the argument in opposing the government's partial-summary-judgment motion. ECF No. 185 at 16–20. The argument, moreover, is "purely legal" and was "fully briefed" below, so this Court may consider it. *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 26 (D.C. Cir. 2016). In any event, the plaintiffs later raised the argument in challenging the IRS's work on remand, which (as discussed in the last section) is final agency action. *See* A235–236. They were therefore entitled to make the argument and have it addressed by the court.

*First*, the IRS's attempt to disaggregate the lawful and unlawful portions of the fee is the essence of arbitrary decisionmaking. The most egregious example of this— and the one that goes to the very core of the IRS's attempt to ascertain a lawful fee— is its decision to apply an across-the-board reduction of 33.3% to dozens of categories of expenses with no explanation. *See* A200, A203–204 (lines 6–8, 11, 17, 65–66, 78–82, 84–86, 88–92, 94–96, 107); A292–293. Under this Court's precedents, that is impermissible. An agency may not take categories of expenses and "reduce[] [them] by an unexplained percentage" to determine a permissible fee under the IOAA. *NCTA*, 554 F.2d at 1105; *see also Cent. & S. Motor*, 777 F.2d at 739 (holding that an agency may not assign 70% of a category of expenses to a fee while providing "no evidence" or explanation of how it arrived at that figure; the agency is "obligated to set forth a more thorough and reasoned explanation"); *Engine Mfrs.*, 20 F.3d at 1182 (similarly holding that an agency's unexplained decision to set a fee by assigning 63% of one division's costs and 84% of another's is impermissible, and reiterating that "we really must insist that [the agency] provide some reasonable basis for its conclusions").

The district court did not disagree. It acknowledged that the IRS "repeatedly set[] the portion to be refunded at a neat and arguably arbitrary 33.3%." A268 n.14. And it acknowledged that the agency did so "without explaining how [it] arrived at that particular percentage." *Id.* Yet, because the court had decided to abandon the ordinary standard of review and to fashion its own standard instead, the court

believed that it could ignore this Court's IOAA precedents. In direct contravention of those precedents, and without citing any authority of its own, the district court stated that "it is not automatically unreasonable to decide to refund one-third of a particular cost category without explaining how the agency arrived at that particular percentage." *Id.* But that is *exactly* what this Court has held. *See NCTA*, 554 F.2d at 1105; *see also Cent. & S. Motor*, 777 F.2d at 739; *Engine Mfrs.*, 20 F.3d at 1182. Under the proper standard, then, the IRS's work on remand is clearly impermissible.

Given the centrality of the 33.3% figure to the IRS's calculations, this error alone is enough to doom the agency's efforts to remedy the unlawful fees. But there is more. For example, the IRS determined that it should reduce the costs of four different departments by numbers that it seemingly picked from a hat (to a total reduction of 60%, 60%, 48.8%, and 28%). A206 (lines 6–8, 12). None of these figures are accompanied by any intelligible reasoning. And the last—refunding just 28% of a department called "Compliance"—is particularly suspect in light of *Loving*.

The IRS's treatment of the vendor fee was even worse. Because the IRS lacked access to "Accenture's internal cost allocation data"—and because it never included the fee in any regulation, much less did so with an explanation of the specific costs on which the fee was based—the agency had no hope of complying with the IOAA. It could not retroactively create regulatory authority for the fees when none existed at the time that they were charged. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204,

208–09 (1988) (explaining the general rule against retroactive rulemaking). Nor could the IRS apparently produce the cost information that the IOAA and APA demands. So it concocted a new methodology that bears no resemblance to financial reality and that no agency has ever used in setting fees. Under this methodology, the IRS saw fit to take the number of sentences in its contract with Accenture (minus duplicates and call-center costs), assign each equal weight, and then reduce the vendor fee by the percentage of the sentences that the agency deemed to be unlawful.

That is every bit as arbitrary as it sounds. It treats the costs of complying with one sentence in a contract as equal to the costs of complying with any other sentence. But nobody—not even the IRS—thinks that this is how it really works. If a contract obligates a borrower to repay a $10 million loan in one sentence and to keep their mailing address current in another, the costs of compliance are obviously not the same for these two contractual obligations. The Accenture contract is no different.

Here, again, the district court held otherwise only by inverting the standard of review. Rather than putting the onus on the agency to produce a non-arbitrary fee, the court put this onus on the plaintiffs. *See* A276 (upholding the IRS's methodology because the plaintiffs had not identified an "alternative method" that was "less arbitrary" than the agency's). The APA, however, requires otherwise. *See, e.g., Air Transp. Ass'n of Can. v. FAA*, 254 F.3d 271, 278 (D.C. Cir. 2001), *as revised*, 276 F.3d 599

(D.C. Cir. 2001) (mem.) (requiring "at least record support for the proposition that the [agency] incurs the same costs" given its assumptions).

*Second*, in attempting to disaggregate the lawful and unlawful portions of the fees, the IRS went about "its task backwards." *NCTA*, 554 F.2d at 1105. Instead of setting a fee from the ground up, the IRS calculated a refund from the top down. This matters. Even if these approaches should produce the same number in theory, they often fail to do so in practice—particularly when the agency didn't separate the lawful and unlawful costs in its original rulemaking. In that scenario—this scenario— building the fee from the ground up means that the agency must assume that *none* of the fee is lawful and must then justify any cost that it wants to include in the fee. By contrast, estimating a refund from the top down means that the agency may assume that the *whole fee* is lawful and that it need only exclude the parts that it cannot justify.

The IRS did the latter. In doing so, it adopted the very approach that this Court rejected in *NCTA*. There, the agency "began with its total budget and eliminated whole offices or activities which it found to be 'too far removed' from the direct regulatory function" for which the fee was charged. *Id.* This Court held that the agency should have started from the bottom. It should have "select[ed] certain expenses, which are directly or indirectly related in a significant degree to the particular service which is the alleged justification for assessing the fee, and then add[ed] up such items." *Id.* Adherence to this approach, the Court explained, is

"essential" to "make clear the basis for a fee … under the IOAA" so that those paying the fee—and a court later reviewing the fee—can ensure that it is "only for the specific expenses which are incurred in connection with the [specific] service." *Id.* at 1100, 1105. The same is true for the IRS here: It should have built a lawful fee from the ground up, justifying each category. In failing to do so, it failed to heed the law.

*Third*, arbitrary post-hoc methodologies aside, the vendor fee is independently unlawful for the simple reason that it was not, and has never been, included in any regulation. The only way that a fee may be authorized by the IOAA is if it was promulgated in a regulation. *See* Part II.A, at 34–35. This is clear from the statute's text. It grants agencies the authority to "prescribe regulations establishing" fees—not the authority to impose fees by some other means. 31 U.S.C. § 9701(b). By requiring return preparers to pay a separate PTIN fee beyond the fee set by regulation, the IRS violated this statute. And that defect was not even arguably cured by its actions on remand, nor could it be. It persists today, making the entire vendor fee ultra vires.

The district court below did not reason to the contrary. Instead, it determined that the plaintiffs had waived this argument because (in its view) they did not make the argument until their summary-judgment reply brief. But as already explained (at 35 n.5), that is not correct: The issue was fully briefed below and is purely legal in any event. Then, when the plaintiffs re-raised the issue following the first remand to the

IRS, the court again refused to consider it—this time based on its mistaken belief that the IRS's work on remand was not "final agency action." A260 & n.10. As already explained (at 30–32), that too is incorrect. Accordingly, the issue has been preserved for this Court's review, and the IOAA's plain text resolves it.

## III. This Court should vacate the IRS's unlawful fee regulations and order a full refund because vacatur is the ordinary APA remedy and because another remand to the IRS would serve no purpose.

That leaves one issue: What's the remedy? Ordinarily, when a court finds that an agency transgressed its authority or acted arbitrarily, the court vacates the agency's action. *See City of Port Isabel*, 111 F.4th at 1218 ("Vacatur is the normal remedy when we are faced with unsustainable agency action."). That remedy flows from the APA's text, which provides that a court "shall … hold unlawful and set aside agency action" that is arbitrary or capricious, "not in accordance with law," or "in excess of statutory … authority." 5 U.S.C. § 706(2). The word "shall" is usually mandatory, which means that vacatur should follow as a matter of course. Vacating the unlawful 2010 and 2015 fee regulations would require that all PTIN fees charged from 2010 to 2017 be refunded because there would no longer be any lawful authority for retaining them, and the IRS cannot retroactively provide that authority via a new rulemaking.

This Court should order that remedy here. Although this Circuit has allowed courts to remand without vacatur in certain limited circumstances, this case does not warrant that exceptional treatment. *See Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir.

1994), *superseded by regulation on other grounds*, 17 C.F.R. § 201.102(e); *see also id.* at 462–65 (D.C. Cir. 1994) (Silberman, J.) (describing this practice); *id.* at 491 (Randolph, J.) (criticizing this practice). Whatever the propriety of remanding without vacatur in general—and indeed, whatever its propriety in this case *pre*-remand—the exception no longer applies *post*-remand. As a result, this Court should vacate the 2010 and 2015 rules and order that the PTIN fees charged through 2017 be refunded in full.[7]

To understand why, consider the cases where remand without vacatur may be appropriate. The classic example is an "inadequately supported rule"—that is, a rule that could be lawful if the agency were to explain itself better. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). "The decision whether to vacate" such a rule will turn on two considerations: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed." *Id.* at 150–51. If "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand" and "justify the Rule," and if vacatur would create "disruptive consequences" for the agency going forward,

_____

[7] We reserve the right to challenge the propriety of vacatur without remand before the en banc Court or U.S. Supreme Court. It "has been the subject of some debate" and has never been endorsed by the Supreme Court. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 837 n.6 (2024) (Kavanaugh, J., concurring); *see Checkosky*, 23 F.3d at 491 (Randolph, J.) (explaining that this practice is inconsistent with the APA's plain text); *Milk Train v. Veneman*, 310 F.3d 747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (agreeing with Judge Randolph).

remand without vacatur will be an appropriate course. *Id.* at 151. Consistent with this approach, this Court has declined to vacate a fee regulation that lacked adequate explanation when "the fees collected" under it were unlikely to be "grossly out of line from what they would be if accompanied by the proper explanation," and when the rule had continuing prospective effect such that the agency would suffer "obvious hardship" if it were vacated. *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1135 (D.C. Cir. 1995); *see Engine Mfrs.*, 20 F.3d at 1184 ("We are willing to assume for now that the agency's error was one of form and not of substance, *i.e.*, that it will be able to provide the information necessary to explain its cost allocation decisions. Therefore we [decline to] vacate the … fees without awaiting the result of the agency's efforts on remand.").

But that is not what we have here. The fee regulations are not only unlawful "in form" (because they are inadequately explained), but they are also unlawful in "substance" (because they are excessive under the IOAA). *Id.* And their excessiveness is not trivial, but concededly significant. The fees include the costs of countless regulatory activities that may not be performed under *Loving*. No amount of after-the-fact explicating, then, can make the regulations lawful. Further, they have no ongoing effect because they are no longer used to collect any fees. So vacating them will not disrupt the agency's operations in practice. It will affect only the amount of restitution paid by the United States (presumably, out of the Judgment Fund). If anything, another remand would likely be *more* disruptive to the IRS because it would

force the agency to continue to devote resources to a pointless, counterfactual exercise that has been made impossible by its own repeated violations of the law.

To be sure, this Court has occasionally ordered remands without vacatur even in cases involving substantively excessive fees. *See Nat'l Ass'n of Broads.*, 554 F.2d at 1133; *Allied-Signal*, 988 F.2d at 153. *But see Air Transp. Ass'n of Can.*, 323 F.3d at 1094, 1098 (vacating and remanding fee regulations). The district court followed that path here. But the premise of these cases is that the agency will actually be able to "calculate[] a proper fee" on remand, *Nat'l Ass'n of Broads.*, 554 F.2d at 1133, and that this fee will then be used to "define that aspect of the old rule that must be *cut away* as legally excessive," *Allied-Signal*, 988 F.2d at 153. That premise no longer exists here. Even if the district court rightly held off on vacating the rule to see if the IRS could calculate a proper fee, the IRS's actions on remand confirm that it will not be able to do so. Another remand, in other words, would be entirely futile.

This is most obvious for the vendor fee. Because that fee was not included in the regulation to begin with, the IRS would not be able to cure this defect on remand, and no amount of cutting away the old rule could change that. *Cf. Fogg v. Ashcroft*, 254 F.3d 103, 111–12 (D.C. Cir. 2001) (remand unnecessary when "only one conclusion would be supportable"). Moreover, even if the vendor fee had been authorized by the regulation (or could somehow retroactively become authorized), the fee would still be concededly excessive. So there would still be a need to have some non-

arbitrary way of figuring out the excess. The problem for the IRS is that it never did the required cost analysis, and now it has no access to the cost data. It thus cannot possibly produce a lawful fee. The agency has already shown us its one and only proposal for ascertaining a lawful fee, and it is almost comically arbitrary. Another remand would be "an unnecessary formality because it is virtually inconceivable that [the agency's] decisions would differ in any way the second time from that which occurred the first time." *Berge v. United States*, 949 F. Supp. 2d 36, 42–43 (D.D.C. 2013).

The same goes for the IRS portion of the fees. Although some sliver of this fee is undoubtedly permissible under *Montrois*, the fundamental difficulty is that there is no way to know what it is. And there is no one to blame for that but the IRS. After all, it is the IRS that tried to regulate tax-return preparers, and to charge a fee for that illegal regulation, when it lacked the statutory authority to do so. It is the IRS that then compounded that violation by failing to identify and break down the categories of costs underlying the fees in its rulemaking process, or to otherwise disaggregate the costs attributable to its unlawful regulatory scheme in the rulemaking. And it is the IRS that has sought at every turn to keep as much of the unlawfully collected fees as possible while the litigation dragged on, without ever attempting to do the absolute minimum that is required before any agency may charge any fee under the IOAA.

This Court should say that enough is enough. When another agency similarly failed to "conduct a new fee assessment" on its first remand, this Court refused to send it back for a second. *Nat'l Ass'n of Regul. Util. Commr's v. U.S. Dep't of Energy*, 736 F.3d 517, 518, 521 (D.C. Cir. 2013). "The [agency's] position is so obviously disingenuous," the Court explained, "that we have no confidence that another remand would serve any purpose." *Id.* at 520. Even though the regulation there (unlike the ones here) was still in effect, the Court ordered the agency to "change the fee to zero" because the agency was "apparently unable to conduct a legally adequate fee assessment." *Id.* at 521; *see also City of Port Isabel*, 111 F.4th at 1218–19 (vacating without remanding where there had been a previous remand, and explaining "that this fact can actually support vacatur where, as here, the agency has yet again come up with insufficient support for its action").

Likewise here. The Court should have "no confidence" that the IRS will be able to remedy the defects so many years after its rulemaking. *Nat'l Ass'n of Regul. Util. Commr's*, 736 F.3d at 520. Given how this fee was originally calculated, it is not just "difficult," but impossible, to "unscramble" the "egg." *Am. Gas Ass'n v. Fed. Energy Regul. Comm'n*, 912 F.2d 1496, 1508, 1519 (D.C. Cir. 1990). "The agency has already had several times at bat"—through multiples rounds of rulemaking, and then again on multiple remands—and yet another remand would mean that this 11-year-old "litigation could go on endlessly over specific items." *Nat'l Ass'n of Broads.*, 554 F.2d at

1129 n.28. Rather than invite a doom loop of remands, this Court should stick to first principles and grant the ordinary remedy for unlawful agency action: vacatur.

## CONCLUSION

This Court should reverse the district court's denial of the plaintiffs' motion to vacate and order a full refund of all PTIN fees collected through 2017.

Respectfully submitted,

/s/ Jonathan E. Taylor
JONATHAN E. TAYLOR
DEEPAK GUPTA
ALISA C. PHILO
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com
deepak@guptawessler.com
alisap@guptawessler.com

VARSHINI PARTHASARATHY*
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
varshini@guptawessler.com

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
bnarwold@motleyrice.com

MEGHAN S.B. OLIVER
CHARLOTTE DOUGHERTY
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
*moliver@motleyrice.com*
*cloper@motleyrice.com*

ALLEN BUCKLEY
LAW OFFICE OF ALLEN BUCKLEY
2900 Paces Ferry Road, Suite C-2000
Atlanta, GA 30339
(678) 217-4083
*ab@allenbuckleylaw.com*

*\*application for admission forthcoming*

October 14, 2025                    *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)**

I hereby certify that my word processing program, Microsoft Word, counted 12,946 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Baskerville font.

October 14, 2025

_/s/ Jonathan E. Taylor_
Jonathan E. Taylor

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Jonathan E. Taylor
Jonathan E. Taylor

# Addendum

# TABLE OF CONTENTS

*Furnishing Identifying Number of Tax Return Preparer,*
    75 Fed. Reg. 14,539 (Mar. 26, 2010) (notice of proposed rulemaking) ................ Add1

*User Fees Relating to Enrollment and Preparer Tax Identification Numbers,*
    75 Fed. Reg. 43,110 (July 23, 2010) (notice of proposed rulemaking).................. Add8

*Furnishing Identifying Number of Tax Return Preparer,*
    75 Fed. Reg. 60,309 (Sept. 30, 2010) (final rule) . ...............................................Add13

*User Fees Relating to Enrollment and Preparer Tax Identification Numbers,*
    75 Fed. Reg. 60,316 (Sept. 30 2010) (final rule) . ..................................................Add21

*Preparer Tax Identification Number (PTIN) User Fee Update,*
    80 Fed. Reg. 66,792 (Oct. 30, 2015) (temporary regulation) ............................ Add27

*Preparer Tax Identification Number (PTIN) User Fee Update,*
    81 Fed. Reg. 52,766 (Aug. 10, 2016) (final rule) . ..................................................Add31



**Register** on November 17, 2009 [74 FR 59108].

**DATES:** Interested persons desiring to participate in this hearing must provide written notice of desired participation as set out below, on or before April 26, 2010.

The hearing will commence on May 4, 2010 at 10 a.m. at 600 Army Navy Drive, Arlington, VA 22202.

**ADDRESSES:** To ensure proper handling of notification, please reference "Docket No. DEA–333" on all correspondence. Written notification sent via regular or express mail should be sent to Hearing Clerk, Office of the Administrative Law Judge, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152.

**FOR FURTHER INFORMATION CONTACT:** Hearing Clerk, Office of the Administrative Law Judge, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152, Telephone (202) 307–8188.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 17, 2009, the Drug Enforcement Administration (DEA) published a Notice of Proposed Rulemaking (NPRM) in the **Federal Register** (74 FR 59108) to place the substance carisoprodol into schedule IV of the Controlled Substances Act (CSA) (21 U.S.C. 801, *et seq.*). The NPRM stated that, if this scheduling action were finalized, carisoprodol would be subject to the regulatory controls and criminal sanctions of schedule IV, as applicable to the manufacture, distribution, dispensing, importation, and exportation of carisoprodol and products containing carisoprodol.

The NPRM invited interested parties to submit comments, objections, and requests for hearing on or before December 17, 2009. The DEA received 18 comments in response to the NPRM. Seventeen commenters strongly supported the control of carisoprodol. These commenters included health care providers, an organization representing pharmaceutical manufacturers and distributors, State regulatory agencies and State Departments of Health officials, law enforcement entities and one pain management association.

According to these commenters, carisoprodol products are being diverted, abused, misused, and sold on the street and from Internet sites without legitimate prescriptions. Commenters indicated carisoprodol is being abused with other controlled drugs such as opioids. There are incidences of pain patients addicted to carisoprodol.

While 17 comments were supportive of control, one commenter requested a hearing on the issue. This commenter stated that it believes "that the NPRM and the associated documentation do not provide substantial evidence to support the proposed scheduling of carisoprodol." Additionally, the petitioner stated that "the proposal gives inadequate weight to the negative impact on patient care of scheduling carisoprodol." In requesting a hearing, the commenter stated its intention to present factual information concerning the relative potential for abuse of carisoprodol, and expert opinion concerning the significance and reliability of data cited in the NPRM and associated materials.

All comments received in response to the NPRM are part of the administrative record and will be considered by DEA in determining whether to finalize the rule placing carisoprodol into schedule IV.

### Hearing Notification

In response to this request, DEA is convening a hearing on the NPRM. Accordingly, notice is hereby given that a hearing in connection with this proposed scheduling action will commence on May 4, 2010, at 10 a.m. at the Drug Enforcement Administration, 600 Army Navy Drive, Arlington, VA 22202 and will continue until all interested persons, as that term is defined in 21 CFR 1300.01(b)(19), desiring to participate, who have given notice of such desire as prescribed below, have been heard. The hearing will be conducted pursuant to the provisions of 5 U.S.C. 556 and 557, and 21 CFR 1308.41–1308.45, and 1316.41– 1316.68.

Every interested person desiring to participate in the hearing shall file a written notice of intention to participate, in duplicate, with the Hearing Clerk, Office of the Administrative Law Judge, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152, on or before April 26, 2010. Each notice of intention to participate must be in the form prescribed in 21 CFR 1316.48. The commenter who requested the hearing is hereby directed to file with the Administrative Law Judge a notice of its continued intention to participate in the hearing and to state with particularity its interest in the proceeding.

Dated: March 21, 2010.

**Michele M. Leonhart,**

*Deputy Administrator.*

[FR Doc. 2010–6763 Filed 3–25–10; 8:45 am]

**BILLING CODE 4410–09–P**

# DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 1**

**[REG–134235–08]**

**RIN 1545–BI28**

## Furnishing Identifying Number of Tax Return Preparer

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This document contains proposed regulations under section 6109 of the Internal Revenue Code (Code) that provide guidance to tax return preparers on furnishing an identifying number on tax returns and claims for refund of tax that they prepare. These proposed regulations provide guidance on the identifying number of a tax return preparer for tax returns and claims for refund filed before and after the proposed effective date. The proposed regulations describe how the IRS will define the identifying number of tax return preparers. Additional provisions of the proposed regulations provide that tax return preparers must apply for and regularly renew their preparer identifying number as the IRS may prescribe in forms, instructions, or other guidance. This document also invites comments from the public regarding these proposed regulations.

**DATES:** Written or electronic comments and requests for a public hearing must be received by April 26, 2010.

**ADDRESSES:** Send submissions to: CC:PA:LPD:PR (REG–134235–08), Room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand-delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to CC:PA:LPD:PR (REG–134235– 08), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC 20224, or sent electronically via the Federal eRulemaking Portal at *http:// www.regulations.gov* (IRS–REG– 134235–08).

**FOR FURTHER INFORMATION CONTACT:** Concerning the proposed regulations, Stuart Murray at (202) 622–4940 (not a toll-free number); concerning submissions of comments and requests for a hearing, Richard Hurst at *richard.a.hurst@irscounsel.treas.gov.*

**SUPPLEMENTARY INFORMATION:**

**Paperwork Reduction Act**

The collection of information contained in this notice of proposed rulemaking has been submitted to the Office of Management and Budget for review in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)). Comments on the collection of information should be sent to the Office of Management and Budget, Attn: Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, DC 20503, with copies to the Internal Revenue Service, Attn: IRS Reports Clearance Officer, SE:W:CAR:MP:T:T:SP, Washington, DC 20224. Comments on the collection of information should be received by April 26, 2010.

Comments are specifically requested concerning:

Whether the proposed collection of information is necessary for the proper performance of the functions of the IRS, including whether the information will have practical utility;

The accuracy of the estimated burden associated with the proposed collection of information (see below);

How the quality, utility, and clarity of the information to be collected may be enhanced;

How the burden of complying with the proposed collections of information may be minimized, including through the application of automated collection techniques or other forms of information technology; and

Estimates of capital or start-up costs of operation, maintenance, and purchase of service to provide information.

The collection of information in these proposed regulations is in § 1.6109–2(d) and (e). This information is required in order for the IRS to issue identifying numbers to tax return preparers who are eligible to receive them. Tax return preparers will need to apply for an identifying number as prescribed in forms, instructions, or other guidance. The use of a prescribed identifying number by tax return preparers on tax returns and claims for refund of tax will enable the IRS to accurately identify tax return preparers, to match tax return preparers to tax returns and claims for refund that they prepare, and to generally administer the internal revenue laws. The collection of information is mandatory. The likely respondents are tax return preparers and employers of tax return preparers.

*Estimated total annual reporting burden:* 300,000 hours.

*Estimated average annual burden hours (or fraction of an hour) per respondent:* varies from 10 to 20 minutes, with an estimated average of 15 minutes.

*Estimated number of respondents:* 1.2 million.

*Estimated annual frequency of responses:* once every three years.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number assigned by the Office of Management and Budget.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

**Background**

This document contains proposed amendments to regulations under section 6109 of the Code relating to furnishing a tax return preparer's identifying number on tax returns and claims for refund of tax. Section 6109 was added to the Code in 1961 (Pub. L. 87–397, 75 Stat. 828) and authorizes the Secretary to prescribe regulations for the inclusion of identifying numbers on a return, statement, or other document required to be filed with the IRS. In addition, section 6109(c) authorizes the Secretary "to require such information as may be necessary to assign an identifying number to any person." Section 6109(a)(4) as originally enacted by section 1203(d) of the Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1520) required return preparers to furnish on income tax returns and claims for refund of income tax an identifying number, as prescribed, to identify the preparer, the preparer's employer, or both. Section 8246(a)(2)(D)(i) of the Small Business and Work Opportunity Tax Act of 2007 (Pub. L. 110–28, 121 Stat. 112), amended section 6109(a)(4) to allow the IRS to prescribe that tax return preparers furnish identifying numbers on any tax returns or claims for refund they prepare. As currently prescribed in regulations, the identifying number of a tax return preparer who is an individual is the preparer's Social Security number (SSN) or alternative number as prescribed by the IRS. The proposed regulations provide that the identifying number of a tax return preparer is exclusively the number prescribed by the IRS. The proposed regulations will implement some of the recommendations made in Publication 4832, *Return Preparer Review* (Rev. 12–2009), published at the end of last year (the Report). The IRS and the Treasury Department believe that the implementation of the Report's recommendations, including the recommendations implemented by these regulations, will increase tax compliance and allow taxpayers to be confident that the tax return preparers to whom they turn for assistance are knowledgeable, skilled, and ethical.

*1. Identifying Numbers Generally*

Because an identifying number is unique to the person to whom assigned, the IRS is able to use the number to correctly identify the taxpayer or the tax return preparer. The use of identifying numbers allows the IRS to accurately and timely process returns and issue refunds, centralize information, post information to the correct taxpayer's account, and effectively administer the rules relating to tax return preparers.

*2. Requiring Identifying Numbers From Tax Return Preparers*

Tax return preparers generally must provide an identifying number on the tax returns they prepare and sign. Specifically, under § 1.6695–1(b), a signing tax return preparer, as defined under § 301.7701–15(b)(1), must sign a return of tax or claim for refund after it is completed and before it is presented to the taxpayer for signature. A signing tax return preparer under § 301.7701–15(b)(1) is a tax return preparer who has primary responsibility for the overall substantive accuracy of the preparation of a return of tax or claim for refund.

Under § 1.6109–2(a)(1), a tax return preparer who must sign a tax return or tax refund claim must also include an identifying number with the preparer's signature. A return of tax includes an information return described in § 301.7701–15(b)(4). If a signing tax return preparer has an employment arrangement or association with another person, then that other person's employer identification number (EIN) must also be included on the tax return or refund claim.

The identifying number of a signing tax return preparer, and the identifying number of any person with whom the preparer has an employment arrangement or association, must be included on electronically filed tax returns, as well as paper returns. Further, because of recent statutory changes, tax return preparers who prepare and file individual income tax returns (Form Series 1040) for their clients will soon be required to electronically file the returns, unless the tax return preparer reasonably expects to file only 10 or fewer individual

income tax returns for the calendar year. *See* Section 17 of the Worker, Homeownership, and Business Assistance Act of 2009, Public Law 111– 92, 123 Stat. 2984, 2997 (adding Code section 6011(e)(3)).

Tax return preparers who are required but fail to include their identifying number on a tax return or refund claim, or fail to include the identifying number of any person with whom they have an employment arrangement or association, are subject to a penalty under section 6695(c). A tax return preparer is not liable for the penalty if the failure to include an identifying number is due to reasonable cause and not due to willful neglect.

### 3. Preparer Tax Identification Numbers

Section 6109(a) initially provided that the identifying number of a tax return preparer was the individual's SSN. Section 3710(a) of the IRS Restructuring and Reform Act of 1998 (Pub. L. 105– 206, 112 Stat. 685) (RRA '98), allowed the IRS to prescribe an identifying number for tax return preparers other than the preparer's SSN. In response to section 3710(a) of RRA '98, the IRS developed and began to issue preparer tax identification numbers (PTINs). Tax return preparers currently may apply online for a PTIN using the e-services PTIN process on the IRS Web site at *http://www.irs.gov* or by filing Form W– 7P, "Application for Preparer Tax Identification Number." Applying online is faster, and return preparers are encouraged to apply online. In the future, the IRS will prescribe the method to apply for a PTIN consistent with these proposed regulations. Currently, under § 1.6109–2(a)(2), a tax return preparer may use as an identifying number on a tax return or claim for refund either the preparer's SSN or an "alternative number" prescribed by the IRS, including a PTIN. But an EIN, an Electronic Filing Identification Number (EFIN) (which is an identification number assigned to IRS e-file providers), or an Electronic Transmitter Identification Number (ETIN) (which is an identification number assigned to IRS e-file providers who electronically transmit tax returns to the IRS) is not a valid preparer identifying number.

### 4. Regulation of Tax Return Preparers

In June 2009, the IRS initiated a comprehensive review of tax return preparers, and in December 2009 the IRS published the Report describing its findings from that review. The Report recommended, in part, that tax return preparers be required to obtain and use a PTIN as the exclusive preparer identifying number and undergo a tax- compliance check. As discussed below, the proposed regulations implement those recommendations.

Under current law, any individual may prepare a tax return or claim for refund. The Report recommended that the IRS establish new eligibility standards that an individual must meet in order to prepare tax returns— including testing, continuing education, and tax compliance checks. The Report contemplates that only attorneys, certified public accountants, enrolled agents, as well as tax return preparers who pass a minimum competency exam and meet other requirements (referred to as "registered tax return preparers") will be eligible to prepare and sign tax returns and claims for refund. These proposed regulations do not establish the requirements to become a registered tax return preparer, which primarily will be set forth in future guidance under Treasury Department Circular No. 230, 31 CFR part 10. After a transition period, however, it is intended that only individuals who satisfy the eligibility standards may obtain and use a PTIN as a tax return preparer.

**Explanation of Provisions**

### 1. Requiring the Use of PTINs

The proposed regulations provide that for tax returns or refund claims filed after December 31, 2010, the identifying number that a tax return preparer must include with the preparer's signature on tax returns and refund claims is that prescribed by the IRS in forms, instructions, or other guidance. Tax return preparers will not be able to use an SSN as a preparer identifying number unless specifically prescribed by the IRS in forms, instructions, or other guidance. Instead, to the extent provided in forms and instructions, a tax return preparer will be required to use a PTIN as the identifying number unless the IRS prescribes in the future a replacement to the PTIN. Forms and instructions will be revised accordingly. The use of PTINs as the identifying number for tax return preparers will improve tax administration and tax compliance, benefit taxpayers and tax return preparers, and help maintain the confidentiality of SSNs.

For tax returns or claims for refund filed before January 1, 2011, the identifying number of a tax return preparer will remain the preparer's SSN or PTIN. In the case of tax returns for taxable periods ending before January 1, 2011, and made on the appropriate forms prescribed for the taxable periods, but which are filed on or after January 1, 2011, tax return preparers must furnish on the returns the identifying number prescribed on the forms to be filed and in associated instructions.

For tax return preparation businesses and other persons having an employment arrangement or association with a tax return preparer, the business's or employer's EIN continues to be the identifying number that must be included on tax returns and refund claims along with the tax return preparer's signature and preparer identifying number. An individual tax return preparer, however, may not use an EIN as a preparer identifying number on a return, even if the preparer has an EIN (for example, as a sole proprietor). Tax return preparers who use their SSN, or an EIN, EFIN, or ETIN, instead of a valid PTIN, on tax returns or claims for refund filed after the effective date may be subject to the penalty under section 6695(c) unless the failure to include a valid PTIN is due to reasonable cause and not due to willful neglect.

### 2. Eligibility To Receive a PTIN

The proposed regulations provide that all tax return preparers must apply for a PTIN or other prescribed identifying number at the time and in the manner as may be prescribed by the IRS in forms, instructions, or other appropriate guidance. The proposed regulations also authorize the IRS to prescribe a user fee in connection with applying for, and renewing, a PTIN (or successor number similar to a PTIN). Except as provided in any transitional period, beginning after December 31, 2010, to obtain a PTIN, an individual must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer under future guidance to be provided in Circular 230.

Only for purposes of applying for and renewing a PTIN or other prescribed preparer identifying number, the term *tax return preparer* means any individual who is compensated for preparing, or assisting in the preparation of, all or substantially all, of a tax return or claim for refund of tax. A tax return preparer does not include an individual who is not otherwise a tax return preparer as that term is defined in § 301.7701–15(b)(2), or who is an individual described in § 301.7701– 15(f). The proposed regulations provide several examples illustrating who is a tax return preparer required to apply for a PTIN.

As part of the process of applying for a PTIN, a tax return preparer may be subject to both an initial tax-compliance check and subsequent periodic checks, which could include a review of a preparer's history of compliance with personal and business tax filing and

payment obligations. The tax-compliance check is intended to establish whether a tax return preparer has timely filed required personal and business tax returns and has paid taxes that are due or made other acceptable arrangements with the IRS, such as an approved installment agreement under section 6159. If a tax return preparer disregards any applicable requirements to obtain a prescribed identifying number and thereafter omits, when required to include, a valid identifying number on a tax return or claim for refund filed after the effective date, the preparer may be liable for the section 6695(c) penalty, unless the failure to include a valid identifying number was due to reasonable cause and not due to willful neglect.

The information a tax return preparer provides when the preparer initially applies for a PTIN or other prescribed identifying number will often become outdated or otherwise inaccurate. The IRS may require tax return preparers to regularly renew their identifying numbers and otherwise maintain updated information with the IRS. If a tax return preparer who is required to include an identifying number on a tax return or claim for refund filed after the effective date uses an expired identifying number, the tax return preparer may be liable for the section 6695(c) penalty, unless the use of the expired number was due to reasonable cause and not due to willful neglect.

The proposed regulations provide that if necessary for effective tax administration, the IRS may prescribe exceptions to any of the requirements, such as for an interim period while procedures are being implemented. For example, the IRS and the Treasury Department recognize that the procedures for becoming a registered tax return preparer may not be fully implemented when these regulations become effective. It is anticipated that transitional interim guidance will be provided to allow individuals who intend to become registered tax return preparers to obtain an interim PTIN or other interim identifying number that may be used as a preparer identifying number on tax returns and refund claims until the procedures are fully implemented. After the interim period, however, to obtain a PTIN, an individual will need to be an attorney, certified public accountant, enrolled agent, or registered tax return preparer authorized to practice before the IRS under Circular 230.

## Proposed Effective/Applicability Date

These regulations are effective after the date that final regulations are published in the **Federal Register**.

## Special Analyses

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations.

It has been determined that an initial regulatory flexibility analysis under 5 U.S.C. 603 is required for this notice of proposed rulemaking. The analysis is set forth below under the heading, "Initial Regulatory Flexibility Analysis."

Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

### Initial Regulatory Flexibility Analysis

When an agency issues a rulemaking proposal, the Regulatory Flexibility Act (5 U.S.C. chapter 6) requires the agency to "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. 603(a). Section 605 of the Act provides an exception to this requirement if the agency certifies that the proposed rulemaking will not have a significant economic impact on a substantial number of small entities. A small entity is defined as a small business, small nonprofit organization, or small governmental jurisdiction. 5 U.S.C. 601(3)–(6). The IRS and the Treasury Department conclude that the proposed regulations, if promulgated (together with other contemplated guidance provided for in these regulations), will impact a substantial number of small entities and the economic impact will be significant. As a result, an initial regulatory flexibility analysis is required.

### Description of the reasons why the agency action is being considered.

Taxpayers' reliance on paid tax return preparers has grown steadily in recent decades. Today, paid tax return preparers assist a majority of U.S. taxpayers in meeting their income tax filing obligations. Beyond preparing tax returns, tax return preparers also help educate taxpayers about the tax laws, and facilitate electronic filing. Tax return preparers provide advice to taxpayers, identify items or issues for which the law or guidance is unclear, and inform taxpayers of the benefits and risks of positions taken on a tax return, and the tax treatment or reporting of items and transactions. Competent tax return preparers who are well educated in the rules and subject matter of their field can prevent costly errors, potentially saving a taxpayer from unwanted problems later on and relieving the IRS from expending valuable examination and collection resources.

Given the important role that tax return preparers play in Federal tax administration, the IRS has a significant interest in being able to accurately identify tax return preparers and monitor their tax return preparation activities. The proposed regulations are intended to advance tax administration by requiring all individuals who are paid to prepare all or substantially all of a tax return or claim for refund of tax to obtain a preparer identifying number prescribed by the IRS. Pursuant to the proposed regulations, the IRS will require individuals who sign tax returns or claims for refund to report the preparer's identifying number on a tax return or claim for refund when the return or refund claim is signed. The proposed regulations also provide that the IRS may require tax return preparers to apply for, and regularly renew, their identifying numbers. Under the proposed regulations, the IRS may prescribe a user fee payable when applying for a number and for renewal.

Further, the IRS and the Treasury Department conclude that taxpayers, tax return preparers, and overall tax administration will be best served through increased oversight of the tax return preparer industry. Mandating a single prescribed identifying number for all tax return preparers and assigning a prescribed number to registered tax return preparers is critical to effective oversight.

*Statement of the objectives of, and the legal basis for, the proposed rule.*

The principal objective of the proposed regulations is to enable the IRS to more accurately identify tax return preparers and the tax returns and refund claims associated with each tax return preparer. The proposed regulations do this by providing that the IRS may prescribe the use of identifying numbers for tax return preparers and the qualifications or other requirements necessary to obtain a valid number. The legal basis for these provisions is section 6109 of the Code, which authorizes the Secretary to prescribe the "identifying number for securing proper identification of" a tax return preparer and "to require such information as may

be necessary to assign an identifying number to any person."

*Description and estimate (where feasible) of the number of small entities subject to the proposed rule.*

The proposed regulations apply to individuals who prepare tax returns and claims for refund of tax. The estimated number of paid tax return preparers is as high as 1.2 million, which means the proposed regulations are likely to impact a large number of individuals. Most paid tax return preparers are employed by firms. A substantial number of paid tax return preparers are employed at small tax return preparation firms or are self-employed tax return preparers. Any economic impact of these regulations on small entities generally will be on self-employed tax return preparers who prepare and sign tax returns or on small businesses that employ one or more individuals who sign tax returns.

The appropriate NAICS codes for tax return preparers are those for tax return preparation services (NAICS code 541213) and other accounting services (NAICS code 541219). Entities identified under either of these two codes are considered small under the Small Business Administration's size standards (13 CFR 121.201), if their annual revenue is less than $7 million or $8.5 million, respectively. The IRS estimates that approximately 70 to 80 percent of the individuals subject to these proposed regulations are tax return preparers operating as or employed by small entities.

*Description of the projected reporting, recordkeeping, and related requirements of the proposed rule, including an estimate of the classes of small entities that will be subject to the requirements and the type of professional skills necessary for preparation of the report or record.*

The proposed regulations do not directly impose any reporting, recordkeeping, or similar requirements on any small entities. Rather, the proposed regulations provide that the IRS may prescribe in forms, instructions, or other guidance (including regulations) requirements for identifying numbers for tax return preparers, regular renewal of identifying numbers, and payment of a user fee when applying for or renewing an identifying number. In addition, other guidance may require certain tax return preparers to complete competency testing, complete continuing education courses, and adhere to established rules of practice governing attorneys, certified public accountants, enrolled agents, enrolled actuaries, and enrolled retirement plan agents.

Applying for an identifying number and subsequent renewal will require reporting of certain information, but are not expected to require recordkeeping. These activities also will not require the purchase or use of any special business equipment or software. To the extent it will be necessary to apply for a PTIN (or similar identifying number that replaces a PTIN) online at *http://www.irs.gov,* most if not all tax return preparation businesses have computers and Internet access. The IRS estimates that applying for a PTIN will take 10 to 20 minutes per individual, with an average of 15 minutes per individual.

Under other guidance that the IRS may issue, tax return preparers who apply to be registered tax return preparers and who regularly renew their status may be subject to recordkeeping requirements because they may be required to maintain specified records, such as documentation and educational materials relating to completion of continuing education courses. These requirements do not involve any specific professional skills other than general recordkeeping abilities already needed to own and operate a small business or to competently act as a tax return preparer. It is estimated that tax return preparers will annually spend approximately 30 minutes to 1 hour in maintaining records relating to the continuing education requirements, depending on individual circumstances.

A separate regulation addressing reasonable user fees will be proposed in the near future. Tax return preparers may be required to pay a user fee when first applying for a PTIN and at every renewal. Small entities may be affected by these costs if the entities choose to pay some or all of these fees for their employees.

Under regulations to be issued in the future, tax return preparers may also incur costs for commercial continuing education courses and minimum competency examinations, plus incidental costs, such as for travel and accommodations in order to maintain their status as registered tax return preparers under Circular 230. Course prices can vary greatly, from free to hundreds of dollars. Many small tax return preparation firms may choose, as with the user fee, to bear these costs for their employees. In some cases, small entities may lose sales and profits while their employed tax return preparers attend training or educational classes or are studying and sitting for examinations. Some small entities that employ tax return preparers may even need to alter their business operations if a significant number of their employees cannot satisfy the necessary registration

and competency requirements. The IRS and the Treasury Department conclude, however, that only a small percentage of small entities, if any, may need to cease doing business or radically change their business model due to the proposed regulations.

Although each of the reporting and recordkeeping requirements and the costs identified above (in connection with the proposed regulations and the other anticipated guidance necessary to implement the Return Preparer Review) is not expected to singly result in a significant economic impact, taken together it is anticipated that they may have a significant economic impact on a substantial number of small entities.

*Identification, to the extent practicable, of all relevant Federal rules that may duplicate, overlap, or conflict with the proposed rule.*

The proposed regulations do not duplicate, overlap, or conflict with any Federal statutes or other rules.

*Description of any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and minimize any significant economic impact on small entities.*

The IRS and the Treasury Department have determined that there are no viable alternatives to the proposed regulations that would enable the IRS to accurately identify tax return preparers, other than through the use of a prescribed identifying number, as provided in the proposed regulations.

More broadly, the IRS received a large volume of comments as part of the Return Preparer Review on the issue of increased oversight of tax return preparers generally and on the Report's proposed recommendations, including requiring tax return preparers to use a uniform prescribed identifying number. The comments were received from all categories of interested stakeholders, including tax professional groups representing large and small entities, IRS advisory groups, tax return preparers, and the public. The input received from this large and diverse community overwhelmingly expressed support for the proposed requirements.

As to the proposed requirements recommended in the Report, the IRS and the Treasury Department considered various alternatives in determining the best ways to effectuate proposed changes with respect to tax return preparers, including:

(1) Requiring all paid tax return preparers to comply with the ethical standards in Circular 230 or an ethics code similar to Circular 230, but not requiring any paid preparers to

demonstrate their qualification and competency;

(2) Requiring tax return preparers who are not currently authorized to practice before the IRS to register with the IRS, complete annual continuing education requirements, and meet certain ethical standards, but not to pass a minimum competency examination;

(3) Requiring all paid tax return preparers to pass a minimum competency examination and meet other registration requirements; and

(4) Requiring all paid tax return preparers who are not currently authorized to practice before the IRS to pass a minimum competency examination and meet other registration requirements, but "grandfather in" tax return preparers who have accurately and competently prepared tax returns for a certain period of years.

After consideration of these and other alternatives and the responses received in the public comment process, the IRS and the Treasury Department conclude that the provisions of the proposed regulations will most effectively promote sound tax administration. The provisions in the proposed regulations for a single prescribed identifying number for tax return preparers will enable the IRS to accurately identify tax return preparers, match preparers with the tax returns and claims for refund they prepare, and better administer the tax laws with respect to tax return preparers and their clients. The provisions, in combination with anticipated guidance described above, also will ensure that qualified, competent, and ethical tax return preparers will be assigned prescribed preparer identifying numbers. The testing requirements that may be set forth in other guidance will establish a benchmark of minimum competency necessary for tax return preparers to obtain their professional credentials, while the continuing education requirements are intended to ensure that tax return preparers remain current on the Federal tax laws and continue to develop their tax knowledge. The extension in the other, prospective guidance of the rules in Circular 230 to any paid tax return preparer will require all practitioners to meet certain ethical standards and allow the IRS to suspend or otherwise appropriately discipline tax return preparers who engage in unethical or disreputable conduct. Accordingly, the implementation of qualification and competency standards is expected to increase tax compliance and allow taxpayers to be confident that the tax return preparers to whom they turn for assistance are knowledgeable, skilled, and ethical.

**Comments and Requests for Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written comments (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. The IRS and the Treasury Department request comments on the clarity of the proposed rules and how they can be made easier to understand. All comments that are submitted by the public will be available for public inspection and copying. A public hearing will be scheduled if requested in writing by any person who timely submits comments. If a public hearing is scheduled, notice of the date, time, and place for the public hearing will be published in the **Federal Register**.

**Drafting Information**

The principal author of these proposed regulations is Stuart Murray of the Office of the Associate Chief Counsel, Procedure and Administration.

**List of Subjects in 26 CFR Part 1**

Income taxes, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 1 is proposed to be amended as follows:

**PART 1—INCOME TAXES**

**Paragraph 1.** The authority citation for part 1 continues to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *
Section 1.6109–2 also issued under 26 U.S.C. 6109(a) * * *

**Par. 2.** Section 1.6109–2 is amended by revising the section heading, revising paragraphs (a)(2) and (d), and adding paragraphs (e), (f), (g), (h), and (i) to read as follows:

**§ 1.6109–2  Tax return preparers furnishing identifying numbers for returns or claims for refund and related requirements.**

(a) * * *
(2)(i) For tax returns or claims for refund filed on or before December 31, 2010, the identifying number of an individual tax return preparer is that individual's social security number or such alternative number as may be prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance.

(ii) For tax returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's preparer tax identification number or such other number prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance.

* * * * *

(d) Beginning after December 31, 2010, all tax return preparers must have a preparer tax identification number or other prescribed identifying number that was applied for and received at the time and in the manner, including the payment of a user fee, as may be prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance. Except as provided in paragraph (h) of this section, beginning after December 31, 2010, to obtain a preparer tax identification number or other prescribed identifying number, a tax return preparer must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer authorized to practice before the Internal Revenue Service under 31 U.S.C. 330 and the regulations thereunder.

(e) The Internal Revenue Service may designate an expiration date for any preparer tax identification number or other prescribed identifying number and may further prescribe the time and manner for renewing a preparer tax identification number or other prescribed identifying number, including the payment of a user fee, as set forth in forms, instructions, or other appropriate guidance. The Internal Revenue Service may provide that any identifying number issued by the Internal Revenue Service prior to the effective date of this regulation will expire on December 31, 2010, unless properly renewed as set forth in forms, instructions, or other appropriate guidance, including these regulations.

(f) As may be prescribed in forms, instructions, or other appropriate guidance, the IRS may conduct a tax compliance check on a tax return preparer who applies for or renews a preparer tax identification number or other prescribed identifying number.

(g) Only for purposes of paragraphs (d), (e), and (f) of this section, the term *tax return preparer* means any individual who is compensated for preparing, or assisting in the preparation of, all or substantially all of a tax return or claim for refund of tax. Factors to consider in determining whether an individual is a tax return preparer under this paragraph (g) include, but are not limited to, the complexity of the work performed by the individual relative to the overall complexity of the tax return or claim for refund of tax; the amount of the items of income, deductions, or losses

attributable to the work performed by the individual relative to the total amount of income, deductions, or losses required to be correctly reported on the tax return or claim for refund of tax; and the amount of tax or credit attributable to the work performed by the individual relative to the total tax liability required to be correctly reported on the tax return or claim for refund of tax. A tax return preparer does not include an individual who is not otherwise a tax return preparer as that term is defined in § 301.7701–15(b)(2), or who is an individual described in § 301.7701–15(f). The provisions of this paragraph (g) are illustrated by the following examples:

*Example 1.* Employee A, an individual employed by Tax Return Preparer B, assists Tax Return Preparer B in answering telephone calls, making copies, inputting client tax information gathered by B into the data fields of tax preparation software on a computer, and using the computer to file electronic returns of tax prepared by B. Although Employee A must exercise judgment regarding which data fields in the tax preparation software to use, A does not exercise any discretion or independent judgment as to the clients' underlying tax positions. Employee A, therefore, merely provides clerical assistance or incidental services and is not a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

*Example 2.* The facts are the same as in *Example 1,* except that Employee A also interviews B's clients and obtains from them information needed for the preparation of tax returns. Employee A determines the amount and character of entries on the returns and whether the information provided is sufficient for purposes of preparing the returns. For at least some of B's clients, A obtains information and makes determinations that constitute all or substantially all of the tax return. Employee A is a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance. Employee A is a tax return preparer even if Employee A relies on tax preparation software to prepare the return.

*Example 3.* C is an employee of a firm that prepares tax returns and claims for refund of tax for compensation. C is responsible for preparing a Form 1040, "U.S. Individual Income Tax Return," for a client. C obtains the information necessary for completing the return during a meeting with the client, and makes determinations with respect to the proper application of the tax laws to the information in order to determine the client's tax liability. C completes the tax return and sends the completed return to employee D, who reviews the return for accuracy before signing it. Both C and D are tax return preparers required to apply for a PTIN or other identifying number as the Internal

Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

*Example 4.* E is an employee at a firm which prepares tax returns and claims for refund of tax for compensation. The firm is engaged by a corporation to prepare its Federal income tax return on Form 1120, "U.S. Corporation Income Tax Return." Among the documentation that the corporation provides to E in connection with the preparation of the tax return is documentation relating to the corporation's potential eligibility to claim a recently enacted tax credit for the taxable year. In preparing the return, and specifically for purposes of the new tax credit, E (with the corporation's consent) obtains advice from F, a subject matter expert on this and similar credits. F advises E as to the corporation's entitlement to the credit and provides his calculation of the amount of the credit. Based on this advice from F, E prepares the corporation's Form 1120 claiming the tax credit in the amount recommended by F. The additional credit is one of many tax credits and deductions claimed on the tax return, and determining the credit amount does not constitute preparation of all or substantially all of the corporation's tax return under this paragraph (g). F will not be considered to have prepared all or substantially all of the corporation's tax return, and F is not a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance. The analysis is the same whether or not the tax credit is a substantial portion of the return under § 301.7701–15 of this chapter, and whether or not F is in the same firm with E. E is a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

(h) The Internal Revenue Service, through forms, instructions, or other appropriate guidance, may prescribe exceptions to the requirements of this section, including the requirement that an individual be authorized to practice before the Internal Revenue Service before receiving a preparer tax identification number or other prescribed identifying number, as necessary in the interest of effective tax administration.

(i) *Effective/applicability date.* Paragraph (a)(2) of this section is effective for returns and claims for refund filed after the date that final regulations are published in the **Federal Register.** Paragraphs (d) through (h) of this section are effective after the date that final regulations are published in the **Federal Register.**

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement.*

[FR Doc. 2010–6867 Filed 3–24–10; 11:15 am]

**BILLING CODE 4830–01–P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R09–OAR–2009–0958; FRL–9131–3]**

**Revisions to the California State Implementation Plan**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to approve revisions to the San Joaquin Valley Unified Air Pollution Control District (SJVUAPCD) portion of the California State Implementation Plan (SIP). These revisions concern volatile organic compound (VOC) emissions from refinery vacuum producing systems and process unit turnaround. We are approving local rules that regulate these emission sources under the Clean Air Act as amended in 1990 (CAA or the Act). We are taking comments on this proposal and plan to follow with a final action.

**DATES:** Any comments must arrive by April 26, 2010.

**ADDRESSES:** Submit comments, identified by docket number [EPA–R09–OAR–2009–0958], by one of the following methods:

1. *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the on-line instructions.

2. *E-mail: steckel.andrew@epa.gov.*

3. *Mail or deliver:* Andrew Steckel (Air–4), U.S. Environmental Protection Agency Region IX, 75 Hawthorne Street, San Francisco, CA 94105–3901.

*Instructions:* All comments will be included in the public docket without change and may be made available online at *http://www.regulations.gov,* including any personal information provided, unless the comment includes Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Information that you consider CBI or otherwise protected should be clearly identified as such and should not be submitted through *http://www.regulations.gov* or e-mail. *Http://www.regulations.gov* is an "anonymous access" system, and EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send e-mail directly to EPA, your e-mail address will be automatically captured and included as part of the public comment. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment.



**List of Subjects in 26 CFR Part 54**

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

**PART 54—PENSION EXCISE TAXES**

**Paragraph 1.** The authority citation for part 54 is amended by adding an entry in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

Section 54.9815–2719 also issued under 26 U.S.C. 9833. * * *

**Par. 2.** Section 54.9815–2719 is added to read as follows:

**§ 54.9815–2719  Internal claims and appeals and external review processes.**

[The text of proposed § 54.9815–2719 is the same as the text of paragraphs (a) through (f) of § 54.9815–2719T published elsewhere in this issue of the **Federal Register**].

**Steven Miller,**

*Deputy Commissioner for Services and Enforcement.*

[FR Doc. 2010–18050 Filed 7–22–10; 8:45 am]

**BILLING CODE 4830–01–P**

---

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 300**

**[REG–139343–08]**

**RIN 1545–B171**

**User Fees Relating to Enrollment and Preparer Tax Identification Numbers**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Notice of proposed rulemaking and notice of public hearing.

**SUMMARY:** This document contains proposed amendments to the regulations relating to the imposition of certain user fees on certain tax practitioners. The proposed regulations establish a new user fee for individuals who apply for or renew a preparer tax identification number (PTIN). The proposed regulations affect individuals who apply for or renew a PTIN. The charging of user fees is authorized by the Independent Offices Appropriations Act of 1952.

**DATES:** Written or electronic comments must be received by August 23, 2010. Outlines of topics to be discussed at the

public hearing scheduled for Tuesday, August 24, 2010, at 10 a.m. must be received by Monday, August 23, 2010.

**ADDRESSES:** Send submissions to: CC:PA:LPD:PR (REG–139343–08), Room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand-delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to CC:PA:LPD:PR (REG–139343–08), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC, or sent electronically via the Federal eRulemaking Portal at *http://www.regulations.gov* (IRS REG–139343–08). The public hearing will be held in the Auditorium of the Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Concerning the proposed regulations, Emily M. Lesniak at (202) 622–4940; concerning cost methodology, Eva J. Williams at (202) 435–5514; concerning submission of comments, the public hearing, or to be placed on the building access list to attend the public hearing, Richard A. Hurst at *Richard.A.Hurst@irscounsel.treas.gov* or (202) 622–7180 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

**Background**

Section 330 of title 31 of the United States Code authorizes the Secretary of the Treasury to regulate the practice of representatives before the Treasury Department. Pursuant to section 330 of title 31, the Secretary has published regulations governing practice before the IRS in 31 CFR part 10 and reprinted the regulations as Treasury Department Circular No. 230 (Circular 230). Circular 230 is administered by the IRS Office of Professional Responsibility (OPR).

**User Fee for PTINs**

Section 6109 of the Internal Revenue Code (Code) authorizes the Secretary to prescribe regulations for the inclusion of a tax return preparer's identifying number on a return, statement, or other document required to be filed with the IRS. Section 6109(c) further authorizes the Secretary "to require such information as may be necessary to assign an identifying number to any person." As currently prescribed in regulations, the identifying number of a tax return preparer who is an individual is the tax return preparer's social security number (SSN) or alternative number as prescribed by the IRS.

Proposed regulations under section 6109 (REG–134235–08) were published in the **Federal Register** (75 FR 14539) on

March 26, 2010, and provide that, for returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's PTIN or such other number prescribed by the IRS in forms, instructions, or other appropriate guidance. The proposed regulations under section 6109 require a tax return preparer who prepares all or substantially all of a return or claim for refund of tax after December 31, 2010 to have a PTIN. The proposed regulations also state that the IRS will provide through other guidance (including forms and instructions) guidance regarding how to apply for a PTIN or other prescribed preparer identifying number, for the regular renewal of a PTIN or other prescribed preparer identifying number, and for the payment of a user fee. Only attorneys, certified public accountants, enrolled agents, and registered tax return preparers will be eligible to apply for a PTIN. The requirements to become a registered tax return preparer will be provided in future Circular 230 guidance.

A third party vendor will administer the PTIN application and renewal process and will charge a reasonable fee that is independent of the user fee charged by the government. The vendor will develop a web-based database that individuals will use to apply for or renew a PTIN and will process paper PTIN applications. The database also will be used for applications to become registered tax return preparers, to renew the registered tax return preparers' status, to self-certify continuing professional education credits for registered tax return preparers, and to pay applicable user fees.

Proposed § 300.9 establishes a $50 user fee to apply for or renew a PTIN. The $50 user fee is based on an annual PTIN renewal period, and the procedures for renewing a PTIN will be provided in other guidance, including forms and instructions. The user fee is nonrefundable regardless of whether the applicant receives a PTIN.

PTINs were previously issued to tax return preparers solely for the convenience of the tax return preparers, providing an alternative to using the tax return preparers' social security numbers. Requiring registration through the use of PTINs will enable the IRS to better collect and track data on tax return preparers. This data will allow the IRS to track the number of persons who prepare returns, track the qualifications of those who prepare returns, track the number of returns each person prepares, and more easily locate and review returns prepared by a

tax return preparer when instances of misconduct are detected.

The user fee to apply for or renew a PTIN recovers the costs that the government incurs to administer the PTIN application process. These costs include the development and maintenance of the IRS information technology system that interfaces with the vendor and the development and maintenance of internal applications that will have the capacity to process and administer the anticipated increase in applications for a PTIN. It is anticipated that the number of individuals requesting PTINs will increase to as many as 1.2 million individuals, and all individuals who receive PTINs will be required to renew their PTINs. The anticipated increase in demand for PTINs will require the IRS to expend more resources. The user fee will recover the cost of IRS customer service support activities, which include Web site development and maintenance and call center staffing to respond to questions regarding PTIN usage and renewal. The user fee also will recover costs for personnel, administrative, and management support needed to evaluate and address tax compliance issues of individuals applying for and renewing a PTIN, to investigate and address conduct and suitability issues, and otherwise support and enforce the programs that require an individual to apply for and renew a PTIN.

The IRS currently issues PTINs to tax return preparers without charging a user fee. The PTIN application, issuance, and renewal process, however, will become significantly more expansive and intricate with the implementation of the registered tax return preparer program. Federal tax compliance checks will be performed on all individuals who apply for or renew a PTIN. Suitability checks will be performed. The IRS will further investigate individuals when the compliance or suitability check suggests that the individual may be unfit to practice before the IRS. These checks were not previously performed as a prerequisite to obtaining a PTIN.

Additionally, the IRS will establish and implement a reconsideration process for individuals who apply to become a registered tax return preparer and are denied a PTIN upon initial application or renewal. The IRS will incur costs to apply existing Circular 230 procedures when those individuals who are certified public accountants, attorneys, enrolled agents, or registered tax return preparers are denied renewal of a PTIN.

## Coordination With Other User Fees

Additional user fees related to the programs for regulating enrolled agents, enrolled retirement plan agents, and registered tax return preparers will be established in future regulations as those programs are implemented. These future regulations will address user fees associated with taking the registered tax return preparer examination and providing continuing education programs. The user fee for taking a registered tax return preparer examination will recover the costs to the government for creating, administering, and reviewing the examination. The user fee for providing continuing education programs will recover the costs to the government for the review, approval, and oversight of continuing education providers to ensure their compliance with program requirements for continuing education programs. The vendor also will charge a reasonable fee to take the registered tax return preparer examination.

Future regulations also will coordinate the enrollment and renewal user fees imposed on enrolled agents and enrolled retirement plan agents with the PTIN user fees because the costs to the government to process an enrollment application are substantially the same as the costs to the government to process a PTIN application. For example, the IRS generally may conduct only a single background check and compliance check for an individual who applies to become an enrolled agent and applies to obtain a PTIN, and therefore the enrollment application fee and the PTIN application fee must be coordinated to prevent the collection of excessive fees. It is currently anticipated that future regulations will require enrolled agents to obtain a PTIN and pay the associated application or renewal fee, in which case the enrollment and renewal fees for enrolled agents will be substantially reduced.

## Effective/Applicability Dates

These regulations reorganize the effective dates for the user fees found in Treasury Regulations part 300. Currently, all of the user fee effective dates are contained in § 300.0 paragraph (c). This reorganization relocates the effective date sections to the appropriate regulation implementing each user fee. This relocation will simplify the process for updating the effective dates as the user fee regulations are revised.

## Authority

The charging of user fees is authorized by the Independent Offices Appropriations Act (IOAA) of 1952, which is codified at 31 U.S.C. 9701. The IOAA authorizes agencies to prescribe regulations that establish charges for services provided by the agency. The charges must be fair and must be based on the costs to the government, the value of the service to the recipient, the public policy or interest served, and other relevant facts. The IOAA provides that regulations implementing user fees are subject to policies prescribed by the President; these policies are currently set forth in the Office of Management and Budget Circular A–25, 58 FR 38142 (July 15, 1993) (the OMB Circular).

The OMB Circular encourages user fees for government-provided services that confer benefits on identifiable recipients over and above those benefits received by the general public. Under the OMB Circular, an agency that seeks to impose a user fee for government-provided services must calculate the full cost of providing those services. In general, a user fee should be set at an amount that allows the agency to recover the full cost of providing the special service, unless the Office of Management and Budget grants an exception.

Pursuant to the guidelines in the OMB Circular, the IRS has calculated its cost of providing services under the PTIN application and renewal process. The government will charge the full cost of administering these programs and will implement the proposed user fees under the authority of the IOAA and the OMB Circular.

## Proposed Effective/Applicability Date

The Administrative Procedure Act provides that substantive rules will not be effective until thirty days after the final regulations are published in the **Federal Register** (5 U.S.C. 553(d)). Final regulations may be effective prior to thirty days after publication if the publishing agency finds that there is good cause for an earlier effective date. The IRS is implementing the recommendations in Publication 4832, "Return Preparer Review", which was published on January 4, 2010, to be effective for the 2011 Federal tax filing season (January–April 2011). The IRS and the Treasury Department find that there is good cause for these regulations to be effective upon the publication of a Treasury decision adopting these rules as final regulations in the **Federal Register**.

## Special Analyses

It has been determined that this notice of proposed rulemaking is a significant regulatory action as defined in Executive Order 12866.

It has been determined that an initial regulatory flexibility analysis is required for this notice of proposed rulemaking under 5 U.S.C. 603. This analysis is set forth under the heading "Initial Regulatory Flexibility Analysis."

Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

*Initial Regulatory Flexibility Analysis*

When an agency issues a rulemaking proposal, the Regulatory Flexibility Act (5 U.S.C. chapter 6) (RFA) requires the agency "to prepare and make available for public comment an initial regulatory flexibility analysis" that will "describe the impact of the proposed rule on small entities." *See* 5 U.S.C. 603(a). Section 605 of the RFA provides an exception to this requirement if the agency certifies that the proposed rulemaking will not have a significant economic impact on a substantial number of small entities. A small entity is defined as a small business, small nonprofit organization, or small governmental jurisdiction. *See* 5 U.S.C. 601(3) through (6). The IRS and the Treasury Department conclude that the proposed rule, if promulgated, will have a significant economic impact on a substantial number of small entities. As a result, an initial regulatory flexibility analysis is required.

*Description of the Reasons Why Action by the Agency Is Being Considered*

The IRS and the Treasury Department are implementing regulatory changes that increase the oversight of the tax return preparer industry based upon findings and recommendations made by the IRS in Publication 4832, "Return Preparer Review," which was published on January 4, 2010. These regulatory changes include implementing a registered tax return preparer program and requiring all individuals who prepare all or substantially all of a tax return or claim for refund to use a PTIN as an identifying number. Except as provided in any transitional period, only attorneys, certified public accountants, enrolled agents, or registered tax return preparers may apply for a PTIN. Thus, only attorneys, certified public accountants, enrolled agents, and registered tax return preparers will be eligible to prepare all or substantially all of a tax return or claim for refund. By limiting the individuals who may prepare all or substantially all of a tax return or claim for refund to individuals who have a PTIN, the IRS is providing a special benefit to the individuals who obtain a PTIN. There are costs to the IRS that are associated with processing a PTIN application and providing the special benefits associated with the PTIN.

Future regulations will establish additional user fees related to the enrolled agent and enrolled retirement plan agent program, and registered tax return preparer program. The additional user fees will recover the costs to the government that result from providing the special benefits associated with taking the registered tax return preparer examination and providing continuing education programs. The cost to the government for administering and reviewing the registered tax return preparer examination will be recovered in a user fee for taking the registered tax return preparer examination. The cost to the government to verify compliance with requirements for continuing education programs will be recovered in a user fee for qualifying continuing education programs. Each continuing education provider may charge a fee to attend a qualified continuing education program. The third party vendor also will charge a reasonable fee to take a registered tax return preparer examination.

*A Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule*

The objective of the proposed regulations is to recover the costs to the government associated with providing the special benefits that an individual receives upon applying for or renewing a PTIN. These costs include the development and maintenance of the IRS information technology system that interfaces with the vendor; the development and maintenance of internal applications; IRS customer service support activities, which include development and maintenance of an IRS Web site and call center staffing; and personnel, administrative, and management support needed to evaluate and address tax compliance issues, investigate and address conduct and suitability issues, and otherwise support and enforce the programs that require individuals to apply for or renew a PTIN. The OMB Circular encourages user fees when special benefits are conferred on identifiable recipients. Individuals who obtain a PTIN receive the ability to prepare all or substantially all of a tax return or claim for refund. The ability to prepare all or substantially all of a tax return or claim for refund is a special benefit.

The legal basis for these requirements is contained in section 9701 of title 31.

*A Description of and, Where Feasible, an Estimate of the Number of Small Entities To Which the Proposed Rule Will Apply*

The proposed regulations affect all individuals who want to become a registered tax return preparer under the new oversight rules in Circular 230. Only individuals, not businesses, can practice before the IRS or become a registered tax return preparer. Thus, the economic impact of these regulations on any small entity generally will be a result of applicants and registered tax return preparers owning a small business or a small entity employing applicants or registered tax return preparers.

The proposed regulations further affect all individual tax return preparers who are required to apply for or renew a PTIN. Only individuals, not businesses, can apply for or renew a PTIN. Thus, the economic impact of these regulations on any small entity generally will be a result of an individual tax return preparer who is required to apply for or renew a PTIN owning a small business or a small business otherwise employing an individual tax return preparer who is required to apply for or renew a PTIN to prepare all or substantially all of a tax return or claim for refund.

The appropriate NAICS codes for the registered tax return preparer program and PTINs are those that relate to tax preparation services (NAICS code 541213), other accounting services (NAICS code 541219), offices of lawyers (NAICS code 541110), and offices of certified public accountants (NAICS code 541211). Entities identified as tax preparation services and offices of lawyers are considered small under the Small Business Administration size standards (13 CFR 121.201) if their annual revenue is less than $7 million. Entities identified as other accounting services and offices of certified public accountants are considered small under the Small Business Administration size standards if their annual revenue is less than $8.5 million. The IRS estimates that approximately 70 to 80 percent of the individuals subject to these proposed regulations are tax return preparers operating as or employed by small entities.

*A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Proposed Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record*

No reporting or recordkeeping requirements are projected to be associated with this proposed regulation.

*An Identification, to the Extent Practicable, of All Relevant Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

The IRS is not aware of any Federal rules that duplicate, overlap, or conflict with the proposed rule.

*A Description of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities*

The IOAA authorizes the charging of user fees for agency services, subject to policies designated by the President. The OMB Circular implements presidential policies regarding user fees and encourages user fees when a government agency provides a special benefit to a member of the public. As Congress has not appropriated funds to the registered tax return preparer program or PTIN application process, there are no viable alternatives to the imposition of user fees.

While the IRS previously issued PTINs to tax return preparers without charging a user fee, the registered tax return preparer program and the issuance of the new regulations under section 6109 will increase the number of PTIN applications to as many as 1.2 million applications and significantly increase the intricacy of the application process. Additionally, PTINs were previously issued solely for the convenience of tax return preparers to provide an alternative to using the tax return preparers' social security numbers as an identifying number on prepared returns. PTINs will now be used to collect and track data on tax return preparers. This data will provide important benefits to the IRS, such as allowing the IRS to track the number of persons who prepare returns, track the qualifications of those persons who prepare returns, track the number of returns each person prepares, and, when instances of misconduct are detected, locate and review returns prepared by a specific tax return preparer.

This anticipated increase in PTIN applications and the revised purpose of a PTIN will require the IRS to develop and maintain a Web site and call center staff to respond to PTIN-related questions. Further, the IRS will now perform Federal tax compliance checks and perform suitability checks prior to the issuance of a PTIN. Previously, neither of these checks was performed before a PTIN was issued. When the initial compliance and suitability checks suggest that the individual applying for a PTIN may not be fit to practice before the IRS, the IRS will conduct an investigation. For individuals with and found unfit to receive a PTIN, the IRS will develop and implement a reconsideration process. Similarly, the IRS will provide due process procedures for those individuals who are certified public accountants, attorneys, enrolled agents, or registered tax return preparers and are denied renewal of their PTIN.

Thus, due to the increased costs to the government to process the application for a PTIN, the anticipated increase in PTIN applications, and the lack of appropriated funds, there is no viable alternative to imposing a user fee.

**Comments and Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. The IRS and Treasury Department request comments on the clarity of the proposed regulations and how they can be made easier to understand. All comments that are submitted by the public will be made available for public inspection and copying.

A public hearing has been scheduled for Tuesday, August 24, 2010, beginning at 10 a.m. in the Auditorium of the Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, DC. Due to building security procedures, visitors must enter at the Constitution Avenue entrance. All visitors must present photo identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 30 minutes before the hearing starts. For information about having your name placed on the building access list to attend the hearing, see the **FOR FURTHER INFORMATION CONTACT** section of this preamble.

The rules of 26 CFR 601.601(a)(3) apply to the hearing. Persons who wish to present oral comments at the hearing must submit written or electronic comments and an outline of the topics to be discussed and the time to be devoted to each topic by Monday, August 23, 2010. A period of 10 minutes will be allocated to each person for making comments.

An agenda showing the scheduling of the speakers will be prepared after the deadline for receiving outlines has passed. Copies of the agenda will be available free of charge at the hearing.

**Drafting Information**

The principal author of these regulations is Emily M. Lesniak, Office of the Associate Chief Counsel (Procedure and Administration).

**List of Subjects in 26 CFR Part 300**

Reporting and recordkeeping requirements, User fees.

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 300 is proposed to be amended as follows:

**PART 300—USER FEES**

**Paragraph 1.** The authority citation for part 300 continues to read in part as follows:

**Authority:** 31 U.S.C. 9701.

**Par. 2.** Section 300.0 is amended by
1. Adding paragraph (b)(9).
2. Removing paragraph (c).
The addition reads as follows:

**§ 300.0  User fees; in general.**

\* \* \* \* \*

(b) \* \* \*
(9) Applying for a preparer tax identification number.
**Par. 3.** Section 300.1 is amended by adding paragraph (d) to read as follows:

**§ 300.1  Installment agreement fee.**
\* \* \* \* \*
(d) *Effective/applicability date.* This section is applicable beginning March 16, 1995, except that the user fee for entering into installment agreements on or after January 1, 2007, is applicable beginning January 1, 2007.
**Par. 4.** Section 300.2 is amended by adding paragraph (d) to read as follows:

**§ 300.2  Restructuring or reinstatement of installment agreement fee.**

\* \* \* \* \*

(d) *Effective/applicability date.* This section is applicable beginning March 16, 1995, except that the user fee for restructuring or reinstatement of an installment agreement on or after January 1, 2007, is applicable beginning January 1, 2007.
**Par. 5.** Section 300.3 is amended by adding paragraph (d) to read as follows:

**§ 300.3  Offer to compromise fee.**

*  *  *  *  *

(d) *Effective/applicability date.* This section is applicable beginning November 1, 2003.

**Par. 6.** Section 300.4 is amended by adding paragraph (d) to read as follows:

**§ 300.4  Special enrollment examination fee.**

*  *  *  *  *

(d) *Effective/applicability date.* This section is applicable beginning November 6, 2006.

**Par. 7.** Section 300.5 is amended by adding paragraph (d) to read as follows:

**§ 300.5  Enrollment of enrolled agent fee.**

*  *  *  *  *

(d) *Effective/applicability date.* This section is applicable beginning November 6, 2006.

**Par. 8.** Section 300.6 is amended by adding paragraph (d) to read as follows:

**§ 300.6  Renewal of enrollment of enrolled agent fee.**

*  *  *  *  *

(d) *Effective/applicability date.* This section is applicable beginning November 6, 2006.

**Par. 9.** Section 300.7 is amended by adding paragraph (d) to read as follows:

**§ 300.7  Enrollment of enrolled actuary fee.**

*  *  *  *  *

(d) *Effective/applicability date.* This section is applicable beginning January 22, 2008.

**Par. 10.** Section 300.8 is amended by adding paragraph (d) to read as follows:

**§ 300.8  Renewal of enrollment of enrolled actuary fee.**

*  *  *  *  *

(d) *Effective/applicability date.* This section is applicable beginning January 22, 2008.

**Par. 11.** Section 300.9 is added to read as follows:

**§ 300.9  Fee for obtaining a preparer tax identification number.**

(a) *Applicability.* This section applies to the application for and renewal of a preparer tax identification number pursuant to 26 CFR 1.6109–2(d).

(b) *Fee.* The fee to apply for or renew a preparer tax identification number is $50 per year, which is the cost to the government for processing the application for a preparer tax identification number and does not include any fees charged by the vendor.

(c) *Person liable for the fee.* The individual liable for the application or renewal fee is the individual applying for and renewing a preparer tax identification number from the IRS.

(d) *Effective/applicability date.* This section will be applicable on the date of

publication of a Treasury decision adopting these rules as final regulations in the **Federal Register.**

**Steven T. Miller,**
*Deputy Commissioner for Services and Enforcement.*
[FR Doc. 2010–18198 Filed 7–21–10; 4:15 pm]
**BILLING CODE 4830–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R06–OAR–2007–0210; FRL–9177–5]**

**Approval and Promulgation of Air Quality Implementation Plans; Texas; Revisions to Emissions Inventory Reporting Requirements and Conformity of General Federal Actions, Including Revisions Allowing Electronic Reporting Consistent With the Cross Media Electronic Reporting Rule**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve revisions to the Texas State Implementation Plan (SIP) submitted by the Governor of Texas and by the Texas Commission on Environmental Quality (TCEQ) respectively on December 17, 1999 and February 26, 2007. The revisions pertain to regulations on reporting air pollution emissions (emission inventories), and conformity of general Federal actions to SIPs. EPA is proposing to approve the revision pursuant to section 110 of the CAA.

**DATES:** Written comments should be received on or before August 23, 2010.

**ADDRESSES:** Comments may be mailed to Mr. Guy Donaldson, Chief, Air Planning Section (6PD–L), Environmental Protection Agency, 1445 Ross Avenue, Suite 1200, Dallas, Texas 75202–2733. Comments may also be submitted electronically or through hand deliver/courier by following the detailed instructions in the **ADDRESSES** section of the direct final rule located in the rules section of this **Federal Register.**

**FOR FURTHER INFORMATION CONTACT:** Emad Shahin, Air Planning Section (6PD–L), Environmental Protection Agency, Region 6, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733, telephone 214–665–6717; fax number 214–665–7263; e-mail address *shahin.emad@epa.gov.*

**SUPPLEMENTARY INFORMATION:** In the rules section of this **Federal Register,**

EPA is approving the State's SIP submittal as a direct final rule without prior proposal because the Agency views this as non-controversial submittal and anticipates no adverse comments. A detailed rationale for the approval is set forth in the direct final rule. If no adverse comments are received in response to this action no further activity is contemplated. If EPA receives adverse comments, the direct final rule will be withdrawn and all public comments received will be addressed in a subsequent final rule based on this proposed rule. EPA will not institute a second comment period. Any parties interested in commenting on this action should do so at this time.

For additional information see the direct final rule, located in the rules section of this **Federal Register.**

Dated: July 12, 2010.

**Al Armendariz,**
*Regional Administrator, Region 6.*
[FR Doc. 2010–17976 Filed 7–22–10; 8:45 am]
**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 81**

**[EPA–R03–OAR–2010–0431; FRL–9178–9]**

**Approval of One-Year Extension for Attaining the 1997 8-Hour Ozone Standard in the Baltimore Moderate Nonattainment Area**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to extend the attainment date from June 15, 2010 to June 15, 2011 for the Baltimore nonattainment area, which is classified as moderate for the 1997 8-hour ozone national ambient air quality standard (NAAQS). This extension is based in part on air quality data for the 4th highest daily 8-hour monitored value during the 2009 ozone season. In the final rules section of this **Federal Register,** EPA is approving the State's request as a direct final rule without prior proposal because the Agency views this as a noncontroversial request and anticipates no adverse comments. A detailed rationale for the approval is set forth in the direct final rule. If no adverse comments are received in response to this action, no further activity is contemplated. If EPA receives adverse comments, the direct final rule will be withdrawn and all public comments received will be addressed in a subsequent final rule based on this



■ Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 558 is amended as follows:

## PART 558—NEW ANIMAL DRUGS FOR USE IN ANIMAL FEEDS

■ 1. The authority citation for 21 CFR part 558 continues to read as follows:

**Authority:** 21 U.S.C. 360b, 371.

**§ 558.342   [Amended]**

■ 2. In § 558.342, in the table in paragraphs (e)(1)(v), (e)(1)(vi), and (e)(1)(vii), in the "Sponsor" column, remove "000009,".

Dated: September 24, 2010.

**Steven D. Vaughn,**

*Director, Office of New Animal Drug Evaluation, Center for Veterinary Medicine.*

[FR Doc. 2010–24480 Filed 9–29–10; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

### 26 CFR Parts 1 and 602

**[TD 9501]**

**RIN 1545–BI28**

### Furnishing Identifying Number of Tax Return Preparer

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final rule.

**SUMMARY:** This document contains final regulations under section 6109 of the Internal Revenue Code (Code) that provide guidance on how the IRS will define the identifying number of tax return preparers and set forth requirements on tax return preparers to furnish an identifying number on tax returns and claims for refund of tax they prepare. Additional provisions of the regulations provide that tax return preparers must apply for and regularly renew their preparer identifying number as the IRS may prescribe in forms, instructions, or other guidance.

**DATES:** *Effective Date:* These regulations are effective on September 30, 2010.

*Applicability Date:* For dates of applicability, see § 1.6109–2(i).

**FOR FURTHER INFORMATION CONTACT:** Stuart Murray at (202) 622–4940 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### Paperwork Reduction Act

The collection of information contained in these final regulations has been reviewed and approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) under control number 1545–2176. The collection of information in these final regulations is in § 1.6109–2(d) and (e). This information is required in order for the IRS to issue identifying numbers to tax return preparers who are eligible to receive them.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

### Background

This document contains final amendments to regulations under section 6109 of the Code relating to furnishing a tax return preparer's identifying number on tax returns and claims for refund of tax. Section 6109(a)(4) requires tax return preparers to furnish on tax returns and claims for refund of tax an identifying number, as prescribed, to ensure proper identification of the preparer, the preparer's employer, or both. In addition, section 6109(c) authorizes the Secretary "to require such information as may be necessary to assign an identifying number to any person." The requirement to furnish an identifying number on tax returns and claims for refund of tax applies to information returns described in § 301.7701–15(b)(4) and to electronically filed tax returns.

In 2009 the IRS conducted a comprehensive review of tax return preparers, culminating in Publication 4832, *Return Preparer Review* (Rev. 12–2009) (the Report). The Report recommended that tax return preparers be required to obtain and use a preparer tax identification number (PTIN) as the exclusive preparer identifying number. The Report also recommended that the IRS establish new eligibility standards to prepare tax returns—including testing, continuing education, and Federal tax compliance checks. The proposed regulations adopted several of the recommendations made in the Report. The Treasury Department and

the IRS conclude that adopting these provisions in the final regulations will increase tax compliance and help to ensure that tax return preparers are knowledgeable, skilled, and ethical.

To implement recommendations made in the Report, on March 26, 2010, the Treasury Department and the IRS published in the **Federal Register** (75 FR 14539) a notice of proposed rulemaking (REG–134235–08) proposing amendments to § 1.6109–2 regarding the identifying number that a tax return preparer must furnish on tax returns and claims for refund of tax. A public hearing was held on the proposed regulations on May 6, 2010. The IRS received written public comments responding to the proposed regulations.

### Summary of Comments and Explanation of Revisions

Over 200 written comments were received in response to the notice of proposed rulemaking. All comments were considered and are available for public inspection. Most of the comments are summarized in this preamble.

### 1. Requiring the Use of PTINs

The final regulations adopt the proposed amendments to § 1.6109–2, which provide that for tax returns or refund claims filed after December 31, 2010, tax return preparers must obtain and exclusively use the identifying number prescribed by the IRS in forms, instructions, or other guidance, rather than a social security number (SSN), as the identifying number to be included with the tax return preparer's signature on a tax return or claim for refund. Prior to these final regulations, the identifying number of a tax return preparer was the tax return preparer's SSN or an alternative number as prescribed by the IRS. The alternative number that the IRS has prescribed is a PTIN. After December 31, 2010, tax return preparers can only use a PTIN (or other number that the IRS prescribes in the future as a replacement to the PTIN) and may not use an SSN as a preparer identifying number unless the IRS directs otherwise. For tax returns or claims for refund filed before January 1, 2011, the identifying number of a tax return preparer will remain the preparer's SSN or PTIN.

The requirement to use a PTIN will allow the IRS to better identify tax return preparers, centralize information, and effectively administer the rules relating to tax return preparers. The final regulations will also benefit taxpayers and tax return preparers and help maintain the confidentiality of SSNs. Most of the comments received

on the notice of proposed rulemaking support the requirement to use a PTIN as the exclusive identifying number for tax return preparers beginning next year.

Under the final regulations, a tax return preparer must sign and furnish a PTIN on a tax return or claim for refund if the tax return preparer has primary responsibility for the overall substantive accuracy of the preparation of the tax return or claim for refund. If a signing tax return preparer has an employment arrangement or association with another person, then that other person's employer identification number (EIN) must also be included on the tax return or refund claim.

Tax return preparers who are required but fail to include a PTIN on a tax return or refund claim, or fail to include the EIN of any person with whom they have an employment arrangement or association, are subject to a penalty under section 6695(c), unless the failure to include an identifying number is due to reasonable cause and not due to willful neglect.

### a. Supervised Tax Return Preparers Who Do Not Sign Tax Returns

The proposed regulations provided that for purposes of the provisions of § 1.6109–2 that would be applicable after December 31, 2010, the term *tax return preparer* means any individual who is compensated for preparing, or assisting in the preparation of, all or substantially all of a tax return or claim for refund of tax. The proposed regulations further provided that a tax return preparer for purposes of these provisions excludes an individual who is not defined as a nonsigning tax return preparer in § 301.7701–15(b)(2). A nonsigning tax return preparer is defined in § 301.7701–15(b)(2) as any tax return preparer who, while not a signing tax return preparer (the individual who has the primary responsibility for the overall substantive accuracy of the preparation of a tax return or claim for refund of tax), prepares all or a substantial portion of a tax return or claim for refund.

Some commentators recommended that individuals who prepare or assist in preparing all or substantially all of a tax return or claim for refund should not be required to obtain a PTIN if they do not sign the tax return or claim for refund and if they act under the supervision of another tax return preparer who substantively reviews the tax return or claim for refund and signs it. Commentators explained, for example, that in some accounting firms, employees who have passed the Uniform Certified Public Accountant Examination and are working toward their license as a certified public accountant are often involved in, or assist with, the preparation of tax returns. Although these employees do not sign tax returns or claims for refund as a tax return preparer, under the regulations as proposed, they are tax return preparers who must have a PTIN after December 31, 2010, if they prepare all or substantially all of a tax return or claim for refund. The commentators proposed an exemption for these individuals.

The Chief Counsel for Advocacy of the Small Business Administration (SBA) submitted similar comments, on behalf of small businesses, on the proposed amendments to § 1.6109–2 as applied to tax return preparers who do not sign tax returns or claims for refund, in particular the provisions requiring tax return preparers to obtain and renew a PTIN as the IRS may prescribe. The SBA heard from small accounting firms that those firms would incur a substantial financial burden if the regulations include certified public accountant candidates and other paraprofessional employees who are involved in tax return preparation under the supervision of a certified public accountant who is a signing tax return preparer. The SBA also observed that requiring these individuals to register with the IRS as tax return preparers would not improve the accuracy of tax returns prepared in small accounting firms because the firms and certified public accountants within these firms are already subject to ethical and competency rules administered by state boards of accountancy, as well as Treasury Department Circular No. 230, 31 CFR Part 10. The SBA recommended that the regulations either exclude outright employees of firms engaged in certified public accountancy who are nonsigning tax return preparers or exclude these employees if they are supervised by a certified public accountant, attorney, or enrolled agent.

These final regulations are intended to address two overarching objectives. The first overarching objective is to provide some assurance to taxpayers that a tax return was prepared by an individual who has passed a minimum competency examination to practice before the IRS as a tax return preparer, has undergone certain suitability checks, and is subject to enforceable rules of practice. The second overarching objective is to further the interests of tax administration by improving the accuracy of tax returns and claims for refund and by increasing overall tax compliance.

The final regulations define a *tax return preparer* in § 1.6109–2(g) as an individual who prepares for compensation, or assists in preparing, all or substantially all of a tax return or claim for refund of tax. The final regulations retain this definition from the proposed regulations without including the requested exemption. It is critical to the IRS's tax administration efforts that, in the first instance, the IRS is readily able to identify all individuals who are involved in preparing all or substantially all of a tax return or claim for refund. Additionally, by requiring regular renewal of a PTIN, tax return preparers will confirm their continuing competence and suitability to be tax return preparers. Accordingly, were the Treasury Department and the IRS to provide an exemption in these regulations for a sizeable segment of tax return preparers, it would undercut effective oversight by the IRS of the tax return preparer community. An exemption for some tax return preparers, as requested in the comments, would allow the exempt individuals to prepare tax returns and claims for refund without identifying themselves to the IRS as tax return preparers and without undergoing competency examinations and suitability checks and being subject to enforceable rules of practice.

### b. Licensed Tax Return Preparers, Tax Return Preparers of Longstanding, and Those Who Prepare a Small Number of Tax Returns

In the proposed regulations, no distinction was made between tax return preparers licensed by a state authority as tax return preparers and unlicensed tax return preparers. A number of comments were received from state-licensed tax return preparers, particularly from those who are Licensed Tax Preparers or Licensed Tax Consultants in Oregon. These comments almost uniformly requested that state-licensed tax return preparers be "grandfathered" into the regulations and not be required to apply for a PTIN, renew an existing PTIN, or comply with requirements that the IRS may prescribe to obtain or renew a PTIN after December 31, 2010. Other commentators asked that the IRS consider an exemption from the regulations for tax return preparers who have been preparers for a certain period of years or who prepare annually a volume of tax returns below a certain (relatively small) number. Some commentators, however, were opposed to exemptions or grandfather provisions.

The Report discussed at some length state licensing and regulation of tax

return preparers, including state-by-state descriptions, but in the Report's recommendations, exemptions were not made for tax return preparers licensed or otherwise regulated under a state program. The Report also concluded that the IRS would not provide "grandfather" exemptions based on experience in preparing tax returns. The proposed regulations, consistent with the Report's recommendations, did not include any exemption for state-based licensure, length of experience, or number of tax returns prepared.

After careful consideration of the comments received on this issue, the final regulations do not include any exemption for state-based licensure, length of experience, or number of tax returns prepared. The Treasury Department and the IRS conclude that tax return preparers who prepare tax returns and claims for refund for compensation should be subject to uniform standards of qualification and practice. When obtaining the services of a tax return preparation business, taxpayers should be assisted by tax return preparers subject to the same Federal regulations, regardless of a taxpayer's state of residence or variable circumstances such as the size of the business or the number of years a tax return preparer has been in the industry.

### c. Volunteers and Other Unpaid Tax Return Preparers

The proposed regulations did not include volunteers and other unpaid tax return preparers as tax return preparers required to obtain a PTIN. Consistent with the definition of a tax return preparer under section 7701(a)(36), which requires a compensation element for an individual to be a tax return preparer, the definition of *tax return preparer* in the proposed regulations excluded an individual described in § 301.7701–15(f), which lists, among others, any individual who provides assistance in the preparation of tax returns as part of a Volunteer Income Tax Assistance (VITA), Tax Counseling for the Elderly (TCE), or Low-Income Taxpayer Clinic (LITC) program. Section 301.7701–15(f)(1)(xii) also excludes from the definition of a tax return preparer anyone who prepares a tax return or claim for refund without an explicit or implicit agreement for compensation. An insubstantial gift, favor, or service received for the preparation of a tax return or refund claim is not considered compensation.

Several commentators recommended that the final regulations require volunteer tax return preparers to obtain a PTIN. According to the commentators, putting volunteers under the regulations would provide several benefits, including increased tax compliance and improvement of the volunteer programs. Although commentators suggested that the PTIN and other requirements applicable to paid tax return preparers also apply to volunteers, it was noted that associated fees could be waived for volunteers. The comments also noted that extending the regulations to all tax return preparers who hold themselves out to the public as tax return preparers would unambiguously include individuals who prepare tax returns for customers purportedly for "free" but incident to a customer's purchase of a product or other service.

The final regulations adopt the same definition of tax return preparer as in the proposed regulations. The Treasury Department and the IRS conclude that the final regulations are properly limited to paid tax return preparers. The focus on paid tax return preparation in the Report and in these regulations is consistent with both the current reality of tax return preparation and applicable legal provisions, including § 301.7701–15(f). As noted by the figures in the Report, volunteer tax return preparers are a small fraction of all tax return preparers and the tax returns prepared by volunteers are a small fraction of all prepared tax returns.

Only volunteers or other truly unpaid tax return preparers, however, are not tax return preparers for purposes of these regulations. As an example, individuals who prepare tax returns without compensation for relatives or friends as a personal favor are not within the definition of the term *tax return preparer.*

The Treasury Department and the IRS conclude that arrangements for tax return preparation as part of a sales transaction are inherently agreements to prepare tax returns for compensation under these regulations, notwithstanding any claim by tax return preparers that the tax return or refund claim preparation is not separately compensated. No change in these regulations is necessary to reflect this result. As a result, an individual who, in connection with a sale of goods or services, prepares all or substantially all of a tax return or claim for refund filed after December 31, 2010, and who does not furnish a valid PTIN on the tax return or claim for refund may be liable for the section 6695(c) penalty, unless the failure to furnish a valid PTIN was due to reasonable cause and not due to willful neglect.

### d. Tax Return Preparation Software

The proposed regulations did not specifically include any provisions on commercially available tax return preparation software or software developers. Several commentators expressed the concern that some tax return preparers use tax return preparation software to prepare multiple "self-prepared" tax returns for clients in order to hide the tax return preparers' involvement and avoid identifying themselves on the tax returns. The commentators proposed that the final regulations include limits on the purchase or use of software, such as a requirement built into the software to enter a PTIN to use the software to prepare more than one tax return.

The final regulations do not include any provisions with respect to software. Software developers are not tax return preparers for purposes of these final regulations, and the regulation of software is beyond the scope of these amendments to § 1.6109–2.

### e. Requiring the Use of a PTIN After December 31, 2010

Under the proposed regulations, the amendments to § 1.6109–2 would apply to tax returns and claims for refund filed after December 31, 2010. For tax returns and claims for refund filed before then, the existing provisions of § 1.6109–2 apply. Some commentators questioned whether, as a matter of implementation, January 1, 2011, is a realistic date for the requirements of these regulations. The final regulations maintain the distinction between tax returns and claims for refund filed on or before December 31, 2010, and those filed after that date. To the extent a transitional period may be necessary, the Treasury Department and the IRS may, under § 1.6109–2(h) of the final regulations, prescribe in other guidance interim procedures for tax return preparers to apply for a PTIN or register with the IRS.

### 2. Eligibility To Receive a PTIN

### a. Foreign Tax Return Preparers

The proposed regulations did not specifically address foreign tax return preparers who prepare tax returns or refund claims. A frequent question in the public comments was whether the regulations as proposed would apply to foreign tax return preparers. These commentators also asked whether foreign tax return preparers who do not have an SSN will be eligible for a PTIN. Currently, both Form W–7P, "Application for Preparer Tax Identification Number," and the existing online process at *http://www.irs.gov* that can be used to apply for a PTIN require an applicant to provide the applicant's SSN. Many foreign tax return preparers

are uncertain as to how they will obtain a PTIN, if they are required to have a PTIN.

The final regulations apply to tax return preparers regardless of United States or foreign citizenship or residency. The IRS will establish a process to obtain a PTIN for tax return preparers who do not have SSNs. The Treasury Department and the IRS intend to issue transitional guidance before December 31, 2010, which describes the process to obtain a PTIN for foreign and other tax return preparers who do not have SSNs.

b. User Fees

The proposed regulations provided that, in applying for a PTIN, tax return preparers must pay a user fee that the IRS prescribes in forms, instructions, or other guidance. The proposed regulations also provided for the IRS to prescribe the manner for renewing a PTIN, including the payment of a user fee. Some commentators objected to the proposed requirement of a user fee to obtain or renew a PTIN. Sole proprietors and small preparation firms commented that a user fee, combined with the potential costs of minimum competency testing and for continuing education, would materially increase their business expenses.

The final regulations adopt the proposed provisions under which the IRS may prescribe requirements to apply for or renew a PTIN, including the payment of a user fee. By statute (31 U.S.C. 9701), Congress authorized Federal agencies to establish user fees. The Treasury Department and the IRS will prescribe in regulations the requirement to pay a user fee, the amount of any fee, and the time and manner of payment. A user fee to obtain or renew a PTIN will be necessary to recover the costs that the IRS will incur to implement and administer the processes to apply for and renew a PTIN. The amount of a user fee will be reasonable and based on accepted methods of calculation that reflect the costs to the government, the value of the service to the recipient, the public policy or interest served, and other relevant factors.

*3. Terminology*

a. Preparation of All or Substantially All of a Tax Return or Claim for Refund

The requirement to obtain a PTIN applies to individuals who for compensation prepare, or assist in preparing, all or substantially all of a tax return or claim for refund. Section 1.6109–2(g) of the proposed regulations identified the following non-exclusive

list of factors to determine whether an individual prepared or assisted in preparing all or substantially all of a tax return or claim for refund:

The complexity of the work performed by the individual relative to the overall complexity of the tax return or claim for refund of tax;

The amount of the items of income, deductions, or losses attributable to the work performed by the individual relative to the total amount of income, deductions, or losses required to be correctly reported on the tax return or claim for refund of tax; and

The amount of tax or credit attributable to the work performed by the individual relative to the total tax liability required to be correctly reported on the tax return or claim for refund of tax.

Examples are included in the proposed regulations to illustrate the provisions of paragraph (g). The final regulations retain these provisions, including the definition of a tax return preparer adopted in paragraph (g) of the final regulations. As explained, this definition of tax return preparer for purposes of these regulations is necessary for meaningful oversight of tax return preparation. The factors in paragraph (g) provide guidance for applying the test of whether an individual has prepared or assisted with preparing all or substantially all of a tax return or claim for refund. Paragraph (g) of the final regulations, however, also adds a sentence not in the proposed regulations to clarify that the preparation of a form, statement, or schedule, such as Schedule EIC (Form 1040), "Earned Income Credit," may constitute the preparation of all or substantially all of a tax return or claim for refund based on the application of the factors in paragraph (g).

Paragraph (h) of the final regulations clarifies that the IRS may specify in other appropriate guidance the returns, schedules, and other forms to which these regulations will apply.

b. Registered Tax Return Preparers

As provided in the proposed regulations, to obtain a PTIN or other prescribed identifying number, a tax return preparer must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer authorized to practice before the IRS under 31 U.S.C. 330 and Circular 230. This requirement will apply after December 31, 2010, unless the IRS prescribes exceptions, such as for a transitional period, as necessary for effective tax administration. A number of the comments noted a concern that

the term *registered tax return preparer* is likely to cause confusion in the marketplace for tax return preparation. The commentators are concerned that this designation for a certain group of tax return preparers, when listed with attorneys, certified public accountants, and enrolled agents, may lead the public to mistakenly infer that registered tax return preparers have credentials and qualifications similar to those of attorneys, certified public accountants, and enrolled agents. Several commentators observed that some registered tax return preparers might even attempt to exploit this confusion to their commercial advantage. To avoid the potential for misperception, the commentators advocate that the IRS explain the distinctions between registered tax return preparers and other practitioners authorized to practice before the IRS under Circular 230. At least one commentator also recommended changing the term to "authorized tax return preparers."

The final regulations adopt the term *registered tax return preparer*. The Treasury Department and the IRS conclude that the term does not reasonably imply that registered tax return preparers are authorized to practice law or certified public accountancy or act as enrolled agents or that the term will cause material confusion or misunderstanding by the public.

The role of registered tax return preparers and their authority to practice before the IRS will be addressed in amendments to Circular 230. The requirements and process to become a registered tax return preparer will be set forth in forms, instructions, and other appropriate guidance. In that regard, some commentators that employ tax return preparers requested that the IRS allow the employers to mass register their employees (with a means for employers to subsequently validate through the IRS an employee's standing as a registered tax return preparer with a current PTIN). The purpose of these final regulations, however, is not to provide guidance on the specific process for registration.

**Special Analyses**

It has been determined that these final regulations are not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations.

It has been determined that a final regulatory flexibility analysis under 5

U.S.C. 604 is required for this final rule. The analysis is set forth under the heading, "Final Regulatory Flexibility Analysis."

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these final regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business. The Chief Counsel for Advocacy submitted comments on the notice of proposed rulemaking, which are discussed elsewhere in this preamble.

*Final Regulatory Flexibility Analysis*

When an agency either promulgates a final rule that follows a required notice of proposed rulemaking or promulgates a final interpretative rule involving the internal revenue laws as described in 5 U.S.C. 603(a), the Regulatory Flexibility Act (5 U.S.C. chapter 6) requires the agency to "prepare a final regulatory flexibility analysis." A final regulatory flexibility analysis must, pursuant to 5 U.S.C. 604(a), contain the five elements listed in this final regulatory flexibility analysis. For purposes of this final regulatory flexibility analysis, a small entity is defined as a small business, small nonprofit organization, or small governmental jurisdiction. 5 U.S.C. 601(3)–(6). The Treasury Department and the IRS conclude that the final regulations (together with other contemplated guidance provided for in these regulations) will impact a substantial number of small entities and the economic impact will be significant.

*A Statement of the Need for, and the Objectives of, the Final Rule*

The final regulations are necessary for tax administration. The final regulations are needed to identify tax return preparers and the tax returns and claims for refund that they prepare, to aid the IRS's oversight of tax return preparers, and to administer requirements intended to ensure that tax return preparers are competent, trained, and conform to rules of practice. Mandating a single type of identifying number for all tax return preparers and assigning a prescribed identifying number to registered tax return preparers is critical to effective oversight.

Taxpayers' reliance on paid tax return preparers has grown steadily in recent decades, and a large number of U.S. taxpayers rely on paid tax return preparers for assistance in meeting the taxpayers' income tax filing obligations. Beyond preparing tax returns, tax return preparers also help educate taxpayers about the tax laws and facilitate electronic filing. Tax return preparers

provide advice to taxpayers, identify items or issues for which the law or guidance is unclear, and inform taxpayers of the benefits and risks of positions taken on a tax return, and the tax treatment or reporting of items and transactions. Competent tax return preparers who are well educated in the rules and subject matter of their field can prevent costly errors, potentially saving a taxpayer from unwanted problems later on and relieving the IRS from expending valuable examination and collection resources.

Given the important role that tax return preparers play in Federal tax administration, the IRS has a significant interest in being able to accurately identify tax return preparers and monitor their tax return preparation activities. The final regulations, therefore, enable the IRS to more accurately identify tax return preparers and improve the IRS's ability to associate filed tax returns and refund claims with the responsible tax return preparer. The final regulations are intended to accomplish this result, and thereby advance tax administration, by requiring all individuals who are paid to prepare all or substantially all of a tax return or claim for refund of tax to obtain a preparer identifying number prescribed by the IRS. Pursuant to the final regulations, the IRS will require individuals who sign tax returns or claims for refund to furnish the tax return preparer's PTIN on a tax return or claim for refund when the return or refund claim is signed. The final regulations also provide that the IRS may require tax return preparers to apply for, and regularly renew, their PTINs. Under the final regulations, the IRS may prescribe a user fee payable when applying for a number and for renewal.

*Summaries of the Significant Issues Raised in the Public Comments Responding to the Initial Regulatory Flexibility Analysis and of the Agency's Assessment of the Issues, and a Statement of Any Changes Made to the Rule as a Result of the Comments*

The IRS did not receive specific comments from the public responding to the initial regulatory flexibility analysis in the proposed regulations that preceded these final regulations. The IRS did receive comments from the public on the proposed amendments to § 1.6109–2. A summary of the comments is set forth elsewhere in this preamble, along with the Treasury Department's and the IRS's assessment of the issues raised in the comments and descriptions of any revisions resulting from the comments.

*A Description and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why an Estimate Is Not Available*

The final regulations apply to individuals who prepare tax returns and claims for refund of tax. The estimated number of paid tax return preparers is as high as 1.2 million, which means the final regulations are likely to impact a large number of individuals. Most paid tax return preparers are employed by firms. A substantial number of paid tax return preparers are employed at small tax return preparation firms or are self-employed tax return preparers. Any economic impact of these regulations on small entities generally will be on self-employed tax return preparers who prepare and sign tax returns or on small businesses that employ one or more individuals who prepare tax returns.

The appropriate NAICS codes for PTINs are those that relate to tax preparation services (NAICS code 541213), other accounting services (NAICS code 541219), offices of lawyers (NAICS code 541110), and offices of certified public accountants (NAICS code 541211). Entities identified as tax preparation services and offices of lawyers are considered small under the SBA's size standards (13 CFR 121.201) if their annual revenue is less than $7 million. Entities identified as other accounting services and offices of certified public accountants are considered small under the SBA's size standards if their annual revenue is less than $8.5 million. The IRS estimates that approximately 70 to 80 percent of the individuals subject to these final regulations are tax return preparers operating as, or employed by, small entities.

*A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Subject to the Requirements and the Type of Professional Skills Necessary for Preparation of a Report or Record*

The final regulations do not directly impose any reporting, recordkeeping, or similar requirements on any small entities. Rather, the final regulations provide that the IRS may prescribe in forms, instructions, or other guidance (including regulations) requirements for PTINs issued to tax return preparers, regular renewal of PTINs, and payment of a user fee when applying for or renewing a PTIN. In addition, other guidance may require certain tax return preparers to complete competency testing, complete continuing education

courses, and adhere to established rules of practice governing attorneys, certified public accountants, enrolled agents, enrolled actuaries, and enrolled retirement plan agents.

Applying for a PTIN and subsequent renewal will require reporting of certain information, but they are not expected to require recordkeeping. No particular or special professional skills will be necessary. These activities also will not require the purchase or use of any special business equipment or software. To the extent it will be necessary to apply for a PTIN (or similar identifying number that may subsequently replace a PTIN) online at *http://www.irs.gov*, most if not all tax return preparation businesses have computers and Internet access. The IRS estimates that applying for a PTIN will take 10 to 20 minutes per individual, with an average of 15 minutes per individual.

Under amendments to Circular 230 that the IRS will issue to implement recommendations in the Report, tax return preparers who apply to be registered tax return preparers and who regularly renew their status may be subject to recordkeeping requirements because they may be required to maintain specified records, such as documentation and educational materials relating to completion of continuing education courses. These requirements do not involve any specific professional skills other than general recordkeeping abilities already needed to own and operate a small business or to competently act as a tax return preparer. It is estimated that tax return preparers will annually spend approximately 30 minutes to 1 hour in maintaining records relating to the continuing education requirements, depending on individual circumstances.

A separate regulation addressing reasonable user fees has been proposed. Tax return preparers may be required to pay a user fee when first applying for a PTIN and at every renewal. Small entities may be affected by these costs if the entities choose to pay some or all of these fees for their employees.

Under the amendments to Circular 230, tax return preparers may also incur costs for commercial continuing education courses and minimum competency examinations, plus incidental costs, such as for travel and accommodations, in order to maintain their status as registered tax return preparers under Circular 230. Course prices can vary greatly, from free to hundreds of dollars. Many small tax return preparation firms may choose, as with the user fee, to bear these costs for their employees. In some cases, small entities may lose sales and profits while

their employed tax return preparers attend training or educational classes or are studying and sitting for examinations. Some small entities that employ tax return preparers may even need to alter their business operations if a significant number of their employees cannot satisfy the necessary registration and competency requirements. The Treasury Department and the IRS conclude, however, that only a small percentage of small entities, if any, may need to cease doing business or radically change their business model due to the final regulations.

Although each of the reporting and recordkeeping requirements and the costs identified above (in connection with the final regulations and the other anticipated guidance necessary to implement the Report) is not expected to singly result in a significant economic impact, taken together it is anticipated that they may have a significant economic impact on a substantial number of small entities.

*A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting Any Alternative Adopted in the Final Rule and Why Other Significant Alternatives Affecting the Impact on Small Entities That the Agency Considered Were Rejected*

The Treasury Department and the IRS are not aware of any steps that could be taken to minimize the economic impact on small entities that would also be consistent with the objectives of these final regulations. These regulations do not impose any more requirements on small entities than are necessary to effectively administer the internal revenue laws. Further, the regulations do not subject small entities to any requirements that are not also applicable to larger entities covered by the regulations.

The Treasury Department and the IRS have determined that there are no viable alternatives to the final regulations that would enable the IRS to accurately identify tax return preparers, other than through the use of a PTIN, as provided in the regulations.

The Treasury Department and the IRS considered alternatives at multiple points. These final regulations are, in large measure, an outgrowth of, and in part carry out, the Report, which extensively reviewed different approaches to improving how the IRS oversees and interacts with tax return preparers. As part of the Report, the IRS

received a large volume of comments on the issue of increased oversight of tax return preparers generally and on the proposed recommendation requiring tax return preparers to use a uniform prescribed identifying number. The comments were received from all categories of interested stakeholders, including tax professional groups representing large and small entities, IRS advisory groups, tax return preparers, and the public. The input received from this large and diverse community overwhelmingly expressed support for the proposed requirements.

Among the alternatives contemplated at the time were:

(1) Requiring all paid tax return preparers to comply with the ethical standards in Circular 230 or an ethics code similar to Circular 230, but not requiring any paid preparers to demonstrate their qualification and competency;

(2) Requiring tax return preparers who are not currently authorized to practice before the IRS to register with the IRS, complete annual continuing education requirements, and meet certain ethical standards, but not to pass a minimum competency examination;

(3) Requiring all paid tax return preparers to pass a minimum competency examination and meet other registration requirements; and

(4) Requiring all paid tax return preparers who are not currently authorized to practice before the IRS to pass a minimum competency examination and meet other registration requirements, but "grandfather in" tax return preparers who have accurately and competently prepared tax returns for a certain period of years.

These and other issues were raised in the public comments to the proposed regulations and were carefully considered in developing the final regulations. After consideration of all of the various alternatives and the responses received in the public comment process, the Treasury Department and the IRS conclude that the provisions of the final regulations will most effectively promote sound tax administration. Establishing a single, prescribed identifying number for tax return preparers will enable the IRS to accurately identify tax return preparers, match preparers with the tax returns and claims for refund they prepare, and better administer the tax laws with respect to tax return preparers and their clients.

Under the final regulations and the additional guidance described, the IRS will establish a process intended to assign PTINs only to qualified, competent, and ethical tax return

preparers. The testing requirements that may be set forth in other guidance will establish a benchmark of minimum competency necessary for tax return preparers to obtain their professional credentials, while the purpose of the continuing education provisions is to require tax return preparers to remain current on the Federal tax laws and continue to develop their tax knowledge. The extension in other, prospective guidance of the rules in Circular 230 to any paid tax return preparer will require all practitioners to meet certain ethical standards and allow the IRS to suspend or otherwise appropriately discipline tax return preparers who engage in unethical or disreputable conduct. Accordingly, the implementation of qualification and competency standards is expected to increase tax compliance and allow taxpayers to be confident that the tax return preparers to whom they turn for assistance are knowledgeable, skilled, and ethical.

**Drafting Information**

The principal author of these final regulations is Stuart Murray of the Office of the Associate Chief Counsel, Procedure and Administration.

**List of Subjects**

*26 CFR Part 1*

Income taxes, Reporting and recordkeeping requirements.

*26 CFR Part 602*

Reporting and recordkeeping requirements.

**Adoption of Amendments to the Regulations**

■ Accordingly, 26 CFR part 1 is amended as follows:

**PART 1—INCOME TAXES**

■ **Paragraph 1.** The authority citation for part 1 continues to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

Section 1.6109–2 also issued under 26 U.S.C. 6109(a). * * *

■ **Par. 2.** Section 1.6109–2 is amended by revising the section heading, revising paragraphs (a)(2) and (d), and adding paragraphs (e), (f), (g), (h), and (i) to read as follows:

**§ 1.6109–2 Tax return preparers furnishing identifying numbers for returns or claims for refund and related requirements.**

(a) * * *

(2)(i) For tax returns or claims for refund filed on or before December 31, 2010, the identifying number of an individual tax return preparer is that individual's social security number or such alternative number as may be prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance.

(ii) For tax returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's preparer tax identification number or such other number prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance.

* * * * *

(d) Beginning after December 31, 2010, all tax return preparers must have a preparer tax identification number or other prescribed identifying number that was applied for and received at the time and in the manner, including the payment of a user fee, as may be prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance. Except as provided in paragraph (h) of this section, beginning after December 31, 2010, to obtain a preparer tax identification number or other prescribed identifying number, a tax return preparer must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer authorized to practice before the Internal Revenue Service under 31 U.S.C. 330 and the regulations thereunder.

(e) The Internal Revenue Service may designate an expiration date for any preparer tax identification number or other prescribed identifying number and may further prescribe the time and manner for renewing a preparer tax identification number or other prescribed identifying number, including the payment of a user fee, as set forth in forms, instructions, or other appropriate guidance. The Internal Revenue Service may provide that any identifying number issued by the Internal Revenue Service prior to the effective date of this regulation will expire on December 31, 2010, unless properly renewed as set forth in forms, instructions, or other appropriate guidance, including these regulations.

(f) As may be prescribed in forms, instructions, or other appropriate guidance, the IRS may conduct a Federal tax compliance check on a tax return preparer who applies for or renews a preparer tax identification number or other prescribed identifying number.

(g) Only for purposes of paragraphs (d), (e), and (f) of this section, the term *tax return preparer* means any individual who is compensated for preparing, or assisting in the preparation of, all or substantially all of a tax return or claim for refund of tax. Factors to consider in determining whether an individual is a tax return preparer under this paragraph (g) include, but are not limited to, the complexity of the work performed by the individual relative to the overall complexity of the tax return or claim for refund of tax; the amount of the items of income, deductions, or losses attributable to the work performed by the individual relative to the total amount of income, deductions, or losses required to be correctly reported on the tax return or claim for refund of tax; and the amount of tax or credit attributable to the work performed by the individual relative to the total tax liability required to be correctly reported on the tax return or claim for refund of tax. The preparation of a form, statement, or schedule, such as Schedule EIC (Form 1040), "Earned Income Credit," may constitute the preparation of all or substantially all of a tax return or claim for refund based on the application of the foregoing factors. A tax return preparer does not include an individual who is not otherwise a tax return preparer as that term is defined in § 301.7701–15(b)(2), or who is an individual described in § 301.7701–15(f). The provisions of this paragraph (g) are illustrated by the following examples:

*Example 1.* Employee A, an individual employed by Tax Return Preparer B, assists Tax Return Preparer B in answering telephone calls, making copies, inputting client tax information gathered by B into the data fields of tax preparation software on a computer, and using the computer to file electronic returns of tax prepared by B. Although Employee A must exercise judgment regarding which data fields in the tax preparation software to use, A does not exercise any discretion or independent judgment as to the clients' underlying tax positions. Employee A, therefore, merely provides clerical assistance or incidental services and is not a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

*Example 2.* The facts are the same as in *Example 1,* except that Employee A also interviews B's clients and obtains from them information needed for the preparation of tax returns. Employee A determines the amount and character of entries on the returns and whether the information provided is sufficient for purposes of preparing the returns. For at least some of B's clients, A obtains information and makes determinations that constitute all or substantially all of the tax return. Employee A is a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in

forms, instructions, or other appropriate guidance. Employee A is a tax return preparer even if Employee A relies on tax preparation software to prepare the return.

*Example 3.* C is an employee of a firm that prepares tax returns and claims for refund of tax for compensation. C is responsible for preparing a Form 1040, "U.S. Individual Income Tax Return," for a client. C obtains the information necessary for the preparation of the tax return during a meeting with the client, and makes determinations with respect to the proper application of the tax laws to the information in order to determine the client's tax liability. C completes the tax return and sends the completed return to employee D, who reviews the return for accuracy before signing it. Both C and D are tax return preparers required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

*Example 4.* E is an employee at a firm which prepares tax returns and claims for refund of tax for compensation. The firm is engaged by a corporation to prepare its Federal income tax return on Form 1120, "U.S. Corporation Income Tax Return." Among the documentation that the corporation provides to E in connection with the preparation of the tax return is documentation relating to the corporation's potential eligibility to claim a recently enacted tax credit for the taxable year. In preparing the return, and specifically for purposes of the new tax credit, E (with the corporation's consent) obtains advice from F, a subject matter expert on this and similar credits. F advises E as to the corporation's entitlement to the credit and provides his calculation of the amount of the credit. Based on this advice from F, E prepares the corporation's Form 1120 claiming the tax credit in the amount recommended by F. The additional credit is one of many tax credits and deductions claimed on the tax return, and determining the credit amount does not constitute preparation of all or substantially all of the corporation's tax return under this paragraph (g). F will not be considered to have prepared all or substantially all of the corporation's tax return, and F is not a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance. The analysis is the same whether or not the tax credit is a substantial portion of the return under § 301.7701–15 of this chapter (as opposed to substantially all of the return), and whether or not F is in the same firm with E. E is a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

(h) The Internal Revenue Service, through forms, instructions, or other appropriate guidance, may prescribe exceptions to the requirements of this section, including the requirement that an individual be authorized to practice before the Internal Revenue Service before receiving a preparer tax identification number or other prescribed identifying number, as necessary in the interest of effective tax administration. The Internal Revenue Service, through other appropriate guidance, may also specify specific returns, schedules, and other forms that qualify as tax returns or claims for refund for purposes of these regulations.

(i) *Effective/applicability date.* Paragraph (a)(1) of this section is applicable to tax returns and claims for refund filed after December 31, 2008. Paragraph (a)(2)(i) of this section is applicable to tax returns and claims for refund filed on or before December 31, 2010. Paragraph (a)(2)(ii) of this section is applicable to tax returns and claims for refund filed after December 31, 2010. Paragraph (d) of this section is applicable to tax return preparers after December 31, 2010. Paragraphs (e) through (h) of this section are effective after September 30, 2010.

## PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

■ **Par. 3.** The authority citation for part 602 continues to read as follows:

**Authority:** 26 U.S.C. 7805.

■ **Par. 4.** In § 602.101, paragraph (b) is amended by revising the entry for "1.6109–2" in the table to read as follows:

**§ 602.101  OMB Control numbers.**

\* \* \* \* \*

(b) \* \* \*

| CFR part or section where identified and described | Current OMB control No. |
|---|---|
| \* \* \* \* \* | |
| 1.6109–2 ....................... | 1545–2176 |
| \* \* \* \* \* | |

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement.*

Approved: August 11, 2010.

**Michael Mundaca,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2010–24653 Filed 9–28–10; 11:15 am]

**BILLING CODE 4830–01–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 300**

**[TD 9503]**

**RIN 1545–BI71**

## User Fees Relating to Enrollment and Preparer Tax Identification Numbers

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final rule.

**SUMMARY:** This document contains amendments to the regulations relating to the imposition of certain user fees on certain tax practitioners. The final regulations establish a new user fee for individuals who apply for or renew a preparer tax identification number (PTIN). The final regulations affect individuals who apply for or renew a PTIN.

**DATES:** *Effective Date:* These regulations are effective on September 30, 2010.

*Applicability Date:* For dates of applicability see §§ 300.1(d), 300.2(d), 300.3(d), 300.4(d), 300.5(d), 300.6(d), 300.7(d), 300.8(d), and 300.9(d).

**FOR FURTHER INFORMATION CONTACT:** Concerning the final regulations, Emily M. Lesniak at (202) 622–4570; concerning cost methodology Eva J. Williams at (202) 435–5514 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

**Background**

This document contains final regulations relating to the imposition of a user fee to apply for or renew a PTIN and the reorganization of the effective date provisions under §§ 300.0 through 300.8. Section 300.9 establishes a $50 user fee to apply for or renew a PTIN. The Independent Offices Appropriations Act of 1952 (IOAA), which is codified at 31 U.S.C. 9701, authorizes agencies to prescribe regulations establishing user fees for services provided by the agency. Regulations prescribing user fees are subject to the policies of the President, which are currently set forth in the Office of Management and Budget Circular A–25 (the OMB Circular), 58 FR 38142 (July 15, 1993). The OMB Circular requires agencies seeking to impose user fees for providing special benefits to identifiable recipients to calculate the full cost of providing those benefits.

On September 30, 2010, the Treasury Department and the IRS published in the **Federal Register** final regulations under section 6109 (TD 9501) that



forms, instructions, or other appropriate guidance. Employee A is a tax return preparer even if Employee A relies on tax preparation software to prepare the return.

*Example 3.* C is an employee of a firm that prepares tax returns and claims for refund of tax for compensation. C is responsible for preparing a Form 1040, "U.S. Individual Income Tax Return," for a client. C obtains the information necessary for the preparation of the tax return during a meeting with the client, and makes determinations with respect to the proper application of the tax laws to the information in order to determine the client's tax liability. C completes the tax return and sends the completed return to employee D, who reviews the return for accuracy before signing it. Both C and D are tax return preparers required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

*Example 4.* E is an employee at a firm which prepares tax returns and claims for refund of tax for compensation. The firm is engaged by a corporation to prepare its Federal income tax return on Form 1120, "U.S. Corporation Income Tax Return." Among the documentation that the corporation provides to E in connection with the preparation of the tax return is documentation relating to the corporation's potential eligibility to claim a recently enacted tax credit for the taxable year. In preparing the return, and specifically for purposes of the new tax credit, E (with the corporation's consent) obtains advice from F, a subject matter expert on this and similar credits. F advises E as to the corporation's entitlement to the credit and provides his calculation of the amount of the credit. Based on this advice from F, E prepares the corporation's Form 1120 claiming the tax credit in the amount recommended by F. The additional credit is one of many tax credits and deductions claimed on the tax return, and determining the credit amount does not constitute preparation of all or substantially all of the corporation's tax return under this paragraph (g). F will not be considered to have prepared all or substantially all of the corporation's tax return, and F is not a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance. The analysis is the same whether or not the tax credit is a substantial portion of the return under § 301.7701–15 of this chapter (as opposed to substantially all of the return), and whether or not F is in the same firm with E. E is a tax return preparer required to apply for a PTIN or other identifying number as the Internal Revenue Service may prescribe in forms, instructions, or other appropriate guidance.

(h) The Internal Revenue Service, through forms, instructions, or other appropriate guidance, may prescribe exceptions to the requirements of this section, including the requirement that an individual be authorized to practice before the Internal Revenue Service before receiving a preparer tax identification number or other prescribed identifying number, as necessary in the interest of effective tax administration. The Internal Revenue Service, through other appropriate guidance, may also specify specific returns, schedules, and other forms that qualify as tax returns or claims for refund for purposes of these regulations.

(i) *Effective/applicability date.* Paragraph (a)(1) of this section is applicable to tax returns and claims for refund filed after December 31, 2008. Paragraph (a)(2)(i) of this section is applicable to tax returns and claims for refund filed on or before December 31, 2010. Paragraph (a)(2)(ii) of this section is applicable to tax returns and claims for refund filed after December 31, 2010. Paragraph (d) of this section is applicable to tax return preparers after December 31, 2010. Paragraphs (e) through (h) of this section are effective after September 30, 2010.

## PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

■ **Par. 3.** The authority citation for part 602 continues to read as follows:

**Authority:** 26 U.S.C. 7805.

■ **Par. 4.** In § 602.101, paragraph (b) is amended by revising the entry for "1.6109–2" in the table to read as follows:

## § 602.101 OMB Control numbers.

\* \* \* \* \*

(b) \* \* \*

| CFR part or section where identified and described | Current OMB control No. |
|---|---|
| \* \* \* \* \* | |
| 1.6109–2 ........................ | 1545–2176 |
| \* \* \* \* \* | |

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement.*

Approved: August 11, 2010.

**Michael Mundaca,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2010–24653 Filed 9–28–10; 11:15 am]

**BILLING CODE 4830–01–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 300**

**[TD 9503]**

**RIN 1545–BI71**

## User Fees Relating to Enrollment and Preparer Tax Identification Numbers

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final rule.

**SUMMARY:** This document contains amendments to the regulations relating to the imposition of certain user fees on certain tax practitioners. The final regulations establish a new user fee for individuals who apply for or renew a preparer tax identification number (PTIN). The final regulations affect individuals who apply for or renew a PTIN.

**DATES:** *Effective Date:* These regulations are effective on September 30, 2010.

*Applicability Date:* For dates of applicability see §§ 300.1(d), 300.2(d), 300.3(d), 300.4(d), 300.5(d), 300.6(d), 300.7(d), 300.8(d), and 300.9(d).

**FOR FURTHER INFORMATION CONTACT:** Concerning the final regulations, Emily M. Lesniak at (202) 622–4570; concerning cost methodology Eva J. Williams at (202) 435–5514 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

### Background

This document contains final regulations relating to the imposition of a user fee to apply for or renew a PTIN and the reorganization of the effective date provisions under §§ 300.0 through 300.8. Section 300.9 establishes a $50 user fee to apply for or renew a PTIN. The Independent Offices Appropriations Act of 1952 (IOAA), which is codified at 31 U.S.C. 9701, authorizes agencies to prescribe regulations establishing user fees for services provided by the agency. Regulations prescribing user fees are subject to the policies of the President, which are currently set forth in the Office of Management and Budget Circular A–25 (the OMB Circular), 58 FR 38142 (July 15, 1993). The OMB Circular requires agencies seeking to impose user fees for providing special benefits to identifiable recipients to calculate the full cost of providing those benefits.

On September 30, 2010, the Treasury Department and the IRS published in the **Federal Register** final regulations under section 6109 (TD 9501) that

require tax return preparers who prepare all or substantially all of a tax return or claim for refund to use a PTIN as their identifying number. These regulations also provide that to be eligible to receive a PTIN, a tax return preparer must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer.

On July 23, 2010, the Treasury Department and the IRS published in the **Federal Register** (75 FR 43110) a notice of proposed rulemaking (REG–139343–08) proposing amendments to part 300 of title 26 of the Code of Federal Regulations. New § 300.9 of these regulations proposed to establish a $50 user fee to apply for or renew a PTIN. These regulations do not include any fees charged by the vendor, which vendor fee is now calculated to be $14.25. Additionally, these regulations proposed to reorganize the effective date provisions of §§ 300.0 through 300.8. A public hearing regarding the proposed regulations was held on August 24, 2010. The IRS also received written public comments in response to the proposed regulations.

After careful consideration of all written public comments and statements made during the public hearing, the Treasury Department and the IRS have decided to adopt without modification the proposed regulations that establish a $50 user fee to apply for or renew a PTIN, recovering the full cost to the IRS for administering the PTIN application and renewal program. The Treasury Department and the IRS also have decided to adopt without modification the proposed regulations reorganizing the effective date provisions under §§ 300.0 through 300.8.

**Summary of Comments**

Over 10,000 written comments were received in response to the notice of proposed rulemaking. The comments were considered and are available for public inspection upon request. The comments related to the $50 user fee to apply for or renew a PTIN, the related PTIN regulations under section 6109, or the proposed amendments to regulations governing practice before the IRS under 31 CFR part 10 (Circular 230). No comments were received regarding the reorganization of the effective date provisions. Many of the comments are summarized in this preamble.

To the extent comments received with respect to the user fee regulation raise issues pertaining to the PTIN regulations under section 6109 or Circular 230, the Treasury Department and the IRS are considering and

addressing those comments in connection with the relevant regulations. Accordingly, the summary of comments below addresses only those comments that seek modification or clarification of the user fee as set forth in the proposed regulations.

*1. Tax Return Preparers Who Already Are Subject to Fees*

The Treasury Department and the IRS received numerous comments stating that tax return preparers who are attorneys, certified public accountants, or enrolled agents already are required to maintain licenses and pay numerous fees associated with obtaining and maintaining their licenses. Some commentators also stated that regulation of currently unenrolled tax return preparers or imposing a user fee to apply for or renew a PTIN for currently unenrolled tax return preparers was acceptable, but individuals who are regulated currently should not be required to obtain a PTIN or pay a user fee. Other similar comments requested that licensed tax consultants in Oregon be grandfathered into the new regulatory scheme and that individuals who currently have a PTIN be exempt from the requirements to apply for and renew a PTIN.

Having a PTIN is a special benefit that allows specified tax return preparers to prepare all or substantially all of a tax return or claim for refund for compensation. The OMB Circular encourages user fees for government-provided services that confer special benefits on identifiable recipients over and above those benefits received by the general public. A user fee must be set at an amount that allows the agency to recover the full cost of providing the special services unless the Office of Management and Budget grants an exception.

The same special benefit is conferred on all persons who obtain a PTIN, and the cost to the government is the same for providing PTINs to attorneys, certified public accountants, and enrolled agents as it is for providing PTINs to formerly unenrolled tax return preparers. Under the OMB Circular, absent special approval, the IRS must recover the full costs for providing the special benefits associated with a PTIN. The IRS cannot charge a user fee solely to tax return preparers who are not otherwise licensed as an attorney, certified public accountant, or enrolled agent. Although many comments sought exceptions to the user fee, one commentator encouraged the Treasury Department and the IRS to maintain a uniform user fee for obtaining a PTIN. Consequently, the Treasury Department

and the IRS are adopting the proposed regulations and requiring all tax return preparers to pay a user fee to apply for or renew a PTIN.

*2. Calculation of the User Fee*

The Treasury Department and the IRS received a comment that the proposed regulations do not comply with the provisions of IOAA because a PTIN is not a service or thing of value to a tax return preparer. The commentator also stated that the proposed regulations do not comply with the general policies for implementing user fees, as provided in the OMB Circular, because providing a PTIN to a tax return preparer benefits the general public by tracking incompetent and unscrupulous tax return preparers and that the IRS already meets a goal of the OMB Circular because it is already self-sustaining, as the IRS collects more taxes than it costs to run the agency.

The IOAA authorizes agencies to prescribe regulations that establish charges for services provided by the agency. The charges must be fair and must be based on the costs to the government, the value of the service to the recipient, the public policy or interest served, and other relevant facts. The IOAA provides that regulations implementing user fees are subject to policies prescribed by the President; these policies are currently set forth in the OMB Circular. The OMB Circular encourages user fees for government-provided services that confer benefits on identifiable recipients over and above those benefits received by the general public. Under the OMB Circular, an agency that seeks to impose a user fee for government-provided services must calculate the full cost of providing those services.

The user fee was determined to be consistent with the IOAA and the OMB Circular. A PTIN both confers a special benefit on an identifiable recipient and is a service or thing of value to a tax return preparer. A PTIN confers a special benefit because without a PTIN, a tax return preparer could not receive compensation for preparing all or substantially all of a federal tax return or claim for refund. Because only attorneys, certified public accountants, enrolled agents, and registered tax return preparers are eligible to obtain a PTIN, only a subset of the general public is entitled to a PTIN and the special benefit of receiving compensation for the preparation of a return that it confers. This analysis is consistent with the current practice of charging a user fee on individuals seeking to become enrolled agents. Being an enrolled agent confers special benefits; and, therefore,

the IRS currently charges a user fee on applicants seeking those special benefits.

Further, while it is anticipated that requiring tax return preparers to obtain a PTIN will benefit tax administration generally, only the tax return preparer who receives the PTIN can take advantage of the special benefit associated with having a PTIN. The OMB Circular provides that a government agency should recover the full cost of providing a special benefit when the general public receives a benefit as a necessary consequence of the government providing a special benefit to an identifiable recipient.

The OMB Circular also provides that one of the objectives of establishing a user fee is to "ensure that each service, sale, or use of Government goods or resources provided by an agency to specific recipients be self-sustaining." As described above, the issuance of a PTIN provides a special benefit to the specific tax return preparer who receives the PTIN. The administration of the PTIN application and renewal program requires the use of IRS services, goods, and resources. For the PTIN application and renewal program to be self-sustaining, the IRS must charge a user fee to recover the costs of providing the special benefits associated with PTIN. The fact that the IRS collects tax revenue for use by the government as a whole does not affect the analysis of whether the PTIN application and renewal program is self-sustaining. Thus, the Treasury Department and the IRS are complying with the provisions of the IOAA and the OMB Circular by implementing a user fee to recover the costs associated with the issuance of PTINs.

### 3. Renewing a PTIN

Several commentators objected to renewing their PTIN on a yearly basis and requested longer renewal periods. At this time the Treasury Department and the IRS have determined that an annual renewal of a PTIN is the most effective procedure. The user fee to renew a PTIN is, however, part of the larger implementation of recommendations in Publication 4832, "Return Preparer Review," which was published on January 4, 2010, to be effective for the 2011 Federal tax filing season (January–April 2011). These recommendations include revisions to Circular 230 implementing the registered tax return preparer program and revisions to the regulations under section 6109 requiring all tax return preparers to obtain and use a PTIN as their identifying number. As these programs are implemented, the IRS will

continually monitor their administration and make appropriate adjustments to increase effectiveness. Thus, in the future, the Treasury Department and the IRS will review the requirement to annually renew a PTIN and will make modifications, as appropriate.

### 4. The Amount of the User Fee

Many commentators objected to the amount of the user fee. Some stated that the user fee should be smaller or that tax return preparers who prepare a limited number of returns should pay a smaller user fee. Other commentators characterized the user fee as a tax or a revenue raiser.

As stated earlier in this preamble, under the OMB Circular, the IRS must recover the full cost of providing a PTIN. The full cost to the government to administer the PTIN application and renewal program was calculated to be $50 per application or renewal. The user fee does not provide funds beyond the cost to process PTIN applications. Thus, the user fee to apply for or renew a PTIN does not provide additional revenue to the IRS that can be allocated to other programs. The PTIN user fee merely offsets costs the IRS incurs to provide the special benefits associated with having a PTIN.

The cost of processing PTIN applications is not affected by the number of tax returns that a tax return preparer prepares during a given tax season. For example, the cost to the IRS to process the PTIN applications of individuals who prepare over 500 tax returns per year, approximately 100 tax returns per year, or under 10 tax returns per year is the same. The IRS will perform the same tax compliance and suitability checks on these individuals and will provide these individuals with the same PTIN support services. The IRS must also maintain the same data in its PTIN database regarding these individuals and develop the same reconsideration process for these individuals in the event their PTIN applications are denied. Because the cost to the IRS is not dependent on the quantity of returns that an individual tax return preparer prepares, the final regulations adopt the $50 user fee for all tax return preparers to apply for or renew a PTIN.

### 5. Burden Imposed by the User Fee

Some commentators stated that the $50 user fee will be a burden on their businesses or that the cost to apply for or renew a PTIN will be passed on to clients. The IRS recognizes that some individuals who prepare a small number of tax returns may stop

preparing tax returns or that the PTIN user fee may be passed on to clients. The IRS, however, believes that the implementation of the registered tax return preparer program and the requirement to use a PTIN as provided in the section 6109 regulations will benefit taxpayers and tax administration as a whole. The registered tax return preparer program will ensure that tax return preparers meet and maintain a minimum level of competency. The requirement to use a PTIN will provide the IRS an effective way to monitor tax return preparers and enforce the regulation of tax return preparers. The Treasury Department and the IRS believe that a user fee to apply for or renew a PTIN is necessary to recover the cost that the IRS will incur to implement and administer the PTIN application and renewal program.

Other commentators suggested that the user fee to apply for or renew a PTIN would cause some tax return preparers to revert to using their social security number when preparing tax returns rather than a PTIN, which would contravene the identity protection currently provided by PTINs. The regulations under section 6109, however, require tax return preparers to use a PTIN as their sole identifying number when preparing tax returns or claims for refund for compensation. Thus, tax return preparers are not allowed to use their social security numbers as an identifying number when preparing tax returns or claims for refund.

### 6. Use of a Third Party Vendor

Several commentators objected to providing identifying information to the third party vendor, and numerous commentators objected to paying a separate fee to the vendor.

The third party vendor is statutorily and contractually obligated to protect all personally identifiable information. The vendor is subject to the confidentiality and disclosure provisions of section 6103. The vendor also must comply with the provisions of the Federal Information Security Management Act; the E–Government Act of 2002; IRS Acquisitions Procedures; the Federal Acquisitions Regulations; the Taxpayer Browsing Protection Act of 1997; and the Privacy Act of 1974, which is codified at 5 U.S.C. 552a, regarding all non-tax information. The vendor must comply with numerous policies of the Office of Management and Budget, including OMB Circular No. A–130, Security and Federal Automated Information Resources Appendix III; OMB Circular policy M–06–16, Protection of Sensitive Agency

Information; OMB Circular Policy M–06–15, Safeguarding Personally Identifiable Information; and OMB Circular Policy M–06–19, Reporting Incidents Involving Personally Identifiable Information.

The vendor faces significant consequences for the unauthorized inspection or disclosure of confidential tax information. These consequences include, among others, that an officer or employee of the vendor may be subject to civil damages; civil or criminal sanctions, such as sanctions imposed by 18 U.S.C. 641 and 3571; or penalties as prescribed in sections 7213, 7213A, and 7431.

The vendor's fee, currently set at $14.25, covers the costs incurred by the vendor to administer the application and renewal process. These costs are separate from the costs to the IRS for administering the PTIN application and renewal program, which are recovered in the $50 user fee. The respective fees pay for different aspects of administering the PTIN program, each of which is essential to providing PTINs to tax return preparers. Additionally, under the vendor's contract with the IRS, the vendor's fee is reviewed and approved by the IRS.

After consideration of all of the public comments and statements made during the public hearing, the Treasury Department and the IRS have adopted the proposed regulations in full.

**Effective/Applicability Date**

The Administrative Procedure Act provides that substantive rules generally will not be effective until thirty days after the final regulations are published in the **Federal Register** (5 U.S.C. 553(d)). Final regulations may be effective prior to thirty days after publication if the publishing agency finds that there is good cause for an earlier effective date.

This regulation is part of the IRS' effort to implement the recommendations in the "Return Preparer Review." The review concluded that obtaining more complete and accurate information on individual tax return preparers and improved IRS oversight of tax return preparers and their preparation of tax returns and claims for refund is necessary for effective tax administration. The PTIN is the mechanism that allows the IRS to obtain more complete and accurate information on tax return preparers. Thus, the issuance of a PTIN is a threshold requirement to implementing the recommendations in the report.

This regulation must be effective significantly in advance of the beginning of the 2011 filing season to enable the IRS to charge a user fee to recover the cost of administering the program under which all individuals who prepare all or substantially all of a tax return or claim for refund of tax are required to obtain a PTIN for use during the 2011 Federal tax filing season. For all tax return preparers to receive a PTIN prior to the 2011 filing season, the IRS must begin registering preparers as quickly as possible. Thus, the Treasury Department and the IRS find that there is good cause for these regulations to be effective upon the publication of a Treasury decision adopting these rules as final regulations in the **Federal Register**.

**Special Analyses**

It has been determined that these final regulations are a significant regulatory action as defined in Executive Order 12866.

It has been determined that a final regulatory flexibility analysis under 5 U.S.C. 604 is required for this final rule. The analysis is set forth under the heading, "Final Regulatory Flexibility Analysis."

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these final regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business. The Chief Counsel for Advocacy did not submit comments on the notice of proposed rulemaking.

*Final Regulatory Flexibility Analysis*

When an agency either promulgates a final rule that follows a required notice of proposed rulemaking or promulgates a final interpretative rule involving the internal revenue laws as described in 5 U.S.C. 603(a), the Regulatory Flexibility Act (5 U.S.C. chapter 6) requires the agency to "prepare a final regulatory flexibility analysis." A final regulatory flexibility analysis must, pursuant to 5 U.S.C. 604(a), contain the five elements listed in this final regulatory flexibility analysis. For purposes of this final regulatory flexibility analysis, a small entity is defined as a small business, small nonprofit organization, or small governmental jurisdiction. 5 U.S.C. 601(3)–(6). The Treasury Department and the IRS conclude that the final regulations (together with other contemplated guidance provided for in these regulations) will impact a substantial number of small entities and the economic impact will be significant.

*A Statement of the Need for, and the Objectives of, The Final Rule*

The final regulations are necessary to recover the full cost to the IRS associated with administering the PTIN application and renewal program and providing the special benefits that are associated with obtaining a PTIN.

The Treasury Department and the IRS are implementing regulatory changes that increase the oversight of the tax return preparer industry. These regulatory changes are based upon findings and recommendations made by the IRS in the "Return Preparer Review." Based upon findings in the review, all individuals who prepare all or substantially all of a tax return or claim for refund will be required to use a PTIN as their identifying number. Except as provided in any transitional period, only attorneys, certified public accountants, enrolled agents, or registered tax return preparers may apply for a PTIN. Thus, only attorneys, certified public accountants, enrolled agents, and registered tax return preparers will be eligible to prepare all or substantially all of a tax return or claim for refund. By limiting the individuals who may prepare all or substantially all of a tax return or claim for refund to individuals who have a PTIN, the IRS is providing a special benefit to the individuals who obtain a PTIN.

The objective of the final regulations is to recover the costs to the government that are associated with providing this special benefit. The costs to the government include the development and maintenance of the IRS information technology system that interfaces with the vendor; the development and maintenance of internal applications; IRS customer service support activities, which include development and maintenance of an IRS Web site and call center staffing; and personnel, administrative, and management support needed to evaluate and address tax compliance issues, investigate and address conduct and suitability issues, and otherwise support and enforce the programs that require individuals to apply for or renew a PTIN.

*Summaries of the Significant Issues Raised in the Public Comments Responding to the Initial Regulatory Flexibility Analysis and of the Agency's Assessment of the Issues, and a Statement of Any Changes Made to the Rule as a Result of the Comments*

A summary of the comments is set forth elsewhere in this preamble, along with the Treasury Department's and the

IRS' assessment of the issues raised in the comments.

*A Description and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why an Estimate Is Not Available*

The final regulations affect all individuals who want to become a registered tax return preparer under the new oversight rules in Circular 230. Only individuals, not businesses, can practice before the IRS or become a registered tax return preparer. Thus, the economic impact of these regulations on any small entity generally will be a result of applicants and registered tax return preparers owning a small business or a small entity employing applicants or registered tax return preparers.

The final regulations further affect all individual tax return preparers who are required to apply for or renew a PTIN. Only individuals, not businesses, can apply for or renew a PTIN. Thus, the economic impact of these regulations on any small entity generally will be a result of an individual tax return preparer who owns a small business and who is required to apply for or renew a PTIN, or a small business otherwise employing an individual tax return preparer who is required to apply for or renew a PTIN, to prepare all or substantially all of a tax return or claim for refund.

The appropriate NAICS codes for the registered tax return preparer program and PTINs are those that relate to tax preparation services (NAICS code 541213), other accounting services (NAICS code 541219), offices of lawyers (NAICS code 541110), and offices of certified public accountants (NAICS code 541211). Entities identified as tax preparation services and offices of lawyers are considered small under the Small Business Administration size standards (13 CFR 121.201) if their annual revenue is less than $7 million. Entities identified as other accounting services and offices of certified public accountants are considered small under the Small Business Administration size standards if their annual revenue is less than $8.5 million. The IRS estimates that approximately 70 to 80 percent of the individuals subject to these proposed regulations are tax return preparers operating as or employed by small entities.

*A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Subject to the Requirements and the Type of Professional Skills Necessary for Preparation of a Report or Record*

No reporting or recordkeeping requirements are projected to be associated with the final regulation.

*A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting Any Alternative Adopted in the Final Rule and Why Other Significant Alternatives Affecting the Impact on Small Entities That the Agency Considered Were Rejected*

The Treasury Department and the IRS are not aware of any steps that could be taken to minimize the economic impact on small entities that would also be consistent with the objectives of these final regulations. These regulations do not impose any more requirements on small entities than are necessary to effectively administer the internal revenue laws. Further, the regulations do not subject small entities to any requirements that are not also applicable to larger entities covered by the regulations.

The Treasury Department and the IRS have determined that there are no viable alternatives to the final regulations.

The IOAA authorizes the charging of user fees for agency services, subject to policies designated by the President. The OMB Circular implements presidential policies regarding user fees and encourages user fees when a government agency provides a special benefit to a member of the public. As Congress has not appropriated funds to the registered tax return preparer program or the PTIN application and renewal program, there are no viable alternatives to the imposition of user fees.

**Drafting Information**

The principal author of these final regulations is Emily M. Lesniak, Office of the Associate Chief Counsel (Procedure and Administration).

**List of Subjects in 26 CFR Part 300**

Reporting and recordkeeping requirements, User fees.

**Adoption of Amendments to the Regulations**

■ Accordingly, 26 CFR part 300 is amended as follows:

**PART 300—USER FEES**

■ **Paragraph 1.** The authority citation for part 300 continues to read in part as follows:

**Authority:** 31 U.S.C. 9701.

■ **Par. 2.** Section 300.0 is amended by
■ 1. Adding paragraph (b)(9).
■ 2. Removing paragraph (c).
■ The addition reads as follows:

**§ 300.0   User fees; in general.**

\*      \*      \*      \*      \*

(b) \* \* \*

(9) Applying for a preparer tax identification number.

■ **Par. 3.** Section 300.1 is amended by adding paragraph (d) to read as follows:

**§ 300.1   Installment agreement fee.**

\*      \*      \*      \*      \*

(d) *Effective/applicability date.* This section is applicable beginning March 16, 1995, except that the user fee for entering into installment agreements on or after January 1, 2007, is applicable January 1, 2007.

■ **Par. 4.** Section 300.2 is amended by adding paragraph (d) to read as follows:

**§ 300.2   Restructuring or reinstatement of installment agreement fee.**

\*      \*      \*      \*      \*

(d) *Effective/applicability date.* This section is applicable beginning March 16, 1995, except that the user fee for restructuring or reinstatement of an installment agreement on or after January 1, 2007, is applicable January 1, 2007.

■ **Par. 5.** Section 300.3 is amended by adding paragraph (d) to read as follows:

**§ 300.3   Offer to compromise fee.**

\*      \*      \*      \*      \*

(d) *Effective/applicability date.* This section is applicable beginning November 1, 2003.

■ **Par. 6.** Section 300.4 is amended by adding paragraph (d) to read as follows:

**§ 300.4   Special enrollment examination fee.**

\*      \*      \*      \*      \*

(d) *Effective/applicability date.* This section is applicable beginning November 6, 2006.

■ **Par. 7.** Section 300.5 is amended by adding paragraph (d) to read as follows:

**§ 300.5   Enrollment of enrolled agent fee.**

\*      \*      \*      \*      \*

(d) *Effective/applicability date.* This section is applicable beginning November 6, 2006.

■ **Par. 8.** Section 300.6 is amended by adding paragraph (d) to read as follows:

**§ 300.6 Renewal of enrollment of enrolled agent fee.**

\* \* \* \* \*

(d) *Effective/applicability date.* This section is applicable beginning November 6, 2006.

■ **Par. 9.** Section 300.7 is amended by adding paragraph (d) to read as follows:

**§ 300.7 Enrollment of enrolled actuary fee.**

\* \* \* \* \*

(d) *Effective/applicability date.* This section is applicable beginning January 22, 2008.

■ **Par. 10.** Section 300.8 is amended by adding paragraph (d) to read as follows:

**§ 300.8 Renewal of enrollment of enrolled actuary fee.**

\* \* \* \* \*

(d) *Effective/applicability date.* This section is applicable beginning January 22, 2008.

■ **Par. 11.** Section 300.9 is added to read as follows:

**§ 300.9 Fee for obtaining a preparer tax identification number.**

(a) *Applicability.* This section applies to the application for and renewal of a preparer tax identification number pursuant to 26 CFR 1.6109–2(d).

(b) *Fee.* The fee to apply for or renew a preparer tax identification number is $50 per year, which is the cost to the government for processing the application for a preparer tax identification number and does not include any fees charged by the vendor.

(c) *Person liable for the fee.* The individual liable for the application or renewal fee is the individual applying for and renewing a preparer tax identification number from the IRS.

(d) *Effective/applicability date.* This section is applicable beginning September 30, 2010.

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement.*

Approved: August 24, 2010.

**Michael Mundaca,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2010–24652 Filed 9–28–10; 11:15 am]

**BILLING CODE 4830–01–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 180**

**[EPA–HQ–OPP–2009–0616; FRL–8844–1]**

**Spinosad; Pesticide Tolerances**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

---

**SUMMARY:** This regulation revises tolerances for residues of spinosad in or on hog, fat; hog, meat; hog, meat byproducts; poultry meat byproducts. Elanco Animal Health (A Division of Eli Lilly & Company) requested these tolerances under the Federal Food, Drug, and Cosmetic Act (FFDCA).

**DATES:** This regulation is effective September 30, 2010. Objections and requests for hearings must be received on or before November 29, 2010, and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

**ADDRESSES:** EPA has established a docket for this action under docket identification (ID) number EPA–HQ–OPP–2009–0616. All documents in the docket are listed in the docket index available at *http://www.regulations.gov.* Although listed in the index, some information is not publicly available, e.g., Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available in the electronic docket at *http://www.regulations.gov,* or, if only available in hard copy, at the OPP Regulatory Public Docket in Rm. S–4400, One Potomac Yard (South Bldg.), 2777 S. Crystal Dr., Arlington, VA. The Docket Facility is open from 8:30 a.m. to 4 p.m., Monday through Friday, excluding legal holidays. The Docket Facility telephone number is (703) 305–5805.

**FOR FURTHER INFORMATION CONTACT:** Samantha Hulkower, Registration Division (7505P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001; telephone number: (703) 603–0683; e-mail address: *hulkower.samantha@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

---

# I. General Information

*A. Does this Action Apply to Me?*

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, or pesticide manufacturer. Potentially affected entities may include, but are not limited to those engaged in the following activities:

• Crop production (NAICS code 111).

• Animal production (NAICS code 112).

• Food manufacturing (NAICS code 311).

• Pesticide manufacturing (NAICS code 32532).

This listing is not intended to be exhaustive, but rather to provide a guide for readers regarding entities likely to be affected by this action. Other types of entities not listed in this unit could also be affected. The North American Industrial Classification System (NAICS) codes have been provided to assist you and others in determining whether this action might apply to certain entities. If you have any questions regarding the applicability of this action to a particular entity, consult the person listed under **FOR FURTHER INFORMATION CONTACT.**

*B. How Can I Get Electronic Access to Other Related Information?*

You may access a frequently updated electronic version of EPA's tolerance regulations at 40 CFR part 180 through the Government Printing Office's e-CFR site at *http://www.gpoaccess.gov/ecfr.*

*C. How Can I File an Objection or Hearing Request?*

Under FFDCA section 408(g), 21 U.S.C. 346a, any person may file an objection to any aspect of this action and may also request a hearing on those objections. You must file your objection or request a hearing on this regulation in accordance with the instructions provided in 40 CFR part 178. To ensure proper receipt by EPA, you must identify docket ID number EPA–HQ–OPP–2009–0616 in the subject line on the first page of your submission. All objections and requests for a hearing must be in writing, and must be received by the Hearing Clerk on or before November 29, 2010. Addresses for mail and hand delivery of objections and hearing requests are provided in 40 CFR 178.25(b).

In addition to filing an objection or hearing request with the Hearing Clerk as described in 40 CFR part 178, please submit a copy of the filing that does not contain any CBI for inclusion in the public docket. Information not marked confidential pursuant to 40 CFR part 2



**2015–22–04 Fiberglas-Technik Rudolf Lindner GmbH & Co. KG:** Amendment 38–18309; Docket No. FAA–2015–3300; Directorate Identifier 2015–CE–024–AD.

**(a) Effective Date**

This airworthiness directive (AD) becomes effective December 4, 2015.

**(b) Affected ADs**

None.

**(c) Applicability**

This AD applies to Fiberglas-Technik Rudolf Lindner GmbH & Co. KG Models G103 TWIN ASTIR, G103 TWIN II, and G103A TWIN II ACRO gliders, all manufacturer serial numbers, certificated in any category.

**(d) Subject**

Air Transport Association of America (ATA) Code 27: Flight Controls.

**(e) Reason**

This AD was prompted by mandatory continuing airworthiness information (MCAI) originated by an aviation authority of another country to identify and correct an unsafe condition on an aviation product. The MCAI describes the unsafe condition as a broken bell-crank installed in the air brake control system. We are issuing this AD to detect and correct a broken bell-crank which could lead to failure of the air brake system, possibly resulting in reduced control.

**(f) Actions and Compliance**

Unless already done, do the following actions:

(1) Within 30 days after December 4, 2015 (the effective date of this AD) and repetitively thereafter at intervals not to exceed 12 months, inspect the locking forces of the air brake control unit, and, if any discrepancy is found, before further flight, correct the locking forces. Do the inspection and correction of any discrepancy following the instructions of Fiberglas-Technik Rudolf Lindner Service Bulletin (SB–G08), Edition April 24, 2015; and Fiberglas-Technik Rudolf Lindner Anweisung (English translation: Instructions), (A/I–G08), Ausgabe (English translation: Edition) April 24, 2015.

**Note 1 to paragraph (f)(1) of this AD:** This service information contains German to English translation. The European Aviation Safety Agency (EASA) used the English translation in referencing the document. For enforceability purposes, we will refer to the Fiberglas-Technik Rudolf Lindner service information as it appears on the document.

(2) Within 60 days after December 4, 2015 (the effective date of this AD), inspect the bell-crank installed in the air brake control system, and, if any cracks are found, before further flight, replace the bell-crank with a serviceable part. Do the inspection and replacement following the instructions of Fiberglas-Technik Rudolf Lindner Service Bulletin (SB–G08), Edition April 24, 2015; and Fiberglas-Technik Rudolf Lindner Anweisung (English translation: Instructions), (A/I–G08), Ausgabe (English translation: Edition) April 24, 2015.

**Note 2 to paragraph (f)(2) of this AD:** In the lower wing surface inspection, openings near the bell-crank may be installed to simplify the inspection and make a possible replacement of the bell-crank possible. This optional installation is described in GROB Luft Und Raumfahrt Service Bulletin 315–45/2, dated December 21, 1995; and Fiberglas-Technik Rudolf Lindner Service Bulletin (SB–G07), Edition April 24, 2015.

(3) Within 30 days after replacing a bell-crank as required by paragraph (f)(2) of this AD or within the next 30 days after December 4, 2015 (the effective date of this AD), whichever occurs later, report the inspection results of the removed bell-crank to Fiberglas-Technik Rudolf Lindner GmbH & Co. KG. You may find contact information for Fiberglas-Technik Rudolf Lindner GmbH & Co. KG in paragraph (h) of this AD.

**(g) Other FAA AD Provisions**

The following provisions also apply to this AD:

(1) *Alternative Methods of Compliance (AMOCs):* The Manager, Standards Office, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. Send information to ATTN: Jim Rutherford, Aerospace Engineer, FAA, Small Airplane Directorate, 901 Locust, Room 301, Kansas City, Missouri 64106; telephone: (816) 329–4165; fax: (816) 329–4090; email: *jim.rutherford@faa.gov.* Before using any approved AMOC on any glider to which the AMOC applies, notify your appropriate principal inspector (PI) in the FAA Flight Standards District Office (FSDO), or lacking a PI, your local FSDO.

(2) *Airworthy Product:* For any requirement in this AD to obtain corrective actions from a manufacturer or other source, use these actions if they are FAA-approved. Corrective actions are considered FAA-approved if they are approved by the State of Design Authority (or their delegated agent). You are required to assure the product is airworthy before it is returned to service.

(3) *Reporting Requirements:* For any reporting requirement in this AD, a federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2120–0056. Public reporting for this collection of information is estimated to be approximately 5 minutes per response, including the time for reviewing instructions, completing and reviewing the collection of information. All responses to this collection of information are mandatory. Comments concerning the accuracy of this burden and suggestions for reducing the burden should be directed to the FAA at: 800 Independence Ave. SW., Washington, DC 20591, Attn: Information Collection Clearance Officer, AES–200.

**(h) Related Information**

Refer to MCAI European Aviation Safety Agency (EASA) AD No.: 2015–0116, dated June 24, 2015; GROB Luft Und Raumfahrt Service Bulletin 315–45/2, dated December 21, 1995; and Fiberglas-Technik Rudolf Lindner Service Bulletin (SB–G07), Edition April 24, 2015, for related information. You may examine the MCAI on the Internet at *http://www.regulations.gov/ #!documentDetail;D=FAA-2015-3300-0003.*

**(i) Material Incorporated by Reference**

(1) The Director of the Federal Register approved the incorporation by reference (IBR) of the service information listed in this paragraph under 5 U.S.C. 552(a) and 1 CFR part 51.

(2) You must use this service information as applicable to do the actions required by this AD, unless the AD specifies otherwise.

(i) Fiberglas-Technik Rudolf Lindner Service Bulletin (SB–G08), Edition April 24, 2015; and

(ii) Fiberglas-Technik Rudolf Lindner Anweisung (English translation: Instructions), (A/I–G08), Ausgabe (English translation: Edition) April 24, 2015.

(3) For Fiberglas-Technik Rudolf Lindner GmbH & Co. KG service information identified in this AD, contact Fiberglas-Technik Rudolf Lindner GmbH & Co. KG, Steige 3, D–88487 Walpertshofen, Germany; phone: ++49 (0) 7353/22 43; fax: ++49 (0) 7353/30 96; email: *info@LTB-Lindner.com;* Internet: *http://www.ltb-lindner.com.*

(4) You may view this service information at the FAA, Small Airplane Directorate, 901 Locust, Kansas City, Missouri 64106. For information on the availability of this material at the FAA, call (816) 329–4148. In addition, you can access this service information on the Internet at *http:// www.regulations.gov* by searching for and locating Docket No. FAA–2015–3300.

(5) You may view this service information that is incorporated by reference at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http:// www.archives.gov/federal-register/cfr/ibr-locations.html.*

Issued in Kansas City, Missouri on October 22, 2015.

**Melvin Johnson,**

*Acting Manager, Small Airplane Directorate, Aircraft Certification Service.*

[FR Doc. 2015–27440 Filed 10–29–15; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 300**

**[T.D. 9742]**

**RIN 1545–BN03**

**Preparer Tax Identification Number (PTIN) User Fee Update**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Temporary regulations.

**SUMMARY:** This document contains temporary regulations relating to the imposition of certain user fees on tax return preparers. The temporary regulations reduce the user fee to apply for or renew a preparer tax identification number (PTIN) and affect individuals who apply for or renew a PTIN. The Independent Offices Appropriations Act of 1952 authorizes the charging of user fees. The text of the temporary regulations also serves as the text of the proposed regulations (REG–121496–15) set forth in the notice of proposed rulemaking on this subject in the Proposed Rules section of this issue of the **Federal Register**.

**DATES:** *Effective Date:* These regulations are effective on October 30, 2015.

*Applicability Date:* For date of applicability, see paragraph (d) of these temporary regulations.

**FOR FURTHER INFORMATION CONTACT:** Concerning the temporary regulations, Hollie M. Marx at (202) 317–6844; concerning cost methodology, Eva J. Williams at (202) 803–9728.

**SUPPLEMENTARY INFORMATION:**

**Background**

The Independent Offices Appropriations Act of 1952 (IOAA), which is codified at 31 U.S.C. 9701, authorizes agencies to prescribe regulations that establish user fees for services provided by the agency. The charges must be fair and must be based on the costs to the government, the value of the service to the recipient, the public policy or interest served, and other relevant facts. The IOAA provides that regulations implementing user fees are subject to policies prescribed by the President; these policies are set forth in the Office of Management and Budget Circular A–25, 58 FR 38142 (July 15, 1993) (OMB Circular A–25).

Under OMB Circular A–25, federal agencies that provide services that confer benefits on identifiable recipients are to establish user fees that recover the full cost of providing the special benefit. An agency that seeks to impose a user fee for government-provided services must calculate the full cost of providing those services. In general, a user fee should be set at an amount that allows the agency to recover the direct and indirect costs of providing the service, unless the Office of Management and Budget grants an exception. OMB Circular A–25 provides that agencies are to review user fees biennially and update them as necessary.

*PTIN Requirement*

Section 6109(a)(4) of the Internal Revenue Code authorizes the Secretary to prescribe regulations for the inclusion of a tax return preparer's identifying number on a return, statement, or other document required to be filed with the IRS. On September 30, 2010, the Treasury Department and IRS published final regulations under section 6109 (REG–134235–08) in the **Federal Register** (TD 9501) (75 FR 60315) (PTIN regulations) to provide that, for returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's PTIN or such other number prescribed by the IRS in forms, instructions, or other appropriate guidance. The PTIN regulations require a tax return preparer who prepares or who assists in preparing all or substantially all of a tax return or claim for refund after December 31, 2010 to have a PTIN. The PTIN regulations also state that the IRS will set forth in forms, instructions or other appropriate guidance PTIN application and renewal procedures, including the payment of a user fee. The PTIN regulations further state that the IRS may conduct a Federal tax compliance check on an individual who applies for or renews a PTIN.

In accordance with section 1.6109–2(d) of the PTIN regulations, the IRS has set forth application and renewal procedures in Form W–12, *IRS Paid Preparer Tax Identification Number (PTIN) Application and Renewal,* and the Form W–12 Instructions. Individuals may also apply for or renew a PTIN and pay the user fee online at *irs.gov/ptin.* The annual PTIN application and renewal period generally begins in the fall (on October 15 in previous years) of the year preceding the filing season to which the PTIN relates. A third-party vendor processes applications to obtain or renew a PTIN and charges a reasonable fee that is separate from the user fee charged by the government.

Requiring the use of PTINs improves tax administration and tax compliance and benefits tax return preparers by allowing them to provide an identifying number on the return that is not an SSN. Requiring the use of PTINs enables the IRS to better collect and track data on tax return preparers, including the number of persons who prepare returns, the qualifications of those who prepare returns, and the number of returns each person prepares. PTIN use allows the IRS to more easily identify and communicate with tax return preparers who make errors on returns, which benefits tax return preparers by improving compliance and therefore reducing the number of client returns that are examined. The PTIN also enables the IRS to more easily locate and review returns prepared by a tax return preparer when instances of misconduct or potential misconduct are detected, which aids tax administration and compliance. These aids to tax administration and compliance in turn benefit taxpayers and tax return preparers by working to reduce preparer error and misconduct.

Section 1.6109–2(d) states that only individuals authorized to practice before the IRS under 31 U.S.C. 330 are eligible to obtain a PTIN. Under section 1.6109–2(h), the IRS may prescribe in forms, instructions, or other appropriate guidance exceptions to the requirements of the PTIN regulations, including the requirement that an individual must be authorized to practice before the IRS to be eligible to receive a PTIN. On December 30, 2010, the IRS released Notice 2011–6 (2011–3 IRB 315 (Jan. 17, 2011)), which stated that, until December 31, 2013, a provisional PTIN could be renewed upon proper application and payment of the applicable user fee, even if the individual holding the provisional PTIN was not authorized to practice before the IRS.

On June 3, 2011, the Treasury Department and the IRS published in the **Federal Register** (76 FR 32286) amendments to Treasury Department Circular No. 230 (31 CFR part 10), to regulate all tax return preparers under 31 U.S.C. 330. In *Loving* v. *IRS,* 917 F.Supp.2d 67 (D.D.C. 2013), the district court concluded that the IRS and Treasury Department lacked statutory authority to regulate tax return preparation as practice before the IRS under 31 U.S.C. 330 and enjoined the IRS and Treasury from enforcing the regulation of registered tax return preparers. The district court subsequently modified its order to clarify that the IRS's authority to require that tax return preparers obtain a PTIN is unaffected by the injunction. *Loving* v. *IRS,* 920 F.Supp.2d 108, 109 (D.D.C. 2013) (stating "Congress has specifically authorized the PTIN scheme by statute . . . [and that] scheme, therefore, does not fall within the scope of the injunction and may proceed as promulgated."). The United States Court of Appeals for the District of Columbia Circuit affirmed the district court's decision and order for injunction. *Loving* v. *IRS,* 742 F.3d 1013 (D.C. Cir. 2014).

*PTIN User Fee*

Final regulations (REG–139343–08) published in the **Federal Register** (TD 9503) (75 FR 60316) (PTIN user fee regulations) on September 30, 2010, established a $50 user fee to apply for

or renew a PTIN. The $50 user fee was based on an annual PTIN renewal period and an estimate that 1.2 million individuals would be applying for or renewing a PTIN each year.

The IRS and Treasury Department determined that a $50 user fee to apply for or renew a PTIN would recover the full direct and indirect costs that the government incurs to administer the PTIN application and renewal process. The initial determination of a $50 annual fee took into account certain costs that the IRS ascertained it would incur to provide the special benefit associated with the provision of PTINs. As explained in the PTIN user fee regulations, the initial projected costs included the development and maintenance of the IRS information technology system that would interface with a third-party vendor, the development and maintenance of internal applications that would have the capacity to process and administer the anticipated increase in PTIN applications, customer service support activities, which included Web site development and maintenance and call center staffing to respond to questions regarding PTIN usage and renewal. The $50 user fee was also determined to recover costs for personnel, administrative, and management support needed to evaluate and address tax compliance issues of individuals applying for and renewing a PTIN, to investigate and address conduct and suitability issues, and otherwise support and enforce the programs that required an individual to apply for and renew a PTIN.

The vendor's fee, currently set at $14.25 for new applications and $13 for renewal applications, is paid directly to the vendor and covers the costs incurred by the vendor to process applications and renewals. The agency user fee and the vendor fee pay for different aspects of the PTIN program, each of which is essential to the program.

**Explanation of Provisions**

Pursuant to the guidelines in OMB Circular A–25, the IRS has re-calculated its cost of providing services under the PTIN application and renewal process. The IRS has determined that the full cost of administering the PTIN program going forward has been reduced from $50 to $33 per application or renewal. Individuals who prepare or assist in preparing all or substantially all of a tax return or claim for refund for compensation are required to have a PTIN. The ability to prepare tax returns and claims for refund for compensation is a special benefit, for which the IRS

may charge a user fee to recover the full costs of providing the special benefit.

The amount of the user fee is $33 for both initial PTIN applications and renewals because the activities the IRS is required to perform to issue a new PTIN or renew an existing PTIN are the same. Pursuant to the authority granted in section 6109(c), the IRS has determined that it requires certain information to assign (or, in the case of a renewal, re-assign) a PTIN to an individual. The required information is set forth in the Form W–12 and Form W–12 Instructions.

The PTIN user fee is based on direct costs of the PTIN program, which include staffing and contract-related costs for activities, processes, and procedures related to the electronic and paper registration and renewal submissions; tax compliance and background checks; professional designation checks; foreign preparer processing; compliance and IRS complaint activities; information technology and contract-related expenses; and communications. The PTIN user fee also takes into account various indirect program costs, including management and support costs.

The reduction in the fee amount is attributable to several factors, which include the reduced number of PTIN holders (approximately 700,000) from the number originally projected (1.2 million) in 2010, which reduced associated costs; the absorption of certain development costs in the early years of the program; and the fact that certain activities that would have been required to regulate registered tax return preparers will not be performed. In particular, the determination of the user fee no longer includes expenses for personnel who perform functions primarily related to continuing education and testing for registered tax return preparers. Additionally, expenses related to personnel who perform continuing education and testing for enrolled agents and enrolled retirement plan agents were also removed from the user fee.

Individuals who apply for or renew a PTIN will continue to pay a fee directly to a third-party vendor, which is separate from the user fee described in this Treasury decision. The vendor fee is increasing from $14.25 for original applications and $13 for renewal applications to $17 for original applications and $17 for renewal applications.

**Special Analyses**

It has been determined that this Treasury decision is not a significant

regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563.

Historically, the annual PTIN application and renewal period has begun on October 15. For 2015, the date has been postponed to November 1. There is insufficient time before November 1 to provide an opportunity for notice and public comment and issue a final regulation prior to that date. To enable the reduced fee amount to be in effect for PTINs issued or renewed by tax return preparers preparing returns in 2016, the IRS and Treasury find that there is good cause to dispense with (1) notice and public comment pursuant to 5 U.S.C. 553(b) and (c) and (2) a delayed effective date pursuant to 5 U.S.C. 553(d). It would be impracticable, unnecessary, and contrary to the public interest to continue to charge the current fee when the IRS has determined pursuant to the biennial review conducted under OMB Circular A–25 that the fee should be reduced going forward. The IRS and Treasury Department will consider public comments submitted in response to the cross-referenced notice of proposed rulemaking published elsewhere in this issue of the **Federal Register** and will promulgate a final rule after considering those comments.

For applicability of the Regulatory Flexibility Act, please refer to the cross-referenced notice of proposed rulemaking published elsewhere in this issue of the **Federal Register**. Pursuant to section 7805(f), this Treasury decision has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Drafting Information**

The principal author of these regulations is Hollie M. Marx, Office of the Associate Chief Counsel (Procedure and Administration).

**List of Subjects in 26 CFR Part 300**

Reporting and recordkeeping requirements, User fees.

**Adoption of Amendments to the Regulations**

Accordingly, 26 CFR part 300 is amended as follows:

■ **Paragraph 1.** The authority citation for part 300 continues to read as follows:

**Authority:** 31 U.S.C. 9701.

■ **Par. 2.** Section 300.13 is amended by removing and reserving paragraph (b) to read as follows:

**§ 300.13   Fee for obtaining a preparer tax identification number.**

\*    \*    \*    \*    \*

(b) *Fee.* [Reserved]

\*    \*    \*    \*    \*

■ **Par. 3.** Section 300.13T is added to read as follows:

**§ 300.13T   Fee for obtaining a preparer tax identification number.**

(a) [Reserved]

(b) *Fee.* The fee to apply for or renew a preparer tax identification number is $33 per year, which is the cost to the government for processing the application for a preparer tax identification number and does not include any fees charged by the vendor.

(c) [Reserved]

(d) *Effective/applicability date.* This section will be applicable for all PTIN applications filed on or after November 1, 2015.

**Karen M. Schiller,**

*Acting Deputy Commissioner for Services and Enforcement.*

Approved: October 16, 2015.

**Mark J. Mazur,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2015–27789 Filed 10–29–15; 8:45 am]

**BILLING CODE 4830–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 180**

**[EPA–HQ–OPP–2014–0607; FRL–9934–88]**

**Metaflumizone; Pesticide Tolerance**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes a tolerance for the combined residues of the insecticide metaflumizone in or on the raw agricultural commodities citrus (crop group 10–10) at 0.04 parts per million (ppm); pome fruit (crop group 11–10) at 0.04 ppm; stone fruit (crop group 12–12) at 0.04 ppm; and tree nut (crop group 14–12) at 0.04 ppm. BASF Corporation requested these tolerances under the Federal Food, Drug, and Cosmetic Act (FFDCA).

**DATES:** This regulation is effective October 30, 2015. Objections and requests for hearings must be received on or before December 29, 2015, and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**.

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPP–2014–0607, is available at *http://www.regulations.gov* or at the Office of Pesticide Programs Regulatory Public Docket (OPP Docket) in the Environmental Protection Agency Docket Center (EPA/DC), West William Jefferson Clinton Bldg., Rm. 3334, 1301 Constitution Ave. NW., Washington, DC 20460–0001. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OPP Docket is (703) 305–5805. Please review the visitor instructions and additional information about the docket available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Susan Lewis, Registration Division (7505P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001; main telephone number: (703) 305–7090; email address: *RDFRNotices@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Does this action apply to me?*

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, or pesticide manufacturer. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

• Crop production (NAICS code 111), *e.g.,* agricultural workers; greenhouse, nursery, and floriculture workers; farmers.

• Animal production (NAICS code 112), *e.g.,* cattle ranchers and farmers, dairy cattle farmers, livestock farmers.

• Food manufacturing (NAICS code 311), *e.g.,* agricultural workers; farmers; greenhouse, nursery, and floriculture workers; ranchers; pesticide applicators.

• Pesticide manufacturing (NAICS code 32532), *e.g.,* agricultural workers; commercial applicators; farmers; greenhouse, nursery, and floriculture workers; residential users.

*B. How can I get electronic access to other related information?*

You may access a frequently updated electronic version of 40 CFR part 180 through the Government Printing Office's e-CFR cite at *http://www.ecfr.gov/cgi-bin/text-idx?&c=ecfr&tpl=/ecfrbrowse/Title40/40tab_02.tpl.*

*C. How can I file an objection or hearing request?*

Under FFDCA section 408(g), 21 U.S.C. 346a, any person may file an objection to any aspect of this regulation and may also request a hearing on those objections. You must file your objection or request a hearing on this regulation in accordance with the instructions provided in 40 CFR part 178. To ensure proper receipt by EPA, you must identify docket ID number EPA–HQ–OPP–2014–0607 in the subject line on the first page of your submission. All requests must be in writing, and must be received by the Hearing Clerk on or before December 29, 2015. Addresses for mail and hand delivery of objections and hearing requests are provided in 40 CFR 178.25(b).

In addition to filing an objection or hearing request with the Hearing Clerk as described in 40 CFR part 178, please submit a copy of the filing (excluding any Confidential Business Information (CBI)) for inclusion in the public docket. Information not marked confidential pursuant to 40 CFR part 2 may be disclosed publicly by EPA without prior notice. Submit the non-CBI copy of your objection or hearing request, identified by docket ID number EPA–HQ–OPP–2014–0607, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be CBI or other information whose disclosure is restricted by statute.

• *Mail:* OPP Docket, Environmental Protection Agency Docket Center (EPA/DC), (28221T), 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001.

• *Hand Delivery:* To make special arrangements for hand delivery or delivery of boxed information, please follow the instructions at *http://www.epa.gov/dockets/contacts.html.* Additional instructions on commenting or visiting the docket, along with more information about dockets generally, is available at *http://www.epa.gov/dockets.*

**II. Background and Statutory Findings**

In the **Federal Register** of December 17, 2014 (79 FR 75107) (FRL–9918–90), EPA issued a document pursuant to FFDCA section 408(d)(3), 21 U.S.C. 346a(d)(3), announcing the filing of a pesticide petition (PP #4F8286) by BASF Corporation, P.O. Box 13528, Research Triangle Park, NC 27709. The petition requested that 40 CFR 180.657 be amended by establishing a tolerance for the combined residues of the



## § 383.1 Purpose and periodic adjustment.

(a) *Purpose.* This part adjusts the civil penalty liability amounts prescribed in 49 U.S.C. 46301(a) for inflation in accordance with the Act cited in paragraph (b) of this section.

(b) *Periodic Adjustment.* DOT will periodically adjust the maximum civil penalties set forth in 49 U.S.C. 46301 and this part as required by the Federal Civil Penalties Inflation Adjustment Act of 1990 as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

■ 3. Section 383.2 is revised to read as follows:

## § 383.2 Amount of penalty.

Civil penalties payable to the U.S. Government for violations of Title 49, Chapters 401 through 421, pursuant to 49 U.S.C. 46301(a), are as follows:

(a) A general civil penalty of not more than $32,140 (or $1,414 for individuals or small businesses) applies to violations of statutory provisions and rules or orders issued under those provisions, other than those listed in paragraph (b) of this section, (*see* 49 U.S.C. 46301(a)(1));

(b) With respect to small businesses and individuals, notwithstanding the general $1,414 civil penalty, the following civil penalty limits apply:

(1) A maximum civil penalty of $12,856 applies for violations of most provisions of Chapter 401, including the anti-discrimination provisions of sections 40127 (general provision), and 41705 (discrimination against the disabled) and rules and orders issued pursuant to those provisions (*see* 49 U.S.C. 46301(a)(5)(A));

(2) A maximum civil penalty of $6,428 applies for violations of section 41719 and rules and orders issued pursuant to that provision (*see* 49 U.S.C. 46301(a)(5)(C)); and

(3) A maximum civil penalty of $3,214 applies for violations of section 41712 or consumer protection rules or orders (*see* 49 U.S.C. 46301(a)(5)(D)).

Issued in Washington, DC, under authority delegated at 49 CFR 1.27(n), on: August 5, 2016.

**Molly J. Moran,**

*Acting General Counsel.*

[FR Doc. 2016–19003 Filed 8–9–16; 8:45 am]

**BILLING CODE 4910–9X–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 300**

**[TD 9781]**

**RIN 1545–BN02**

## Preparer Tax Identification Number (PTIN) User Fee Update

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final regulations and removal of temporary regulations.

**SUMMARY:** This document contains final regulations relating to the imposition of certain user fees on tax return preparers. The final regulations supersede and adopt the text of temporary regulations that reduced the user fee to apply for or renew a preparer tax identification number (PTIN) from $50 to $33. The final regulations affect individuals who apply for or renew a PTIN. The Independent Offices Appropriations Act of 1952 authorizes the charging of user fees.

**DATES:** *Effective Date:* These regulations are effective on September 9, 2016.

*Applicability Date:* For date of applicability, see § 300.13(d).

**FOR FURTHER INFORMATION CONTACT:** Concerning the final regulations, Hollie M. Marx at (202) 317–6844; concerning cost methodology, Eva J. Williams at (202) 803–9728 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

## Background and Summary of Comments

This document contains final regulations relating to the imposition of a user fee to apply for or renew a PTIN. The Independent Offices Appropriations Act of 1952 (IOAA), which is codified at 31 U.S.C. 9701, authorizes agencies to prescribe regulations that establish user fees for services provided by the agency. The charges must be fair and must be based on the costs to the government, the value of the service to the recipient, the public policy or interest served, and other relevant facts. The IOAA provides that regulations implementing user fees are subject to policies prescribed by the President; these policies are set forth in the Office of Management and Budget Circular A–25, 58 FR 38142 (July 15, 1993) (OMB Circular A–25).

Under OMB Circular A–25, federal agencies that provide services that confer special benefits on identifiable recipients beyond those accruing to the general public are to establish user fees that recover the full cost of providing the special benefit. An agency that seeks to impose a user fee for government-provided services must calculate the full cost of providing those services, review user fees biennially, and update them as necessary.

Section 6109(a)(4) of the Internal Revenue Code (Code) authorizes the Secretary to prescribe regulations for the inclusion of a tax return preparer's identifying number on a return, statement, or other document required to be filed with the IRS. On September 30, 2010, the Treasury Department and the IRS published final regulations under section 6109 (REG–134235–08) in the **Federal Register** (TD 9501) (75 FR 60315) (PTIN regulations) to provide that, for returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's PTIN or such other number prescribed by the IRS in forms, instructions, or other appropriate guidance. The PTIN regulations require a tax return preparer who prepares or who assists in preparing all or substantially all of a tax return or claim for refund after December 31, 2010 to have a PTIN. Final regulations (REG–139343–08) published in the **Federal Register** (TD 9503) (75 FR 60316) on September 30, 2010, established a $50 user fee to apply for or renew a PTIN. The ability to prepare tax returns and claims for refund for compensation is a special benefit, for which the IRS may charge a user fee to recover the full costs of providing the special benefit.

Pursuant to the guidelines in OMB Circular A–25, the IRS recalculated its cost of providing services under the PTIN application and renewal process and determined that the full cost of administering the PTIN program going forward is reduced from $50 to $33 per application or renewal. On October 30, 2015, the Treasury Department and the IRS published in the **Federal Register** (80 FR 66851–01) a notice of proposed rulemaking by cross-reference to temporary regulations (REG–121496–15) proposing amendments to regulations under 26 CFR part 300. On the same date, the Treasury Department and the IRS published in the **Federal Register** (80 FR 66792–01) temporary regulations (TD 9742) that reduced the amount of the user fee to obtain or renew a PTIN from $50 to $33 per original or renewal application. Five electronic public comments were submitted under the regulation number for the proposed regulations, but their contents related to issues other than a user fee for applying for or renewing a PTIN and are not relevant to these regulations. The comments are available for public

inspection at *http://www.regulations.gov* or upon request. The IRS received no requests for a public hearing, and none was held. The final regulations adopt the proposed regulations without change. The temporary regulations are hereby made obsolete and removed.

## Effect on Other Documents

Temporary regulations § 300.13T are obsolete as of September 9, 2016.

## Special Analyses

Certain IRS regulations, including this one, are exempt from the requirements of Executive Order 12866, as supplemented and reaffirmed by Executive Order 13563. Therefore, a regulatory impact assessment is not required.

The Administrative Procedure Act provides that substantive rules generally will not be effective until thirty days after the final regulations are published in the **Federal Register** (5 U.S.C. 553(d)). The Treasury Department and the IRS have determined that section 5 U.S.C. 553(d) of the Administrative Procedure Act applies to these final regulations.

The notice of proposed rulemaking (REG–121496–15) included an initial regulatory flexibility analysis. The Treasury Department and the IRS concluded in the initial regulatory flexibility analysis that the proposed regulations, if promulgated, may have a significant economic impact on a substantial number of small entities. None of the public comments submitted under the regulation number for the proposed regulation addressed the initial regulatory flexibility analysis. After further consideration, the Treasury Department and the IRS conclude that no final regulatory flexibility analysis is required. The Treasury Department and the IRS certify that the final regulations will not have a substantial economic impact on a substantial number of small entities. Although the final regulations will likely affect a substantial number of small entities, the economic impact on those entities is not significant. The final regulations establish a $33 fee to apply for or renew a PTIN per original or renewal application, which is a reduction from the previously established fee of $50 per original or renewal application, and the $33 fee will not have a significant economic impact on a small entity.

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking that preceded these final regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business. No comments were received on the proposed regulations.

## Drafting Information

The principal author of these final regulations is Hollie M. Marx, Office of the Associate Chief Counsel (Procedure and Administration). However, other personnel from the Treasury Department and the IRS participated in their development.

## List of Subjects in 26 CFR Part 300

Reporting and recordkeeping requirements, User fees.

## Adoption of Amendments to the Regulations

Accordingly, 26 CFR part 300 is amended as follows:

## PART 300—USER FEES

■ **Paragraph 1.** The authority citation for part 300 continues to read as follows:

**Authority:** 31 U.S.C. 9701.

■ **Par. 2.** Section 300.13 is amended by adding paragraph (b) and revising paragraph (d) to read as follows:

### § 300.13 Fee for obtaining a preparer tax identification number.

\* \* \* \* \*

(b) *Fee.* The fee to apply for or renew a preparer tax identification number is $33 per year, which is the cost to the government for processing the application for a preparer tax identification number and does not include any fees charged by the vendor.

\* \* \* \* \*

(d) *Applicability date.* This section will be applicable for applications for and renewal of a preparer tax identification number filed on or after September 9, 2016.

### § 300.13T [Removed]

■ **Par. 3.** Section 300.13T is removed.

**John Dalrymple,**

*Deputy Commissioner for Services and Enforcement.*

Approved: July 14, 2016.

**Mark J. Mazur,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2016–18925 Filed 8–9–16; 8:45 am]

**BILLING CODE 4830–01–P**

## DEPARTMENT OF DEFENSE

### Department of the Army

### 32 CFR Part 505

[USA–2016–HQ–0030]

### Army Privacy Program

**AGENCY:** Department of the Army, DoD.

**ACTION:** Direct final rule.

**SUMMARY:** The Department of the Army is amending the Army Privacy Program Regulation. Specifically, Army is adding exemption rules for Army system of records ''A0600–20 SAMR, Soldiers Equal Opportunity Investigative Files''. This rule provides policies and procedures for the Army's implementation of the Privacy Act of 1974, as amended. This direct final rule makes changes to the Department of the Army's Privacy Program rule. These changes will allow the Department to exempt records from certain portions of the Privacy Act. This will improve the efficiency and effectiveness of the Department of Defense's (DoD's) program by preserving the exempt status of the records when the purposes underlying the exemption are valid and necessary to protect the contents of the records.

**DATES:** The rule will be effective October 19, 2016 unless comments are received that would result in a contrary determination. Comments will be accepted on or before October 11, 2016.

**ADDRESSES:** You may submit comments, identified by docket number and/or RIN number and title, by any of the following methods:

• *Federal Rulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Department of Defense, Office of the Deputy Chief Management Officer, Directorate for Oversight and Compliance, 4800 Mark Center Drive, Mailbox #24, Alexandria, VA 22350–1700.

*Instructions:* All submissions received must include the agency name and docket number or Regulatory Information Number (RIN) for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the Internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** Ms. Tracy C. Rogers, Chief, FOIA/PA, telephone: 703–428–7499.